# EXHIBIT

# 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------- x

DEUTSCHE BANK SECURITIES INC.; DB ALEX.
BROWN LLC; JANET SIBLE; MARK WESTHOFF;
MICHAEL JACOBY; J. RALPH PARKER; NANCY
FAHMY; MICHAEL RAPHAEL; and MARY ANN
COLEMAN,

                                Plaintiffs,

            - against -

THOMAS M. ROSKOS, JR.; DR. THOMAS ROSKOS,
SR.; BRION APPLEGATE; EDDY ASLANIAN; TOM
JERMOLUK; VAL VADEN; and LILLI J. REY,

                            Defendants.

-------------------------------------------------------------------- x

**15 Civ. 00534 (LTS)**

**PRELIMINARY PRE-TRIAL**
**STATEMENT**

**Conference Date:**
July 10, 2015, 10:15 am

Pursuant to the Court's Initial Conference Order dated February 3, 2015, Plaintiffs

Deutsche Bank Securities Inc. ("DBSI"); DB Alex. Brown LLC ("DB Alex. Brown"); Janet

Sible ("Sible"); Mark Westhoff ("Westhoff"); Michael Jacoby ("Jacoby"); J. Ralph Parker

("Parker"); Nancy Fahmy ("Fahmy"); Michael Raphael ("Raphael"); and Mary Ann

Coleman ("Coleman") (collectively, "Plaintiffs") and Defendants Thomas M. Roskos, Jr.

("Roskos, Jr."); Dr. Thomas Roskos, Sr. ("Roskos, Sr."); Brion Applegate ("Applegate");

Eddy Aslanian ("Aslanian"); Tom Jermoluk ("Jermoluk"); Val Vaden ("Vaden") and Lilli J.

Rey ("Rey") (collectively, "Defendants") respectfully submit this Preliminary Pre-Trial

Statement.

      The counsel identified below have conferred as required by Fed. R. Civ. P. 26(f) and

subsequently prepared the following written report. The parties reserve the right to amend or

supplement this Preliminary Pre-Trial Statement, including both the positions taken and the statements made herein.

The pre-trial conference in this matter is scheduled for July 10, 2015 at 10:30 a.m.

The following paragraphs relate to Paragraph 4 of the Court's Initial Conference Order:

### (a)     Statement as to the Nature of this Action

Plaintiffs bring a claim for a declaration that the FINRA arbitration captioned *Thomas M. Roskos, Jr., et al. v. Deutsche Bank Securities Inc., et al.*, FINRA Claim No. 14-03280 (the "FINRA Arbitration") is not arbitrable, and seek an order enjoining Defendants from proceeding with the FINRA Arbitration.

Defendants bring a counterclaim for a declaration that the FINRA Arbitration is arbitrable.

### (b)     Pending Related Criminal or Civil Actions

None.

### (c)     Basis of this Court's Jurisdiction

The Parties agree that the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the Amended Statement of Claim in the FINRA Arbitration includes a claim for violation of federal statutes. *See* Amended Statement of Claim (Am. Compl. Ex. A), at ¶ 70.

Plaintiffs contend that the Court also has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs. *See* Am. Compl. ¶¶ 6-21 (setting forth citizenship of parties); Amended Statement of Claim

2

(Am. Compl. Ex. A), at 29 (seeking in excess of $15 million in damages). Defendants deny

that the matter in controversy in this declaratory judgment action exceeds $75,000. (Dkt. 15,

¶ 22.)

    **(d)**   **Material Uncontested Facts**

       (1)    Between 2000 and 2002, Defendants participated in six separate Custom

              Adjustable Rate Debt Structure ("CARDS") transactions.[1]

      (2)    As part of the CARDS transactions, Defendants entered into Assumption

              Agreements with Deutsche Bank AG, New York Branch, as well as

              various other agreements executed in connection with these transactions,

              including a Credit Agreement, Master Pledge and Security Agreement, and

              Deposit Account Pledge.

      (3)    Plaintiff DB Alex. Brown was a broker-dealer firm registered with FINRA

              until 2001 (CRD #17790), when it merged into DBSI.

      (4)    Plaintiff DBSI was a broker-dealer firm registered with FINRA beginning

              in 2001 (CRD #2525).

      (5)    Plaintiffs Sible, Westhoff, Jacoby, Fahmy, Raphael, Parker and Coleman

              were FINRA-registered brokers during portions of the period from 2000 to

              2002.

      (6)    Plaintiffs' actions in connection with the CARDS transactions at issue

              formed the basis of Defendants' claims, brought pursuant to FINRA Rule

---

[1] Except Lilli J. Rey, who filed joint federal income tax returns with Val Vaden for the tax years 2000 and 2001 and who shares an interest in any recovery resulting from the claims against Plaintiffs.

12200, in FINRA Claim No. 14-03280 on October 27, 2014 (the "FINRA Arbitration") against, *inter alia*, DBSI, Sible, Westhoff and Jacoby.

(7)     DBSI, Sible, Westhoff and Jacoby brought the instant action on January 23, 2015, seeking to enjoin the FINRA Arbitration, asserting that Defendants were not "customers" of Plaintiffs (under FINRA Rule 12200) and thus that Plaintiffs need not arbitrate the claims brought against them in the FINRA Arbitration.

(8)     Also on January 23, 2015, Defendants entered into a stipulation with Plaintiffs whereby the parties agreed "to a stay of the FINRA Arbitration and to adjourn all deadlines in the FINRA Arbitration without prejudice until the entry of a final decision by [this Court] as to whether [Plaintiffs] are required to arbitrate [Defendants'] claims in FINRA."

(9)     On April 22, 2015, the stay of the FINRA arbitration was lifted by agreement of the parties for the limited purpose of allowing Defendants to amend their FINRA Statement of Claims to add as respondents Parker, Fahmy, Raphael, Coleman and DB Alex. Brown. The Amended Statement of Claims was filed with FINRA the same day.

(10)    On May 12, 2015, Plaintiffs amended their Complaint in the instant action, adding as Plaintiffs Parker, Fahmy, Raphael, Coleman and DB Alex. Brown.

(11)    On May 29, 2015, Defendants answered the amended complaint in the instant action and brought a counterclaim seeking a declaration that Plaintiffs must arbitrate the claims brought against them in the FINRA

Arbitration, asserting that Defendants purchased services from Plaintiffs in

connection with the CARDS transactions, and they were therefore

"customers" of Plaintiffs for purposes of FINRA Rule 12200.

(12) On June 19, 2015, Plaintiffs answered Defendants' counterclaim.

**(e)** **Uncontested Legal Issues**

(1) FINRA Arbitrability is governed by FINRA Rule 12200, which provides in

relevant part that FINRA members must arbitrate a dispute if:

"[1] Arbitration under the Code is . . . requested by the customer; [2] The

dispute is between a customer and a member or associated person of a

member ; and [3] The dispute arises in connection with the business

activities of the member or the associated person."

(2) "[A] 'customer' under FINRA Rule 12200 is one who, while not a broker

or dealer, either (1) purchases a good or service from a FINRA member or

(2) has an account with a FINRA member." *Citigroup Global Markets Inc.*

*v. Abbar*, 761 F.3d 268 (2014).

(3) An actual, present, and justiciable controversy exists as to whether

Defendants were customers of Plaintiffs within the meaning of Rule 12200

of the FINRA Code, and thus whether Defendants' claims against

Plaintiffs in the FINRA Arbitration are properly arbitrable in FINRA.

**(f)** **Statement of Contested Legal Issues**

Whether Defendants were "customers" of Plaintiffs for purposes of FINRA Rule

12200.

Defendants contend that a party is a customer under FINRA Rule 12200 whether the

5

services were purchased directly or indirectly from the FINRA member. *Triad Advisors, Inc. v. Siev*, 2014 WL 6601153, at *3 (E.D.N.Y. Nov. 21, 2014).

**(g)** **Each Party's Statement of Material Disputed Facts**

Plaintiffs:

As set forth in its Motion for Judgment on the Pleadings, filed July 7, 2015, Plaintiffs do not believe there are any disputed facts material to the adjudication of the sole legal issue before the Court. The disputed facts identified by Defendants are irrelevant to the arbitrability of Defendants' claims in FINRA.

Defendants:

In or around 2000 to 2002, each of the Defendants purchased goods and/or services from Deutsche Bank in connection with their CARDS transactions—collectively paying Deutsche Bank at least $1.85 million in fees. Several years later, the CARDS transactions were disallowed by the IRS and Defendants were required to pay tax, penalties and interest. Defendants then asserted various claims in the FINRA Arbitration based on Plaintiffs' conspiracy to defraud Defendants in connection with their CARDS transactions.

There are key factual disputes regarding Defendants' purchase of services from Plaintiffs, including on whose behalf the seven Deutsche Bank FINRA-registered brokers here were providing services in connection with Defendants' CARDS transactions. For instance, Defendants' Counterclaim alleges, and Plaintiffs deny, that:

- Sible, Westhoff, Fahmy, Raphael, Parker, Coleman, and Jacoby performed brokerage services for Defendants in connection with their CARDS transactions, including executing and/or supervising the execution of the CARDS transactions' securities trades;

- Deutsche Bank saw the participation of such FINRA-registered brokers as a necessary part of its implementation of CARDS transactions;

- Defendants paid Deutsche Bank millions of dollars of fees for its services in implementing their CARDS transactions, including the services of DBSI and its broker-dealers; and

- DBSI, DB Alex. Brown, Sible, Westhoff, Jacoby, Parker, Fahmy, Raphael, and/or Coleman received a portion of those fees, directly or indirectly.

(Plaintiffs' Answer to Counterclaim, Dkt. 16, ¶¶ 24-27.)

In addition, the "Legal Basis for Plaintiffs' Causes of Action," drafted by Plaintiffs, contains disputed issues of fact, including Plaintiffs' self-serving assertion that Brown, Sible, Westhoff, Jacoby, Parker, Fahmy, Raphael, and Coleman "were working on behalf of Deutsche Bank AG for purposes of FINRA Rule 12200." *See infra* § h. On whose behalf the FINRA-registered Plaintiffs were providing services and what they received in compensation for those services—as well as why all of these FINRA-registered parties were involved in Defendants' CARDS transactions—are disputed issues of fact for the trier of fact.

### (h) Legal Basis for Plaintiffs' Causes of Action

The issue of arbitrability under FINRA Rule 12200 depends solely upon whether Defendants could be considered "customers" of the Plaintiffs. *See* Am. Compl. ¶¶ 46, 51.

Recent Second Circuit case law makes clear that Defendants were never "customers" of any Plaintiff. *See Abbar*, 761 F.3d at 275-76. According to the "bright-line rule" set forth in *Abbar*: "[A] 'customer' under FINRA Rule 12200 is one who, while not a broker or dealer, either (1) purchases a good or service from a FINRA member, or (2) has an account with a FINRA member." *Id.*

No customer relationship existed between Deutsche Bank Securities Inc. and DB

Alex. Brown on one hand, and Defendants on the other. Neither Deutsche Bank Securities

Inc. nor DB Alex. Brown LLC executed the transactions at issue, and no account relevant to

the CARDS transactions was held at either entity. Since Defendants were customers of non-

FINRA member Deutsche Bank AG (the counterparty on all of the relevant credit

documents), their claims against Plaintiffs are not arbitrable.

Moreover, under *Abbar*, the role and status of the individual employees named in the

Statement of Claim is irrelevant to the "customer" analysis. *See Abbar*, 761 F.3d. at 275.

These employees were working on behalf of Deutsche Bank AG for purposes of FINRA

Rule 12200. Accordingly, Defendants' claims against the individual employees are similarly

non-arbitrable.

### (i)   Defendants' Statement of the Legal Basis Its Counterclaim

The Court should declare that Plaintiffs must arbitrate Defendants' claims against

them in the FINRA Arbitration because, pursuant to FINRA Rule 122000, Defendants were

"customers" of Plaintiffs in connection with the CARDS transactions at issue.

Individuals are "customers" under FINRA Rule 12200 if they "purchase[] a good or

service from a FINRA member." *Abbar*, 761 F.3d at 275. The purchase may be either direct

or indirect. *Triad Advisors, Inc. v. Siev,* 2014 WL 6601153, at *3 (E.D.N.Y. Nov. 21, 2014).

Defendants' purchase of services from Plaintiffs easily meets this test under FINRA

Rule 12200. Among other things:

- Sible, Westhoff, Fahmy, Raphael, Parker, Coleman, and Jacoby performed brokerage services for Defendants in connection with their CARDS transactions, including executing and/or supervising the execution of the CARDS transactions' securities trades;
- Deutsche Bank saw the participation of such FINRA-registered brokers as a necessary part of its implementation of CARDS transactions;

8

- Defendants paid Deutsche Bank millions of dollars of fees for its services in implementing their CARDS transactions, including the services of DBSI and its broker-dealers; and
- DBSI, DB Alex. Brown, Sible, Westhoff, Jacoby, Parker, Fahmy, Raphael, and/or Coleman received a portion of those fees, directly or indirectly.

(Defendants' Counterclaim, Dkt. 15, ¶¶ 24-27.)

### (j)    Burden of Proof

Plaintiff bears the burden of the proof on each of its causes of action by a preponderance of the evidence. Defendants bear the burden of proof on their affirmative defenses by a preponderance of the evidence.

### (k)    Amendments to Pleadings/Joinder of Parties

The parties do not presently anticipate any additional amendments to pleadings or joinder of additional parties.

### (l)    Consent to Proceed before Magistrate

The parties do not consent to the transfer of this case to a Magistrate Judge at this time.

### (m)    Fed R. Civ. P 26(a) Disclosures

The parties do not have any proposed or anticipated changes to the timing, form or requirements under Fed. R. Civ. P. 26(a), which are due on July 6, 2015.

### (n)    Discovery

Plaintiffs do not believe discovery is necessary to determine the arbitrability of Defendants' FINRA claims. As such, Plaintiffs request that discovery be stayed pending adjudication of Plaintiffs' motion for judgment on the pleadings, filed on July 7, 2015. In the event that discovery goes forward, Plaintiffs believe that the only material subjects are:

9

(1) Which entit(y)(ies) Defendants contracted with; (2) Which entit(y)(ies) received the fees paid by Defendants; (3) Whether Defendants had any accounts with any Plaintiff related to the transactions at issue.

Defendants believe that, given the above disputed issues of fact concerning their purchase of goods or services from Plaintiffs, discovery is needed concerning the services Plaintiffs provided, Plaintiffs' receipt of compensation for those services, why Deutsche Bank's FINRA-registered brokers were involved in CARDS transactions, and whether Plaintiffs opened any accounts in connection with Defendants' CARDS transactions. Defendants request that the Court set a fact discovery cut-off date of December 22, 2015 and reject Plaintiffs' request to stay discovery.

### (o)  Expert Discovery

The parties do not anticipate the need for expert discovery. If that expectation changes, the parties propose that expert discovery be completed one month after the close of fact discovery.

### (p)  Changes to Limitations on Discovery

In the event fact discovery proceeds, the parties do not anticipate the need for any changes under the Federal Rules or Local Rules, but reserve the right to request amendments to the discovery schedule and the limits on discovery should the need arise.

### (q)  Settlement Discussions

The parties have not discussed settlement of the declaratory judgment action. While the parties have begun settlement discussions relating to the underlying FINRA dispute, they are not currently optimistic about the prospects of settlement.

**(r)**     **Trial by Jury**

The case is to be tried without a jury. The parties expect that it will take approximately five trial days to present their cases.

**(s)**     **Other Orders under Fed. R. Civ. P. 26(c), or Fed. R. Civ. P. 16(b) or 16(c)**

As set forth above, Plaintiffs believe that the Court should stay discovery under Fed. R. Civ. P. 16(c) pending resolution of their Fed. R. Civ. P. 12(c) motion for judgment on the pleadings. To the extent that the Court desires briefing on the issue, Plaintiffs will move for a protective order under Fed. R. Civ. P. 26(c).

Defendants believe that there is no basis for judgment on the pleadings and the Court should not stay discovery pending resolution of Plaintiffs' anticipated motion.

Dated: New York, New York
       July 6, 2015

DUVAL & STACHENFELD LLP

By: _____
    Allan N. Taffet
    Keith Blackman
    555 Madison Avenue, 6th Floor
    New York, New York 10022
    Tel No.: (212) 883-1700

*Attorneys for Plaintiffs*

SPERLING & SLATER, P.C.

By: _____
    Scott F. Hessell
    Spenser Q. Friel
    55 West Monroe Street, Suite 3200
    Chicago, IL 60603
    Tel No.: (312) 641-3200

*Attorneys for Defendants*

11

# EXHIBIT

# 3

## FINRA DISPUTE RESOLUTION, INC.
## CHICAGO, ILLINOIS

Thomas M. Roskos, Jr., Dr. Thomas )
Roskos, Sr., Brion Applegate, Eddy )
Aslanian, Tom Jermoluk, Val Vaden, )
and Lilli J. Rey, )
                                  )
    Claimants, )      FINRA Case No. 14-3280
                                  )
v. )
                                  )
Deutsche Bank Securities Inc., DB )
Alex Brown LLC, Janet Sible, Mark )
Westhoff, Michael Jacoby, J. Ralph )
Parker, Nancy Fahmy, Michael )
Raphael, and Mary Ann Coleman )
                                  )
    Respondents. )

## AMENDED STATEMENT OF CLAIMS

Claimants demand arbitration of their dispute against Respondents before

FINRA Dispute Resolution, Inc. ("FINRA") pursuant to FINRA Rule 12200.

Respondents Deutsche Bank Securities Inc. and DB Alex Brown LLC (collectively

"Deutsche Bank") and Deutsche Bank broker-dealers Janet Sible, Mark Westhoff,

Michael Jacoby, J. Ralph Parker, Nancy Fahmy, Michael Raphael and Mary Ann

Coleman (collectively with Deutsche Bank, "Respondents") are required to submit

to this arbitration proceeding before FINRA by reason of their contract for

membership with FINRA, incorporating by reference the Code of Arbitration

Procedures of FINRA, under which Claimants, as customers, are members of the

class of intended third party beneficiaries.

## **NATURE OF THE CASE**

1.      Respondents conspired to push Claimants into a tax shelter known as a Custom Adjustable Rate Debt Structure ("CARDS"), which was one of a number of sophisticated tax shelter schemes Respondents, along with other unnamed co-conspirators, promoted and sold to Claimants and other victims. For its conduct involving these and similar tax shelters, Deutsche Bank, and its co-conspirators, have been the subjects of criminal investigations by the Internal Revenue Service ("IRS"), the Department of Justice ("DOJ"), and the United States Senate. This is an action for damages arising out of Respondents' fraud, aiding and abetting fraud, conspiracy, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and negligent supervision.

2.      As established in guilty pleas and criminal convictions, Deutsche Bank and its brokers, along with the law firm Sidley & Austin, and former Sidley partner R.J. Ruble, convicted of multiple federal crimes for his role in this scheme, conspired to perpetrate one of the largest tax frauds in the history of this country.

3.      Deutsche Bank and Sidley pushed a supposed loophole in the tax code they knew would not withstand IRS scrutiny. They did so for the sole purpose of enriching themselves and their co-conspirators with unconscionable fees – in excess of $330 million to Deutsche Bank alone, and without regard to the monetary and reputational damage their conduct would cause their clients. By this arbitration, Claimants seek recovery for the millions in out-of-pocket losses caused by Deutsche Bank and its brokers' criminal misconduct.

4.     After years of denying responsibility for involvement in illegal tax strategies, in December 2010, Deutsche Bank entered a non-prosecution, or "plea," agreement with the Department of Justice and Internal Revenue Service. Deutsche Bank admitted that it helped design, market, and implement illegal tax shelters, such as those sold to Claimants. Deutsche Bank thus admitted its central role in the conspiracy to sell fraudulent tax shelters.

5.     In order to avoid criminal indictment, Deutsche Bank agreed to pay the Government more than a half-billion dollars in fines and penalties, including an IRS "promoter" penalty of $149 million. Deutsche Bank also explicitly admitted that "during the period between approximately 1996 and 2002, through the conduct of certain Deutsche Bank employees, **Deutsche Bank participated in and implemented fraudulent tax shelters."** *See* Deutsche Bank Non-Prosecution Agreement ("NPA"), at 1-2. Deutsche Bank admitted it "**unlawfully, willfully and knowingly participated**" in fraudulent tax shelters like the ones it sold Claimants, and that "**it was wrong and unlawful** [for Deutsche Bank] **to have engaged in these transactions and it regrets having done so."** Ex. A to NPA at 1. By the NPA, Deutsche Bank resolved its criminal liability arising out of its involvement in CARDS.

6.     Unbeknownst to Claimants, Deutsche Bank, along with Sidley, designed CARDS to be implemented to create the least amount of risk and cost to the Bank, while extorting the maximum fee.  Specifically, Deutsche Bank charged Claimants a "lender inducement fee" many times greater than the current market

fee.  The outsized fee is itself damaging evidence that Deutsche Bank knowingly participated in the scheme to sell Claimants an illegal tax shelter.

7.     The transactions Respondents encouraged Claimants to execute were no more than illegal tax shelters, developed and implemented by Sidley and Deutsche Bank for the sole purpose of generating unconscionable fees.  In direct contravention of established rules and regulations governing tax shelters, the CARDS strategy involved transactions that were economically worthless. Deutsche Bank admitted that "Despite DB's awareness of the issuance of [IRS] Notices," which prohibited these strategies, "DB continued to engage in the transactions."  Ex. 1 to NPA at ¶ 28.

8.     Deutsche Bank admits to further institutional deficiencies: "DB's supervisory and internal controls with respect to [tax shelter] transactions were inadequate.  Specifically, for example, Deutsche Bank did not have adequate policies and procedures for analyzing client tax-motivated transactions in which Deutsche Bank participated as a counterparty, nor for involving its internal control functions in an appropriate analysis and approval process for such transactions." Ex. 1 to NPA at ¶ 4.

9.     Claimants reasonably relied on the advice and actions of Deutsche Bank, one of the most well-respected banks in the world, its brokers, and the Sidley lawyers with whom Deutsche Bank conspired, when they agreed to participate in the CARDS strategy.

10.     As a result, each of the Claimants has paid a heavy price, including, to the extent applicable, (1) excessive fees to participate in the

4

CARDS strategy, (2) huge penalties and interest assessed by the IRS and state internal revenue agencies, and (3) significant clean-up costs to extricate themselves from the mess created by Deutsche Bank and its partners-in-crime.

## **PARTIES**

11.    Claimant Thomas M. Roskos, Jr. ("Roskos Jr.") is an individual and, at all relevant times, has been a resident of Scottsdale, Arizona.

12.    Claimant Dr. Thomas Roskos Sr. ("Roskos Sr.") is an individual and, at all relevant times, was a resident of Scottsdale, Arizona at the time of the transactions.

13.    Claimant Brion Applegate ("Applegate") is an individual and, at all relevant times, has been a resident of Menlo Park, California.

14.    Claimant Eddy Aslanian ("Aslanian") is an individual and, at all relevant times, has been a resident of Las Vegas, Nevada.

15.    Claimant Tom Jermoluk ("Jermoluk") is an individual and resides in Miami, Florida.

16.    Claimant Val Vaden ("Vaden") is an individual and currently resides in Bryn Mawr, Pennsylvania.

17.    Claimant Lilli J. Rey is an individual who was the spouse of Claimant Val Vaden during the tax years Respondents perpetrated their fraud and, at all relevant times, has been a resident of Hillsborough, California.  Ms. Rey is a claimant solely on the bases of (a) having filed joint federal income tax returns with Mr. Vaden for the tax years 2000 and 2001 that reflected the

CARDS transaction, and (b) her interests in any recovery resulting from this action, which interests arise under the community property laws of the State of California.

18. Respondent Deutsche Bank Securities, Inc. ("DBSI") is a registered broker-dealer firm (CRD # 2525) and was involved in implementing Claimants' CARDS transactions.

19. Respondent DB Alex Brown LLC ("DBAB") is a registered broker-dealer firm (CRD # 17790) and was involved in implementing Claimants' CARDS transacitons.

20. Respondents DBSI and DBAB are collectively referred to in the Statement of Claim as "Deutsche Bank."

21. Respondent Janet Sible (CRD # 19310300) is a broker-dealer employed by DBSI who helped market and implement the CARDS transaction sold to Claimants and is based in DBSI's Chicago office.

22. Respondent Mark Westhoff (CRD # 4368008) is a broker-dealer employed by DBSI who helped market and implement the CARDS transaction to Claimants and is based in DBSI's Chicago office.

23. Respondent Michael Scott Jacoby (CRD # 1506392) is a broker-dealer employed by DBSI who was also registered with DBAB and helped market and implement the CARDS transaction to Claimants and is based in DBSI's Chicago office.

24.    Respondent J. Ralph Parker (CRD # 356664) is a broker-dealer who was registered with DB Alex Brown and helped implement Vaden's CARDS transaction.

25.    Respondent Nancy Fahmy (CRD # 2689751) is a broker-dealer who was registered with DBSI and helped market and implement the CARDS transaction to Claimants.

26.    Respondent Michael Raphael (CRD # 4372124) is a broker-dealer who was registered with DBSI and helped market and implement the CARDS transaction to Claimants.

27.    Respondent Mary Ann Coleman (CRD # 1677646) is a broker-dealer who was registered with DBSI and DBAB, and helped market and implement the CARDS transaction to Claimants.

28.    Respondents' unnamed co-conspirators in the fraudulent scheme to sell and implement CARDS transaction include, but are not limited to, the following: Sidley LLP, f/k/a Sidley Brown & Wood LLP, f/k/a Brown & Wood LLP ("Sidley"); Raymond J. Ruble ("Ruble"); Dewey & LeBoeuf LLP, f/k/a LeBoeuf, Lamb, Greene & MacRae LLP ("LeBoeuf"); Graham Taylor ("Taylor"); Sussex Financial Enterprises f/k/a Chenery Associates, Inc. ("Chenery"); and Roy Hahn ("Hahn"). MyCFO, Inc. a/k/a STARS Holding Co., KPMG, and CBIZ also participated in these and related tax shelter programs and formed associations in fact with each other to market and promote tax shelters in order to generate substantial fees. Respondents and their co-conspirators are referred to in the Statement of Claims collectively as "CARDS Dealers."

## FACTUAL BACKGROUND

29.    During the late 1990s, the tax shelter industry experienced exponential growth as accounting firms and financial institutions sought to exploit weaknesses in the IRS enforcement capabilities. Tax shelters developed and sold during the late 1990s and early 2000s included Offshore Portfolio Investment Strategy ("OPIS"), the Bond Linked Issue Premium Structure ("BLIPS"), the Foreign Leveraged Investment Program (FLIP), the Bond and Option Sales Strategy ("BOSS"), the Contingent Deferred Swap ("CDS"), and the Custom Adjustable Rate Debt Structure ("CARDS"). While the structure and mechanics of these transactions varied slightly, the undisclosed goal was always the same – to generate phony losses for taxpayers, using a series of complex, orchestrated transactions, structured finance, and investments with little or no potential for profit.

### A.    Development of CARDS Transaction.

30.    Chenery was formed in the early 1990s by Roy Hahn, a CPA who had previously worked for Arthur Young, Coopers & Lybrand, and then PriceWaterhouseCoopers. Chenery was formed as a financial and tax services boutique. In a deposition in *Sussex Financial Enterprises v. HVB*, No. C-08-4791, N. Dist. California, Hahn testified that he met Ruble of Sidley (then Brown & Wood) in 1989. He and Ruble worked on a number of tax-related transactions together, often for the same client. Hahn and Ruble worked together on closing at least one 357(c) financing transaction known as Zero Enhanced Note Structure ("ZENS"), the corporate predecessor to CARDS, in approximately 1996 or 1997.

8

31.    Ruble claimed a proprietary interest in CARDS, and as a result Hahn entered into a License Agreement with Ruble. Under the License Agreement, Hahn agreed to pay Ruble 20 percent of the gross fees paid to Chenery from CARDS; the payments were to be made to Ruble's Family Investment Statutory Trust ("FIST"). Hahn testified that the formula in the license agreement was another "paper" agreement, never meant to be followed. Instead, Hahn and Ruble agreed on the royalty Hahn would pay Ruble. Hahn admitted to paying $1,850,000 as royalties for CARDS.

**B.    Structure of CARDS Transactions**

32.    Like other tax shelters executed in the 1996-2002 time period, CARDS sought to create a tax loss without any economic loss. Under the CARDS scheme, Chenery would organize a single purpose limited liability company ("LLC") in Delaware. These LLCs were typically named after underground metro lines in London, England, and later after underground train stations.

33.    Each of these transactions followed the same scheme. The scheme required the LLCs to be owned by foreign citizens. Thus, Chenery employee/associate Larry Austin contacted a friend in the United Kingdom, a tax attorney named Mio Sylvester. Because Sylvester held dual citizenship in the U.S., he could not be a member of the LLC and still achieve the desired tax benefits. However, Sylvester recruited his wife, Elizabeth Sylvester, and Michael Sherry, also a tax attorney, to be the members. Mio Sylvester was named as manager of each LLC.

34.     As was known by Deutsch Bank and the other banks who executed CARDS, but not Claimants, the members of the LLCs were merely involved for tax purposes and were not subject to the customary financial due diligence typically required by a bank.

35.     The LLC would enter into a euro denominated loan with a large international bank, here Deutsche Bank. The size of the loan was generally determined by the size of the tax deduction sought by the customer. The loan proceeds would then be used to purchase two certificates of deposit (CDs). One of the CDs was purchased with 85% of the loan proceeds and one was purchased with the remaining 15%. Both CDs were immediately pledged back to the lender as collateral for the loan. At no time did the loan proceeds leave the custody and control of the lender.

36.     The CARDS customer would purchase the 15% portion of the loan in exchange for his or her assumption of joint and several liability for 100% of the LLC's loan on a joint and several basis; the CARDS customer would also agree to pay 100% of the principal of the loan at maturity. The CARDS customer would then convert the 15% euro denominated CD to a U.S. dollar denominated CD and give the CD back to the lender as collateral for the loan. In practice, this money and the CDs never left the custody and control of the lender, unless other acceptable collateral was transferred to the lender.

37.     According to the conspirators, the CARDS customer's conversion of the 15% euro denominated CD into U.S. dollars is a taxable event. The CARDS Dealers represented that the entire loan amount would become the CARDS

customer's basis in the 15% CD so that the CARDS customer could claim the loss of the 85% of the initial investment—the transaction was designed to inflate the CARDS customer's basis to generate a large loss. For example, if the loan amount was $100 million and the CARDS customer converted the 15% euro denominated CD into a $15 million CD, the CARDS customer would then claim an $85 million loss. This loss would be used to offset gains.

38.     Deutsche Bank, however, required customers to maintain collateral at Deutsche Bank sufficient to repay the loan. Consequently, Deutsche Bank had no risk of loss.

## C.     Implementation of CARDS Transactions

39.     Thus, CARDS required several classes of players: an arranger of a transaction (Chenery); law firms to render opinions and create transaction documents (Sidley); a lender (Deutsche Bank); and finders, who would identify potential assuming parties and introduce them to Chenery in exchange for a fee.

40.     Chenery, led by Roy Hahn, was the "arranger." Chenery would identify and market the transaction to lenders, coordinate with the lenders on the documentation for the transaction, identify the LLCs and LLC members, market the transaction to finders, and choose suitable assuming parties from the corporations and individuals identified by finders. Chenery would also receive the fees from the assuming parties and distribute those to the other players according to its confidential fee structure.

41.     Chenery promoted CARDS by telling potential clients, including Claimants, that nationally renowned and prestigious law firms such as Sidley

11

had reviewed the transaction and serve as Claimants' legal counsel—including by supplying opinion letters. These opinion letters would bless CARDS and confirm that the tax advantages would be recognized by the IRS for income tax purposes.

42.    For example, a Chenery brochure claimed that the legal opinions supporting its tax plans would protect participants from being assessed penalties by the IRS:

> MYTH:
> Tax-planning strategies can result in penalties if the IRS rejects a claimed tax benefit.
> ANSWER:
> Each tax plan arranged by Chenery Associates is backed by a favorable legal opinion addressed directly to the client. This opinion is in the form required by Treasury regulations to eliminate penalty risk for individuals. In addition, it is part of the minimum requirements standard for corporations.

43.    Similarly, a Chenery presentation about CARDS claimed that a "[f]avorable tax opinion by major New York law firm eliminates penalty risk."

44.    Hahn testified that Sidley and other law firms lent their reputation to enhance the credibility of Chenery and CARDS because, where a law firm issued an opinion, the impression was that the entire firm was standing behind the opinion.

45.    **Deutsche Bank's essential role**: A total of five banks funded CARDS loans: Bankers Trust, Deutsche Bank, Heller Financial, HVB, and Zurich Capital Management. In total, on information and belief, the CARDS Banks made at least €2,296,667,970 in CARDS loans.

46.    Deutsche Bank understood the tax shelter implications of CARDS. On information and belief, Deutsche Bank's outside counsel engaged in several

calls with the other conspirators, including Chenery, Sidley and Lebouf Lamb. These calls occurred in September and October of 2000, and during them, Deutsche Bank specifically discussed the tax aspects of the CARDS transaction and whether CARDS transactions had to be registered as tax shelters.

47.    The CARDS facility was nothing more than a sham transaction designed to "create" paper losses for income tax purposes and Respondents knew that the CARDS facility was a sham transaction that would not generate any profits and would not be recognized by federal or state taxing authorities for income tax purposes.

48.    Respondents used their reputation to assure Claimants that CARDS was a legitimate transaction. The Respondents, however, knew that the loss could not be taken and that the deduction would be denied when discovered.

**D.    CLAIMANTS' CARDS TRANSACTIONS**

49.    Claimants were induced to enter into CARDS transactions in reliance on the reputations of the CARDS Dealers involved in their transactions.

50.    Claimants paid significant fees. Each of the Claimants has been audited by the IRS in connection with their CARDS strategy.

51.    Claimants incurred significant economic loss by relying on the advice of Deutsche Bank, and other members of the conspiracy, who had fiduciary duties to look out for the Claimants' best financial interests.

52.    The IRS concluded that the CARDS transaction lacked economic substance, and consequently he disallowed the losses generated therefrom. Claimants challenged the IRS determination. As a result the Internal Revenue

Service determined that Claimants owe deficiencies in income tax and penalties related to the IRS disallowance of the tax treatment accorded to the CARDS strategy.

53.    Claimants, thus, have been damaged in the substantial fees (and interest payments) paid to Respondents and the others, legal fees and expenses paid in defending the CARDS strategy, and in interest due to the government.

**E.    Deutsche Bank's Market Manipulation of Foreign Exchange Markets**

54.    As has recently come to light through several domestic and foreign investigations, Deutsche Bank was a participant in an international conspiracy to manipulate the foreign exchange, or FX, market. The U.S. Department of Justice opened a criminal investigation into manipulation of the $5.3 trillion-a-day FX market by Deutsche Bank and its co-conspirators. The DOJ investigation comes on the heels of investigations by governments and regulators, including the CFTC and United Kingdom, Hong Kong, Singapore and Swiss regulators. In particular, in June 2013, the Monetary Authority of Singapore censured 20 banks, including Deutsche Bank, for trying to rig currency benchmarks and order them to set aside approximately $9.7 billion and strengthen internal controls.

55.    Deutsche Bank and its co-conspirators rigged the foreign exchange market, including in the currencies traded by Claimants. Such collusion altered the prices at which Claimants foreign exchange trades were executed, including their trades as part of the CARDS transactions and Complainants subsequent foreign exchange trades.

14

56.     Deutsche Bank financially benefitted from the unlawful manipulation. Deutsche Bank and its co-conspirators secretly intentionally manipulated rates to artificial leaves to obtain and retain hundreds of millions of dollars in ill-gotten profits.

## COUNT I
## STATUTORY FRAUD/RACKETEERING ACTIVITY

57.     Claimants reassert and incorporate by reference all of the foregoing allegations in their entirety and further allege:

58.     The CARDS Dealers associated with each other to form an enterprise for the purpose of promoting and selling various tax products in order to receive large fees.

59.     The CARDS Dealers arrangement described herein constitutes an ongoing organization, with an ascertainable structure and purpose beyond the predicate acts and the conspiracy to commit such acts, by which Deutsche Bank and the other CARDS Dealers functioned as a continuing unit comprised of said Respondents.

60.     The CARDS Dealers engaged in a pattern of unlawful activity consisting of a scheme or artifice to defraud Claimants and other individuals by using the CARDS Dealers' reputations to induce them to enter into CARDS transactions. The CARDS Dealers, including Deutsche Bank and its brokers, engaged in a pattern of criminal activity to defraud Claimants and others into using the CARDS Strategy, for the sole purpose of enriching the CARDS Dealers.

61.     The CARDS Dealers promoted the CARDS transactions and conducted or helped conduct the financial transactions that were a part of the CARDS facility tax shelter.

62.     The CARDS Dealers knew that the CARDS transaction would not be approved by the IRS, but marketed and sold these transactions anyway in order to generate substantial fees.

63.     The CARDS Dealers engaged in this scheme or artifice to defraud over a period of over a year for the CARDS tax shelter alone.

64.     Deutsche Bank's participation was integral to Claimants entering into and claiming the tax benefits of the CARDS transaction. Deutsche Bank itself was integral to the conduct of the enterprise.

65.     The CARDS Dealers induced the Claimants to enter into a CARDS transaction. This act was related to the rest of their tax shelter scheme in purpose, results, participants, methods of commission, and similarity of victims. This behavior constituted a pattern of unlawful activity over an extended period of time.

66.     In connection with Claimants' CARDS transactions, the CARDS Dealers made the following representations as part of their pattern of unlawful activity:

- CARDS was legitimate and a suitable investment for Claimants.
- Deutsche Bank was entering an arm's length and legitimate loan agreement with Claimants.
- Sidley's legal opinions would provide protection to Claimants in the event the tax deductions were disallowed by the IRS.

67.    Also in connection with Claimants' CARDS transactions, the CARDS Dealers omitted material facts that were necessary to render not misleading the remainder of their representations. The CARDS Dealers omitted these facts as part of their pattern of unlawful activity.

- The CARDS transaction should have been registered as a tax shelter with the IRS.
- The pre-packaged nature of the CARDS transactions would negate the claimed tax benefits.
- The lack of risk inherent in the structure of the transaction would negate the claimed tax benefits.
- CARDS had similarities to other tax strategies already rejected by the IRS and listed by the IRS as potentially abusive tax shelters.
- The roles of Deutsche Bank, Chenery, Hahn, Sidley, and Ruble as promoters and the consequences of that role, including that IRS would argue that none of their work was independent.
- The roles Ruble and Sidley played in developing CARDS would mean that the IRS could take the position that the Claimants would be unable to rely on opinion letters from them in the event of an audit.
- The CARDS Dealers acted in concert.
- The legal analysis in the Sidley letters was fundamentally flawed and would not be upheld by the relevant state or federal authorities.

68.    In addition to the Claimants' CARDS transactions, on information and belief, Deutsche Bank and the CARDS Dealers induced at least 29 other investors to enter into CARDS transactions between 1999 and 2002. These acts were related to each other in purpose, results, participants, methods of commission, and similarity of victims. This behavior constituted a pattern of unlawful activity and amounted to a period of continued unlawful activity between 1999 and 2002.

69.    Deutsche Bank's conduct was in concert with each of the other CARDS Dealers' conduct, and planned and pre-arranged with and known by

17

each of the other said CARDS Dealers pursuant to said CARDS Dealers common scheme to sell tax strategies.

70.    The CARDS Dealers conducted or participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity and criminal activity consisting of; inter alia, more than two acts of mail fraud, wire fraud, interstate transportation in aid of racketeering, money laundering, engaging in transactions in property derived from unlawful activity, transportation of fraudulently obtained monies, and bribery (in violation of 18 U.S.C. §§ 1341, 1343, 1952, 1956, 1957, and 2314.).   As part of this pattern, continuing over the course of years, by using the mails, private Interstate carriers and interstate wire communications, said Respondents, through their Enterprise, sold these and other fraudulent tax schemes beginning as early as 1999-2000. In particular, without limitation, in violation of 18 U.S.C. §§ 1341 and 1343, the CARDS Dealers employed the Postal Service and/or private or commercial interstate carriers and/or interstate  wire communications to send their retainer letters, invoices, opinion letters, tax advice, and investment advice to Claimants and others who implemented the CARDS Strategy and other tax shelters.

71.    Claimants are entitled to recover damages that reasonably flow from the CARDS Dealers' pattern of unlawful activity in promoting, facilitating, and misrepresenting the business purpose and legality of the CARDS facility, including, but not limited to, the CARDS transaction fees paid to the CARDS Dealers, the attorneys' and accountants' fees paid by all Claimants in litigating

18

against the IRS, back taxes and interest paid by Claimants to the taxing authorities, and such other and further damages as reasonably flow therefrom.

72.    Claimants' damages were a reasonably foreseeable result of the CARDS Dealers' pattern of unlawful activity.

73.    Claimants are entitled to compensatory and treble damages and attorneys' fees and costs.

## COUNT II
## COMMON LAW FRAUD

74.    Claimants reassert and incorporate by reference all of the foregoing allegations in their entirety and further allege:

75.    In order to induce Claimants to pay fees for the CARDS transaction, the CARDS Dealers made numerous knowingly misleading representations and intentional omissions of material fact to Claimants; including, but not limited to:  failing to disclose that the CARDS transaction would not entitle a taxpayer to claim for income tax purposes losses recognized from the transaction; failing to disclose existing published authority, including notices published by the IRS, that purported losses arising from similar transactions are not allowable for income tax purposes; promoting and developing a transaction while knowing that it was not likely to be allowable for income tax purposes; promoting the CARDS Facility as a legitimate transaction, when in fact, it was nothing more than a sham transaction designed to create artificial, paper losses for tax purposes; concealing the manner in which the CARDS Facility worked; concealing the illegal nature of the CARDS Facility,

including the impact of the IRS notice listing it as an abusive tax shelter; failing to disclose that Deutsche Bank had helped to develop and design the CARDS Facility; failing to disclose that Deutsche Bank was not acting as an "independent" bank but was operating together with the other Respondents; failing to disclose that the opinion letters were not issue independently and were nothing more than boilerplate opinions designed to induce Claimants to enter into the CARDS Facility transaction; failing to disclose that the authors of these opinion letters had a pecuniary interest in the CARDS transaction and had helped to develop and/or promote the transaction; and failing to disclose that the CARDS transactions had to be registered as tax shelters, but were not.

76.    Each of the foregoing misrepresentations and omissions, were material to Claimants' decisions to enter into the CARDS transactions.

77.    Respondents made the above-listed misrepresentations and omissions of material facts intending that Claimants rely thereupon in determining whether to enter into the CARDS transaction.

78.    The CARDS Dealers acted individually and as each other's agents in the CARDS transactions. Thus, knowledge acquired (or knowledge recklessly not acquired) by each of the CARDS Dealers is imputed to Deutsche Bank.

79.    Claimants did not know that Respondents' representations were false or that Respondents and/or the CARDS Dealers were omitting material facts.

80.    Claimants relied on Respondents' representations and/or their material omissions in deciding to enter into CARDS transactions, in claiming

deductions related to the CARDS transactions on their tax returns, and in continuing to assert the CARDS-related deductions despite IRS warnings. Claimants' reliance was reasonable in light of Deutsche Bank's reputation and the reputations of the other CARDS Dealers.

81.     Claimants are entitled to recover damages that reasonably flow from Deutsche Bank's fraud, including, but not limited to, the CARDS transaction fees paid to the CARDS Dealers, the attorneys' and accountants' fees paid by Claimants in litigating against the IRS, back taxes and interest paid by Claimants, and such other and further damages as reasonably flow therefrom.

82.     Claimants are informed and believe and on that basis allege that the Respondents' conduct was willful, malicious, reckless, wanton and in knowing disregard of their professional obligations, such that Claimants are entitled to recover exemplary damages against the Respondents in an amount to be determined at trial.

## COUNT III
## AIDING AND ABETTING FRAUD

83.     Claimants reassert and incorporate by reference all of the foregoing allegations in their entirety and further allege:

84.     In connection with the promotion of the CARDS transaction, CARDS Dealers Chenery, Hahn, Sidley, and Ruble made misstatement of material fact, including, but not limited to:

- •      CARDS was a legitimate investment and legal under the tax laws.

- Deutsche Bank represented that the loan was a legitimate and arms length transaction.
- Deutsche Bank represented that CARDS was routine and ordinary and that CARDS had the necessary legal, tax, and accounting approval from national highly accredited firms.
- Sidley represented in its opinion letters that it was more likely than not that Claimants' tax basis in the CARDS loans would be the principal amount of the loan plus the amount of transaction fees paid to obtain the loan.
- Sidley represented in its opinion letter that it was more likely than not that any gain or loss recognized by Assuming Party upon the disposition of the Foreign Currency would be characterized as ordinary gain or loss.
- Sidley represented in its opinion letters that it was more likely than not the IRS would not successfully challenge the timing, character, or source of the loss recognized by Claimants.
- Sidley represented in its opinion letters that it was more likely than not that CARDS had the requisite economic substance and business purpose to be respected under the existing tax law.

85.   Also in connection with the promotion of the CARDS transaction, Chenery, Hahn, Sidley, and Ruble knew or were reckless in failing to ascertain that certain material facts were omitted, that were necessary to render not misleading the remainder of their representations. Those omitted facts include, but are not limited to, the following:

- The CARDS transaction should have been registered as a tax shelter with the IRS.
- Deutsche Bank was receiving a portion of the CARDS fees paid to Chenery.
- The pre-packaged nature of the CARDS transactions.
- That the lack of risk inherent in the structure of the transaction would negate the  claimed tax benefits.
- CARDS had similarities to other tax strategies already rejected by the IRS and listed by the IRS as potentially abusive tax shelters.
- The roles of Deutsche Bank, Chenery, Hahn, Sidley, Ruble as promoters and the consequences of that role.
- The role that Ruble and Sidley played in developing CARDS would mean that  the IRS could take the position that the clients would be unable to rely on opinion   letters from them in the event of an audit.
- The CARDS Dealers were acting in concert with each other.

- The legal analysis in the Sidley letters was fundamentally flawed and would not be upheld by the relevant state or federal authorities.

86.   Respondents knew or were generally aware that the representations and omissions of Chenery, Hahn, Sidley, and Ruble were fraudulent and that they were omitting material facts.

87.   Deutsche Bank and its brokers had knowledge of the CARDS Dealers' fraud and provided substantial assistance or encouragement to Chenery, Hahn, and Sidley in the fraudulent conduct described above by, inter alia, providing financing for the CARDS transaction.

88.   Respondents provided that substantial assistance or encouragement with the intent of promoting the CARDS scheme.

89.   Claimants are entitled to recover damages that reasonably flow from Respondents' aiding and abetting fraud, including, but not limited to, the CARDS transaction fees paid to the CARDS Dealers, the attorneys' and accountants' fees paid by Claimants in litigating against the IRS, back taxes and interest paid by Claimants, and such other and further damages as reasonably flow therefrom.

90.   Claimants are also entitled to punitive damages in an amount to be determined at trial.

**COUNT IV**
**CIVIL CONSPIRACY**

91.   Claimants reassert and incorporate by reference all of the foregoing allegations in their entirety and further allege:

23

92.     As described herein, the CARDS Dealers entered into an agreement to defraud Claimants, and other CARDS investors not named herein, by misrepresenting the legitimacy and tax consequences of the investment.

93.     The CARDS Dealers each committed overt acts in furtherance of the conspiracy, including, but not limited to, the following:

- The issuance of "more likely than not" tax opinions by Sidley, and others, despite their conflicts of interest.
- The implementation of the loans to the LLCs and structuring of the various related transactions.
- Failing to advise Claimants to amend their tax returns.

94.     The CARDS Dealers' agreement to defraud Claimants, and other CARDS investors not named herein, can be inferred by their cooperation in creating the tax opinion letters and in failing to disclose the 1999 and 2000 IRS notices to Claimants, their attempts to conceal their fraud after the transactions.

95.     The CARDS Dealers were motivated to conspire to defraud Claimants in order to generate millions of dollars in fees.

96.     The CARDS Dealers intended to defraud Claimants by representing that the CARDS transaction was legitimate and that it was more likely than not that the transaction would be considered legitimate by the taxing authorities.

97.     The CARDS Dealers made positive, distinct misrepresentations and fraudulently concealed material information as outlined above. They made these misrepresentations and omissions pursuant to their agreement to defraud Claimants and other CARDS investors not named herein.

24

98.    Claimants are entitled to recover damages that reasonably flow from the CARDS Dealers' conspiracy to commit fraud, including, but not limited to, the CARDS transaction fees paid to the CARDS Dealers, the attorneys' and accountants' fees paid by all Claimants in litigating with the IRS, back taxes and interest paid by Claimants to the taxing authorities, and such other and further damages as reasonably flow therefrom.

99.    Claimants are entitled to punitive damages in an amount to be determined at trial.

## COUNT V
## BREACH OF FIDUCIARY DUTY

100.   Claimants reassert and incorporate by reference all of the foregoing allegations in their entirety and further allege:

101.   Respondents owed Claimants fiduciary duties by virtue of Deutsche Bank's role as Claimants' lender, its superior knowledge of the CARDS transaction, the control Deutsche Bank retained over Claimants' accounts under the CARDS transaction and the trust and confidence that the Claimants reposed in Deutsche Bank.

102.   Respondents owed Claimants fiduciary duties to deal with them honestly and forthrightly and with full disclosure of all material facts. In addition, Respondents had a duty to reveal facts unknown to Claimants of which they were aware which affected Claimants' legal rights and liabilities, including the full circumstances concerning the opinion letters provided by the

CARDS Dealers and the CARDS Dealers relationships and the true analysis of the CARDS strategy.

103. Respondents owed the Claimants fiduciary duties to act, with adequate skill and care, in their best interest and to protect their interests.

104. Respondents violated their fiduciary duties to Claimants by failing to reveal material information, by concealing material information from Claimants, by committing fraud, by failing to advise Claimants of their conflicts of interest, and by advising Claimants to enter into the CARDS transaction.

105. Claimants are entitled to recover damages that reasonably flow from Respondents' breaches of their fiduciary duties, including, but not limited to, the CARDS transaction fees paid to the CARDS Dealers, the attorneys' and accountants' fees paid by Claimants in litigating against the IRS, back taxes and interest paid by Claimants and such other and further damages as reasonably flow therefrom.

106. Claimants are entitled to punitive damages in an amount to be determined at trial.

**COUNT VI**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**

107. Claimants reassert and incorporate by reference all of the foregoing allegations in their entirety and further allege:

108. Chenery and Hahn owed Claimants' fiduciary duties by virtue of their role as Claimants' investment advisor.

109. Sidley and Ruble owed Claimants fiduciary duties by virtue of their attorney-client relationships with Claimants.

110. Respondents knew that Chenery, Hahn, Sidley, and Ruble owed fiduciary duties to Claimants.

111. Chenery, Hahn, Sidley, and Ruble breached their fiduciary duties to Claimants by failing to reveal material information, by concealing material information from Claimants, by committing fraud, by failing to advise Claimants of their conflicts of interest, by advising Claimants to enter into the CARDS transaction, and by advising Claimants to claim an inflated basis in the CARDS transaction.

112. Respondents knew or were generally aware that Chenery, Hahn, Sidley, and Ruble, were breaching their fiduciary duties to Claimants.

113. Respondents knowingly provided substantial encouragement to Chenery, Hahn, Sidley, and Ruble Morris in the breach of their fiduciary duties by, inter alia, providing financing for the CARDS transaction.

114. In aiding and abetting the other CARDS Promoters' breaches of fiduciary duty, Respondents acted wantonly and with an evil mind.

115. Claimants are entitled to recover damages that reasonably flow from Respondents' aiding and abetting breaches of fiduciary duties, including, but not limited to, the CARDS transaction fees paid to the CARDS Promoters, the attorneys' and accountants' fees paid by all Claimants in litigating against the IRS, back taxes and interest paid by Claimants to the taxing authorities and such other and further damages as reasonably flow therefrom.

27

116.   Claimants are also entitled to punitive damages in an amount to be determined at trial.

**COUNT VII**
**NEGLIGENT SUPERVISION**

117.   Claimants reassert and incorporate by reference all of the foregoing allegations in their entirety and further allege:

118.   Deutsche Bank owed Claimants fiduciary duties by virtue of their role as Claimants' lender, its superior knowledge of the CARDS transaction, the control Deutsche Bank retained over Claimants' accounts under the CARDS transaction and the trust and confidence that the Claimants reposed in Deutsche Bank.

119.   As Claimants' bank, Deutsche Bank also owed Claimants a duty to supervise its executives and employees.

120.   Deutsche Bank intentionally, recklessly and/or negligently permitted a fraudulent tax strategy to be implemented. Deutsche Bank also failed to properly supervise its employees and executives, including William Boyle, Janet Sible, Mark Westhoff, Michael Jacoby, J. Ralph Parker, Nancy Fahmy, Michael Raphael and Mary Ann Coleman.   Deutsche Bank negligently or intentionally failed to implement and maintain an effective program of supervision and control over Claimants account investments and intentionally or otherwise negligently permitted a fraudulent tax strategy to be implemented. Certainly the nature of the tax strategy implemented should have alerted Deutsche Bank to the negligent supervision.

121.   As a result of Deutsche Bank's failure to supervise its employees and executives, Claimants were injured through their implementation of the CARDS Strategy.

122.   Claimants are entitled to recover damages that reasonably flow from Deutsche Bank's negligent supervision, including, but not limited to, the CARDS transaction fees paid to the CARDS Promoters, the attorneys' and accountants' fees paid by all Claimants in litigating against the IRS, back taxes and interest paid by Claimants to the taxing authorities and such other and further damages as reasonably flow therefrom.

123.   Claimants are also entitled to punitive damages in an amount to be determined at trial based on Deutsche Bank's gross negligence in failing to supervise employees and executives.

## PRAYER FOR RELIEF

WHEREFORE, Claimants pray for relief and judgment against Respondents as follows:

a.   For actual damages to Claimants in an amount according to proof in excess of $15,000,000.00 as a result of the illegal tax strategy recommended by Respondents to Claimants;

b.   For punitive damages based on wanton and willful disregard for Claimants' interests and Respondents illegal conduct;

c.   For all "clean up" costs incurred by Claimants as a result of the IRS's investigation into Claimants' participation in this illegal tax strategy, including any attorneys' fees incurred;

d.   For interest and all of Claimants' costs and expenses associated with their filing of this claim, including expert witness fees; and

    e.      For such other relief as the Arbitration Panel deems just and proper.

Dated: April 22, 2015                     Respectfully Submitted:

                                           By: /s/ Scott F. Hessell
                                                Attorneys for Claimants

Scott F. Hessell                  D. Dax White
Spenser Q. Friel                  The White Law Group, LLC
Sperling & Slater, P.C.           2865 N. Clybourn Avenue, Unit 1
55 West Monroe Street, Suite 3200   Chicago, Illinois 60618
Chicago, IL 60603                312.238.9650
312.641.3200                  dax@whitesecuritieslaw.com
shessell@sperling-law.com
sfriel@sperling-law.com

# EXHIBIT
# 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------- x

DEUTSCHE BANK SECURITIES INC.; DB ALEX.
BROWN LLC; JANET SIBLE; MARK WESTHOFF;
MICHAEL JACOBY; J. RALPH PARKER; NANCY
FAHMY; MICHAEL RAPHAEL; and MARY ANN
COLEMAN,

                             Plaintiffs,

                    - against -

THOMAS M. ROSKOS, JR.; DR. THOMAS ROSKOS,
SR.; BRION APPLEGATE; EDDY ASLANIAN; TOM
JERMOLUK; VAL VADEN; and LILLI J. REY,

                             Defendants.

----------------------------------------------------------------------- x

**FIRST AMENDED
COMPLAINT**

**15 Civ. 00534 (LTS)**

        Plaintiffs Deutsche Bank Securities Inc. ("DBSI") and DB Alex. Brown LLC ("DB Alex.

Brown"), and Plaintiffs Janet Sible, Mark Westhoff, Michael Jacoby, J. Ralph Parker, Nancy

Fahmy, Michael Raphael, and Mary Ann Coleman (collectively, the "Private Bank Employees"

and, together with DBSI and DB Alex. Brown, the "Plaintiffs" or the "Deutsche Bank Parties"),

by and through their undersigned attorneys, hereby allege as follows for their first amended

complaint against Defendants Thomas M. Roskos, Jr.; Dr. Thomas Roskos, Sr.; Brion Applegate;

Eddy Aslanian; Tom Jermoluk; Val Vaden; and Lilli J. Rey (collectively, the "Defendants" or

"Tax Shelter Participants"):

## NATURE OF THE ACTION

        1.      This is an action to enjoin an arbitration that the Tax Shelter Participants sought to

file against the Deutsche Bank Parties before the Financial Industry Regulatory Authority

("FINRA") on or about October 27, 2014, captioned *Thomas M. Roskos, Jr., Dr. Thomas Roskos,*

*Sr., Brion Applegate, Eddy Aslanian, Tom Jermoluk, Val Vaden, and Lilli J. Rey v. Deutsche Bank Investment Management Americas Inc., Deutsche Bank Securities Inc., Janet Sible, Mark Westhoff, and Michael Jacoby*, FINRA Claim No. 14-03280 (the "FINRA Arbitration").

2.      On April 22, 2015, Defendants amended their FINRA Statement of Claim to add as respondents J. Ralph Parker, Nancy Fahmy, Michael Raphael and Mary Ann Coleman, and to substitute DB Alex. Brown for respondent Deutsche Bank Investment Management Americas Inc.  *See* Amended Statement of Claim (**Ex. A**).[1]

3.      The FINRA Arbitration concerns the Deutsche Bank Parties' alleged roles in certain Custom Adjustable Rate Debt Structure ("CARDS") loans relating to six tax shelter transactions separately entered into beginning in 2000 by these seven Tax Shelter Participants -- extremely high-net-worth individuals -- for the purpose of shielding millions of dollars from United States tax liability.  The Deutsche Bank Parties seek a declaration that those claims are non-arbitrable and an injunction prohibiting the Tax Shelter Participants from pursuing those claims before any arbitral body, including FINRA.

4.      The Tax Shelter Participants premise their right to arbitration on Rule 12200 of the FINRA Code of Arbitration for Customer Disputes (the "FINRA Code"), which provides in relevant part that a FINRA member is only obligated to arbitrate disputes brought by its "customer" against a "member or associated person of a member."  FINRA Rule 12200. Moreover, the dispute must "arise[] in connection with the business activities of the member . . . ."  *Id.*

_____

[1] Although DB Alex. Brown is named as a respondent in the FINRA Arbitration, DB Alex. Brown withdrew its FINRA registration on January 12, 2001 when it merged into DBSI.

5.      The Tax Shelter Participants cannot compel the Deutsche Bank Parties to arbitrate the Tax Shelter Participants' claims in FINRA because the Tax Shelter Participants were not "customers" of DBSI, DB Alex. Brown, or the Private Bank Employees with respect to the transactions at issue in the FINRA Arbitration.

## THE PARTIES

6.      Plaintiff DBSI is a Delaware corporation with its principal place of business in New York, New York.

7.      Plaintiff DB Alex. Brown is a Delaware subsidiary of DBSI and is no longer registered with FINRA.

8.      Plaintiff Janet Sible is an employee of Deutsche Bank Trust Company Americas ("DBTCA" or "Deutsche Bank Private Bank") and is currently a resident of Burr Ridge, Illinois.

9.      Plaintiff Mark Westhoff is an employee of DBTCA and is currently a resident of Winnetka, Illinois.

10.     Plaintiff Michael Jacoby is an employee of DBTCA and is currently a resident of Winnetka, Illinois.

11.     Plaintiff J. Ralph Parker is a former employee of DBTCA and is currently a resident of Menlo Park, California.

12.     Plaintiff Nancy Fahmy is a former employee of DBTCA and is currently a resident of Montvale, New Jersey.

13.     Plaintiff Michael Raphael is a former employee of DBTCA and is currently a resident of Florham Park, New Jersey.

14.     Plaintiff Mary Ann Coleman is an employee of DBTCA and is currently a resident of Garrison, New York.

15. Defendant Thomas M. Roskos, Jr. is an individual and, upon information and belief, is currently a resident of Scottsdale, Arizona.

16. Defendant Dr. Thomas Roskos, Sr. is an individual and, upon information and belief, is currently a resident of Scottsdale, Arizona.

17. Defendant Brion Applegate is an individual and, upon information and belief, is currently a resident of Menlo Park, California.

18. Defendant Eddy Aslanian is an individual and, upon information and belief, is currently a resident of Las Vegas, Nevada.

19. Defendant Tom Jermoluk is an individual and, upon information and belief, is currently a resident of Miami, Florida.

20. Defendant Val Vaden is an individual and, upon information and belief, is currently a resident of Bryn Mawr, Pennsylvania.

21. Defendant Lilli J. Rey is an individual and, upon information and belief, is currently a resident of Hillsborough, California.

## JURISDICTION AND VENUE

22. The Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

23. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the Amended Statement of Claim in the FINRA Arbitration includes a claim for violation of federal statutes. *See* Amended Statement of Claim ¶ 70 (alleging violations of RICO and other federal statutes).

4

24. This Court has personal jurisdiction over the defendants because, among other reasons, the defendants all consented to this Court's jurisdiction in the transaction agreements out of which this action and the FINRA Arbitration arise. *See* Credit Agreement § 10.09(a) (Ex. B).

25. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred within this judicial district. In addition, venue is proper because the Tax Shelter Participants contractually consented to the venue of this judicial district in the transaction agreements out of which this action and the FINRA Arbitration arise. *See* Credit Agreement § 10.09(a) (Ex. B); Assumption Agreement § 11(a) (Ex. C); *see also id.* at 1 (Tax Shelter Participant assumes all obligations of LLC under Credit Agreement).[2] The transaction agreements also contain New York choice of law provisions. *See* Credit Agreement § 10.09(a); Assumption Agreement § 11(a).

## FACTUAL BACKGROUND

26. The Tax Shelter Participants entered into the CARDS transactions at issue beginning in the year 2000.

27. Each CARDS transaction operated in a series of steps, which were arranged by an unrelated entity, Chenery Associates, Inc. ("Chenery"), to result in a tax loss that would offset the Tax Shelter Participants' taxable income. Deutsche Bank's role in these shelters was limited to serving as the arm's-length counterparty to the loans and executing certain financial transactions relating to those loans.

_____

[2] The Credit Agreement and Assumption Agreement pertaining to defendant Jermoluk's CARDS transaction are attached as Exhibits B and C, respectively. Though not attached as exhibits to this Complaint, the other Tax Shelter Participants all signed substantially identical documents.

28.     Each of the Tax Shelter Participants' CARDS transactions were structured substantially as follows:

a.  <u>Formation of an LLC</u>:  The Tax Shelter Participant would cause to be formed a special purpose foreign LLC.

b.  <u>Credit Agreement</u>:  The LLC would enter into a thirty-year Credit Agreement with Deutsche Bank AG (*see* Ex. B).  The Credit Agreement provided for one principal payment due at maturity coupled with annual interest payments, the rate of which would reset annually based on LIBOR.  The Credit Agreement gave Deutsche Bank AG the unilateral right to require repayment of the entire loan on each yearly interest rate reset date, beginning on the first anniversary of each Tax Shelter Participant's borrowing date.  The LLC had the right to assign its obligations under the Credit Agreement to another party as co-obligor subject to Deutsche Bank AG's approval.

c.  <u>Establishment of a Collateral Account</u>:  The LLC was required to deposit the loan proceeds into a collateral account at Deutsche Bank Private Bank.  The collateral was segregated into two separate accounts, one containing a majority share of the collateral (usually around 85%), which was invested in a certificate of deposit, and the other containing a minority share of the collateral (usually around 15%), which was invested in a short-term deposit account.  The interest earned on the certificate of deposit provided the source of funds to pay the annual interest accrual on the loan.

d.  <u>Sale to Taxpayer as Co-Obligor</u>:  The Tax Shelter Participant would acquire the minority share of the collateral from the LLC in exchange for becoming jointly

and severally liable as a co-obligor under the Credit Agreement. Pursuant to a purchase agreement between the LLC and the Tax Shelter Participant, the LLC agreed to make all the interest payments under the Credit Agreement, and the Tax Shelter Participant agreed to pay the principal due under the loan at maturity. The Tax Shelter Participant exchanged the certificate of deposit (which was denominated in Euros), for an equivalent dollar-denominated certificate of deposit to create a taxable event. Finally, the Tax Shelter Participant also executed a pledge and security agreement with Deutsche Bank AG, under which the Participant would pledge additional collateral to Deutsche Bank AG to secure its obligations under the various agreements.

    e. <u>Claimed Losses Used to Offset Taxable Income</u>: As a result of their joint and several liability as a co-obligor under the Credit Agreement, the Tax Shelter Participants each took the position on their tax returns that their basis in the certificate of deposit was the entire loan amount -- thereby claiming a "loss" for federal income tax purposes in an amount equal to the excess of the stated principal amount of the loan over the fair market value of the minority share of the collateral. In this way, the Tax Shelter Participants each sought to shelter tens of millions of dollars of income from federal taxation.

    29.    To implement their CARDS tax shelter transactions, the Tax Shelter Participants entered into or assumed obligations under a number of agreements with nonparty Deutsche Bank AG, New York Branch, including a Credit Agreement, Master Pledge and Security Agreement, Assumption Agreement, and Deposit Account Pledge (collectively, the "Credit Documents").

30. The Tax Shelter Participants also deposited collateral into certain accounts at Deutsche Bank Private Bank to be pledged as security for the loan.

31. The Credit Agreement, as well as several of the other Credit Documents entered into by the Tax Shelter Participants, included New York choice of law clauses and clauses agreeing to New York jurisdiction and venue with respect to any claims against the Tax Shelter Participants arising out of those agreements.

32. Specifically, the Credit Agreement provided that: "This Agreement and each Note and the rights and obligations of the parties hereunder and thereunder shall be construed in accordance with and be governed by the law of the State of New York. Any legal action or proceeding against the Borrower with respect to this Agreement or any Note may be brought in the courts of the State of New York located in New York County or of the United States for the Southern District of New York, and, by execution and delivery of this Agreement, the Borrower hereby irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts." Credit Agreement § 10.09(a); *see also id.* § 10.09(c) (Borrower agrees to waive any objection to venue and forum) (Ex. B); Assumption Agreement § 11 (Ex. C).

33. The Tax Shelter Participants had no interaction whatsoever with DBSI or DB Alex. Brown relating in any respect to the transactions at issue.

34. The Tax Shelter Participants did not open any accounts with DBSI or DB Alex. Brown relating to the transactions at issue. Rather, the Tax Shelter Participants' accounts relating to each of the transactions at issue were held by Deutsche Bank Private Bank, a non-FINRA member.

35.     Nor did the Tax Shelter Participants purchase any goods or services from DBSI or DB Alex. Brown relating to any of the transactions at issue.  DBSI and DB Alex. Brown were not parties to any of the Credit Documents.  Rather, all of the Credit Documents were entered into between the Tax Shelter Participants (and/or their affiliates), on the one hand, and Deutsche Bank AG, a non-FINRA member (and/or affiliated banks that were also non-FINRA members), on the other hand.

36.     Indeed, the Tax Shelter Participants were well aware as early as 2005 that Deutsche Bank AG was the entity with whom they had transacted, when they each received notices that the United States government had issued subpoenas on Deutsche Bank AG for documents relating to their transactions in connection with a federal lawsuit between the IRS and CARDS transaction participants Neal and Christine Douglas.  *See Douglas v. United States*, 410 F. Supp. 2d 292 (S.D.N.Y. 2006); *Irani v. United States*, 448 F.3d 507 (2d Cir. 2006).

37.     Each Tax Shelter Participant joined in a third party motion to quash the subpoena issued to Deutsche Bank AG pursuant to the Right to Financial Privacy Act, arguing that "the purpose of the Right to Financial Privacy Act is to 'protect the customers of financial institutions [here, Deutsche Bank AG] from unwarranted intrusion into records. . . .'"  Memorandum in Support of Motion of Third Parties to Quash Subpoena Duces Tecum at 3, *Douglas v. United States*, No. M8-85 (S.D.N.Y. Dec. 22, 2005) (Related Case No. C-03-4518 (N.D. Cal.)) (Ex. D) (emphasis added).

38.     The Tax Shelter Participants also were not customers of any of the individual Private Bank Employees.

39.     The Private Bank Employees did not perform any investment management services on the Tax Shelter Participants' behalf with respect to the transactions at issue.

40.     The Private Bank Employees did not provide any investment advice to the Tax Shelter Participants with respect to the transactions at issue.

41.     To this day, none of the Private Bank Employees have ever met with any of the Tax Shelter Participants with respect to the transaction at issue.

42.     MyCFO, Inc., a company unaffiliated with any of the Deutsche Bank Parties, provided independent investment advisory services to the Tax Shelter Participants and introduced the Tax Shelter Participants to the CARDS transactions.

43.     The Private Bank Employees were employees of DBTCA, a non-FINRA member, at the time of and in connection with the transactions at issue.

44.     All work the Private Bank Employees performed in connection with the Tax Shelter Participants' CARDS transactions was performed on behalf of DBTCA.

## FIRST CLAIM FOR RELIEF
### (Declaratory Judgment as to Non-Arbitrability -- 28 U.S.C. § 2201)

45.     The Deutsche Bank Parties repeat and reallege the allegations of paragraphs 1 to 44 of the Complaint above, as if fully set forth here.

46.     An actual, present, and justiciable controversy exists between the parties as to whether any of the Tax Shelter Participants were customers of the Deutsche Bank Parties at the time of the transactions at issue within the meaning of Rule 12200 of the FINRA Code.

47.     The Deutsche Bank Parties seek a declaration that the Tax Shelter Participants were not customers of the Deutsche Bank Parties at the time of the transactions at issue and that the claims alleged by the Tax Shelter Participants against the Deutsche Bank Parties in the FINRA Arbitration are therefore non-arbitrable.

## SECOND CLAIM FOR RELIEF
### (Injunction)

48.     The Deutsche Bank Parties repeat and reallege the allegations of paragraphs 1 to 47 of the Complaint above, as if fully set forth here.

49.     In their Amended Statement of Claim in the FINRA Arbitration, the Tax Shelter Participants assert causes of action for "Statutory Fraud/Racketeering Activity," common law fraud, aiding and abetting fraud, civil conspiracy, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and negligent supervision against the Deutsche Bank Parties.  On information and belief, the Tax Shelter Participants will continue to pursue these claims unless enjoined from doing so.

50.     As a matter of law, unless the Tax Shelter Participants are enjoined from pursuing their claims in the FINRA Arbitration, the Deutsche Bank Parties will suffer irreparable harm because they will be forced to incur the substantial time and expense of defending themselves in the FINRA Arbitration, or risk an adverse outcome in those proceedings, even though the Deutsche Bank Parties are not legally compelled to arbitrate the Tax Shelter Participants' claims. Being compelled to arbitrate a dispute where the parties have not agreed to arbitrate constitutes irreparable harm as a matter of law.

51.      The Tax Shelter Participants' claims are not arbitrable because the Deutsche Bank Parties did not have a valid arbitration agreement with the Tax Shelter Participants and because the Tax Shelter Participants were not customers of the Deutsche Bank Parties at the time of the transactions at issue.

52.     The balance of equities weighs heavily in favor of an injunction.

53.     For the reasons set forth above, the Deutsche Bank Parties seek a temporary, preliminary, and permanent injunction enjoining any FINRA Arbitration against the Deutsche

Bank Parties by any of the Tax Shelter Participants or entities they control in connection with the conduct alleged in the Amended Statement of Claim.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs are entitled to judgment as against the Defendants:

(i)     declaring that the Deutsche Bank Parties' dispute with the Tax Shelter Participants is not arbitrable;

(ii)    permanently enjoining the Tax Shelter Participants from proceeding in any way with the FINRA Arbitration;

(iii)   awarding the Deutsche Bank Parties all attorney's fees and other costs associated with this action; and

(iv)    awarding the Deutsche Bank Parties such other and further relief as to the Court seems just and proper.

Dated:  New York, New York
        May 12, 2015

                                    DUVAL & STACHENFELD LLP


                        By:     /s/ Allan N. Taffet
                                Allan N. Taffet
                                Keith Blackman
                                555 Madison Avenue, 6th Floor
                                New York, New York 10022
                                Tel No.: (212) 883-1700

                                *Attorneys for Plaintiffs*

12

# EXHIBIT

# 5

**Deutsche Bank Private Banking, Americas**                    **Structured Loan: LWH 4.1**

| **I-15 -LINE SHEET  -** | | |
|---|---|---|
| EUR/USD = 0.9439 | **Initial** | **Date:**   June 10, 2002 |
| June 10, 2002 | **Commitment** | **Review  X** |

| **Borrower:** Wanstead Financial Trading LLC ("Wanstead") | **Location:** | **Next Review** |
|---|---|---|
| **Co-Obligor:**  Dr. Thomas Roskos ("Co-Obligor") | Chicago (Westhoff) | June 30, 2003 |

| **Collateral Provider: Borrower and Co-Obligor      Location:  Same** |
|---|

| **Customer** | **Booking Location:** Deutsche Bank | **Country of** |
|---|---|---|
| **RAROC: 1 / A+** | Structured Products Inc. (DBSP) | **Risk:  USA** |

| **Credit Audit Classification: (Pass/WL/SM/SS/DBT)  Pass** |
|---|

**Repayment Terms: One Year**

**Rate:**  Libor + 50 basis points year   Thirty Year Term Note. Single Draw (Non-Revolver), Bank has the right to require repayment of Facility on each 1 year anniversary.

| **Type of Facility** | **Amount** | **Expiry/Maturity Date of DB Commitment** | **Collateral A/C #, Name & Location** |
|---|---|---|---|
| Term Credit Agreement | EUR 11MM (USD 10.5MM) | June 17, 2003 | **Borrower:** Collateral held in custody account #191326 which consists of  DB Deposit plus interest.  Loan Proceeds were used to purchase DB deposit instruments. MV: EUR 9.8MM (USD 9.2MM) LV: EUR 9.8MM (USD 9.2MM) **Co-Obligor:** Collateral held in custody account #140383 which consists of  EUR cash, USD cash and muni bonds. MV: EUR 2.6MM (USD 2.3MM)  LV: EUR 2.1MM (USD 1.9MM) |
| FX Line * | EUR 1.5MM (USD 1.4MM) | | Co-Collateralized by Borrower & Co-Obligor's accounts (as defined above) |
| *  FX Line to hedge Collateral / Loan Currency exposure for Loan repayment. No incremental exposure. | | | |
| TOTALS: | EUR 11MM (USD 10.5MM) | | MV: EUR 12.4MM (USD 11.5MM) LV: EUR 11.9MM (USD 11.1MM) Co-Collateralized by Borrower & Co-Obligor's accounts (as defined above) |

Other Group Relationships (through Borrower or Collateral Provider Group)

| Borrower | Type of Facility | Amount | Collateral A/C #, Name & Location |
|---|---|---|---|
| N/A | N/A | N/A | N/A |
| TOTAL GROUP EXPOSURE: | EUR 11MM (USD 10.5MM) | | MV: EUR 12.4MM (USD 11.5MM) LV: EUR 11.9MM (USD 11.1MM) |

**Approvals:**                    **Date:**

| **Total AUM:** | USD | **Lending Officer:** | **J. Marson** |
|---|---|---|---|
| **PB Earnings Year 1:** | USD 48,400 | **Lending Division Head:** | **L. Hoagland** |
| **CTS Accurate** | | **Risk Management:** | **N. Haigh** |

cc:    Risk Management    Central Files      S. Schwuchow    M. Lewis    C. Cronin

Confidential                                                                                    DB0012375

**Deutsche Bank Private Banking, Americas**                    **Structured Loan: LWH 4.1**

### CREDIT MEMORANDUM
### TERM CREDIT AGREEMENT UNDER CARDs PROGRAM
### BORROWER: Wanstead Financial Trading LLC ("Wanstead")
### CO-OBLIGOR: Dr. Thomas Roskos

**BACKGROUND:**     This transaction is one of a series of CARDs transactions.

The Co-Obligor has significant net worth, stated in his financials dated April 30, 2002, exceeding USD 12 million. Annual income for 2002 is estimated at $553 thousand.  Co-Obligor's sole liability is stated to be the pro-rata exposure on this CARDs deal which is defined as the Loan Amount minus  Portion of Loan Secured by DB Deposits pledged by Borrower which is approximately EUR 1.75mm (US$1.6 million).  Co-Obligor's source of wealth results from sale of Americall & STPCF, two companies involved in the medical supplies industry.

**PURPOSE:**     The original proceeds of the loan were used to purchase Euro-denominated DBNY deposits.  These DBNY deposits are held as collateral in custody accounts in the name of the Borrower and the Co-Obligor.  (The Co-Obligor received cash equivalent instruments, which were pledged as collateral in a custody account in the name of the Co-Obligor.)

**COLLATERAL :**     Borrowers's custody account number #191326 will continue to hold the following: DBNY branch deposits + Interest with a current MV of EUR 9.8MM (USD 9.2MM) and a LV of EUR 9.8MM (USD 9.2MM).  This deposit is denominated in Euro, has a one year maturity and pays Euribor. The first interest period was 1 month, the second interest period was eleven months and the current and subsequent interest periods are 1 year. The deposit has been designed for this transaction.

**Total Borrower Collateral:**
**MV: EUR 9.8MM, (USD 9.2MM)**
**LV: EUR 9.8MM, (USD 9.2MM)**

Co-Obligor's custody account number #140383 currently consists of the following collateral:
(i) Euro Cash with a MV of  EUR 8M (USD 7M) and a LV of EUR 8M (USD 7M) (ii) USD Cash with a MV of EUR 119M (USD 106M) and a LV of EUR 119M (USD 106M) (iii) Muni Bonds with a MV of EUR 2.5MM (USD 2.2MM) and a LV of EUR 1.9MM (USD 1.8MM)
**Total Co-Obligor collateral:**
**MV: EUR 2.6MM (USD 2.3MM)**
**LV:  EUR 2.1MM (USD 1.9MM)**

The Co-Obligor originally received EUR 1.73MM promissory note as consideration for joint liability under the Facility. The Co-Obligor liquidated the entire promissory note in order to trigger a tax loss in the tax (calendar) year 2001.  A portion of the liquidation remained in the account as Euro cash.  Other collateral substituted subsequently to the liquidation of the promissory note currently consists of USD cash and municipal bonds. Standard DB Private Banking approved lending values have been applied to all collateral.

**Total Collateral:**
**MV: EUR 12.4MM (USD 11.5MM)**
**LV: EUR 11.9MM (USD 11MM)**

Confidential                                                                                                    DB0012376

**Deutsche Bank Private Banking, Americas**                    **Structured Loan: LWH 4.1**

As with all CARDs transactions, borrower will continue to have the right to substitute collateral, all collateral to be deemed acceptable to the Bank in its sole discretion.

**SECTION 23 ATTESTATION:**   The Lending Officer has made such inquiries as determined to be appropriate under the circumstances, including an analysis of the transaction, the collateral and the application of the proceeds of the transaction and has accessed the database maintained by the Compliance Department that contains a listing of entities that have been determined to be affiliates ("Affiliates") for purposes of Sections 23A and 23B of the Federal Reserve Act ("Affiliate List").

- The entity which is entering into the transaction with Deutsche Bank Structured Products Inc. (DBSP) is not named as an Affiliate of the Applicable Bank on the Affiliate List maintained by the Compliance Department.
- The proceeds will not be transferred to or used for the benefit of a named Affiliate, except for transactions that are not covered transactions.

To the extent deemed appropriate for the purposes of this attestation, the Lending Officer has consulted with a member of the Legal Division.

**SECTION 23A:**   Lender is a non-bank entity collateral held; 23-A not applicable.

**BORROWER OWNERSHIP:**   Wanstead is a Delaware, USA registered special purpose vehicle, owned by Elizabeth A.D. Sylvester and Michael Sherry , U.K. residents. The updated KYC dated as of  May 20, 2002 is attached herein. Wanstead was established for this transaction.

**BORROWER FINANCIAL POSITION:**   The Borrower's initial pro-form balance sheet dated May 2002, is attached, prepared by the Borrower's manager.  Total assets stated to be EUR 11.5MM offset by our loan EUR 11MM.  Owner's Equity stated to be EUR 390M.

**DOCUMENTATION:**   The Bank was represented by the firms of Akin Gump (Stefan Dombrowski) and Moses & Singer (Jim Cornelio).  Akin Gump prepared the documentation.

**RECOMMENDATION:**   Based on the quality of the collateral this transaction continues to represent an acceptable credit risk.

Confidential                                                                                    DB0012377

# EXHIBIT

# 6

PB Americas                                                          Private Client Financing

## I-15 -LINE SHEET

| | | | Date: December 7, 2000 |
|---|---|---|---|

EUR/USD = 0.85335   **Initial**
November 16, 2000   **Commitment X**   **Review**   *Collateral Substitution*

| **Borrower:** Knightsbridge Financial Trading LLC ("Knightsbridge") **Co-Obligor:** Brion Applegate | **Location:** Chicago (Westhoff) | **Next Review** 11/30/01 |
|---|---|---|

| Collateral Provider: Same | Location:  Same |
|---|---|

| Customer RAROC: 1 / A+ | Booking Location: Deutsche Bank Sharps Pixley Inc. (DBSP) | Country of Risk:  USA |
|---|---|---|

| Credit Audit Classification: (Pass/WL/SM/SS/DBT)  Pass |
|---|

**Rate:** Libor + 50 basis points year 1;
**Libor + 70 basis points thereafter**

**Repayment Terms: Effectively 7 Years**
Thirty Year Term Note. Single Draw (Non-Revolver), Bank has the right to require repayment of Facility after 7 years.

| Type of Facility | Amount | Expiry/Maturity Date of DB Commitment | Collateral A/C #, Name & Location |
|---|---|---|---|
| Term Credit Agreement | USD 23.52MM (EUR 27.56MM) | November 16, 2007 | **Borrower:** BTCO Custody account #191039 USD 20MM (EUR 23.437MM) **Co-Obligor:** BTCO Custody a/c #140354 EURO: 4.18MM, (USD 3.57MM) in DBNY issued Promissory Note with right of substitution of Cash or US Government Bond Portfolio. |
| TOTALS: | USD 23.52MM (EUR 27.56MM) | | MV: USD23.57MM  (EUR 27.62MM) LV:  USD23.57MM  (EUR 27.62MM) |

*STANDARD ADVANCE RATES*

Other Group Relationships (through Borrower or Collateral Provider Group)

| Borrower | Type of Facility | Amount | Collateral A/C #, Name & Location |
|---|---|---|---|
| | | | |
| TOTAL GROUP EXPOSURE: | USD 23.52MM (EUR 27.56MM) | | MV: USD23.57MM  (EUR 27.62MM) LV:  USD23.57MM  (EUR 27.62MM) |

**Approvals:**                                      Date:

Total AUM:        | USD |        Lending Officer:        J. Marson        *12/14/00*

PB Earnings Year 1:   | USD 174,029 |   Lending Division Head:   L. Hoagland   *12/14/00*

CTS Accurate        | |        Risk Management:        C. Binder   *12·14·00*

cc:   Risk Management    Central Files    Chrono    Credit Audit    S. Schwuchow

Knightrsbridge -Applegate                                          Page 1 of 3

Confidential                                          DB0023689

PB Americas                                          Private Client Financing

**CREDIT MEMORANDUM**
**TERM CREDIT AGREEMENT UNDER CARDs PROGRAM**
**BORROWER: Knightsbridge Financial Trading LLC ("Knightsbridge")**
**CO-OBLIGOR:  Brion Applegate**

**THIS MEMO SERVES TO AMEND THE ORIGINAL I-15 CREDIT MEMORANDUM TO INCORPORATE A CO-OBLIGOR, JOINT AND SEVERALLY LIABLE ON THE FACILITY.**

**BACKGROUND:**     This amendment to the original credit memorandum documents emergence of the Co-Obligor Euro loan commitment of EUR 27.56MM, (being the equivalent USD 23.52MM) to Knightsbridge Financial Trading LLC. This borrower is one of a series of CARDs transactions.

The Co-Obligor has significant net worth, stated in his financials dated November 15, 2000, to exceed USD 315 million. Annual income for 2000 is estimated at $30.7 million.  No stated liabilities.  His source of wealth results from Venture Capital deals since 1979.

**PURPOSE:**     The original proceeds of the loan were used to purchase Euro-denominated DBNY deposits.  Co-Obligor received cash equivalent instruments, which will be pledged as collateral in Bankers Trust custody accounts in the names of the Borrower and the Co-Obligor.

**COLLATERAL :**     Borrower's BT Custody Account number #191039 will continue to hold the following:  EUR 23.43MM, (USD 20.00MM) DBNY branch deposits; EUR 28.02M, (USD 23.91M) cash

Co-Obligor's BT Custody Account number #140354 will initially hold EUR 4.18MM, (USD 3.57MM) DBNY branch promissory note.  The Co-Obligor receives the USD 3.57MM promissory note as consideration for joint liability under the Facility.  The Co-Obligor will initially liquidate 100% of the promissory note to trigger a tax loss in the tax (calendar) year 2000 and substitute cash for the entire portion of promissory note redeemed. Note that over time cash will be converted to a DB managed US Government Bond Portfolio, for which our standard DB Private Banking approved lending values will apply.

Borrower's Collateral:
EUR 23.44MM, (USD 20MM) DBNY branch deposits
EUR 28.02MM, (USD 23.91M) cash.

Co-Obligor's Collateral:
EUR 4.18MM, (USD 3.57MM) DBNY branch promissory note
(To be initially substituted with cash which will over time be converted to a DB managed US Government Bond Portfolio.)

Total Market Value: USD 23.57MM  (EUR 27.62MM)
Total Loan Value: USD 23.57MM  (EUR 27.62MM)

*[handwritten: 90% of 3 years maturity or less.]*

Knightrsbridge -Applegate                                  Page 2 of 3

PB Americas                                             Private Client Financing

**BORROWER
OWNERSHIP:**                Knightsbridge is a Delaware, USA registered special purpose vehicle,
                           owned is owned by Mio Sylvester, a U.K. resident who is a barrister. The
                           completed KYC dated October 2000 is attached herein. Knightsbridge was
                           established for this transaction.

**BORROWER
FINANCIAL POSITION:**       The Borrower's initial pro-form balance sheet dated November 1, 2000, is
                           attached, prepared by the Borrower's manager.  Initial paid in capital of
                           USD1.65MM, in the form of notes receivable, no liabilities.

**CO-OBLIGOR
RELATIONSHIP:**             Co-Obligor was introduced to the transaction by Chenery Associates and is
                           part of a tax strategy.   The Co-Obligor will receive favorable tax treatment
                           by creating a loss which will be used to offset gains in the applicable tax
                           year when such loss is incurred.

**CO-OBLIGOR
FINANCIAL POSITION:**       The Co-Obligor has significant net worth, stated in his financials dated
                           November 15, 2000, to exceed USD 315 million. Annual income for 2000
                           is estimated at $30.7 million.  No stated liabilities.

**DOCUMENTATION:**          Bank has been represented by the firms of Akin Gump (Ruth Carmen) and
                           Moses & Singer (Jim Cornelio). Akin Gump prepared the documentation.
                           Moses & Singer advised on lending terms.

**RECOMMENDATION:**         Based on the quality of the initial collateral (DB deposits and equivalent
                           liabilities), this transaction represents an acceptable credit risk.

Knightrsbridge -Applegate                                          Page 3 of 3

# EXHIBIT
# 7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x

DEUTSCHE BANK SECURITIES INC.; DB ALEX. :
BROWN LLC; JANET SIBLE; MARK WESTHOFF; :
MICHAEL JACOBY; J. RALPH PARKER; NANCY :
FAHMY; MICHAEL RAPHAEL; and MARY ANN :
COLEMAN, :
                                                        :

                       Plaintiffs, :

            - against - :

THOMAS M. ROSKOS, JR.; DR. THOMAS ROSKOS, :
SR.; BRION APPLEGATE; EDDY ASLANIAN; TOM :
JERMOLUK; VAL VADEN; and LILLI J. REY, :
                                                        :

                      Defendants. :
-------------------------------------------------------------------- x

**ANSWER TO
COUNTERCLAIM**

**15 Civ. 00534 (LTS)**

       Plaintiffs Deutsche Bank Securities Inc. ("DBSI") and DB Alex. Brown LLC ("DB

Alex. Brown"), and Plaintiffs Janet Sible, Mark Westhoff, Michael Jacoby, J. Ralph Parker,

Nancy Fahmy, Michael Raphael, and Mary Ann Coleman (collectively, the "Private Bank

Employees" and, together with DBSI and DB Alex. Brown, the "Plaintiffs" or "Deutsche

Bank Parties"), by and through their undersigned attorneys, hereby allege as follows for their

answer to the Counterclaim by Defendants Thomas M. Roskos, Jr.; Dr. Thomas Roskos, Sr.;

Brion Applegate; Eddy Aslanian; Tom Jermoluk; Val Vaden; and Lilli J. Rey (collectively,

the "Defendants" or "Tax Shelter Participants"):

             **COUNTERCLAIM FOR DECLARATION OF ARBITRABILITY**

       1.     On April 22, 2015, Defendants brought an Amended Statement of
Claims in FINRA Claim No. 14-03280 (the "FINRA Arbitration") against Deutsche

1

Bank Securities Inc. ("DBSI"), DB Alex. Brown LLC ("DB Alex. Brown"), Janet
Sible ("Sible"), Mark Westhoff ("Westhoff"), J. Ralph Parker ("Parker"), Nancy
Fahmy ("Fahmy"), Michael Raphael ("Raphael"), Mary Ann Coleman ("Coleman")
and Michael Jacoby ("Jacoby").

   **ANSWER:**   Admitted.

   2.    Defendants' Statement of Claims in the FINRA Arbitration asserted
various claims against Plaintiffs based on Plaintiffs' conspiracy to defraud
Defendants.

   **ANSWER:**   With respect to the allegations contained in this paragraph,

Plaintiffs admit that Defendants filed an Amended Statement of Claims in the FINRA

Arbitration.  Plaintiffs respectfully refer the Court to that document for its complete,

true and correct contents, and otherwise deny the allegations contained in this

paragraph.

   3.    In particular, DBSI, DB Alex. Brown, Sible, Westhoff, Jacoby, Parker,
Fahmy, Raphael, Coleman and their other co-conspirators conspired to defraud
Defendants, and did defraud them, into participating in six separate Custom
Adjustable Rate Debt Structure ("CARDS") transactions. Defendants believed the
CARDS transactions were loans with legitimate tax sheltering benefits but, as
Plaintiffs and their co-conspirators knew, they were in reality nothing more than
illegal tax shelters.

   **ANSWER:**   Denied.

   4.    Plaintiffs are each current or former FINRA members and each agreed
to arbitrate claims brought against them pursuant to FINRA Rule 12200. Under that
rule, Plaintiffs must arbitrate the FINRA Arbitration because it involves disputes
between customers (*i.e.*, Defendants) and FINRA members (*i.e.*, Plaintiffs), and
because those disputes arise "in connection with the business activities" of Plaintiffs.
Defendants are "customers" of Plaintiffs for purposes of FINRA Rule 12200 because
they purchased services from Plaintiffs in connection with the CARDS transactions
into which they were defrauded.

   **ANSWER:**   Plaintiffs admit that they are current or former FINRA

members.  The remaining allegations contained in this paragraph constitute legal

conclusions to which no response is required. To the extent a response is required,

Plaintiffs deny such allegations.

5.    As such, Defendants bring this counterclaim seeking a declaration that Plaintiffs are required to arbitrate, in FINRA, the claims alleged in the FINRA Arbitration.

**ANSWER:**   Plaintiffs admit that Defendants have brought a counterclaim for

declaratory relief but deny that the claims raised in the Amended Statement of Claims

are subject to FINRA arbitration.

## Parties

6.    DBSI is a Delaware corporation with an office in New York, New York, is a registered broker-dealer firm (CRD #2525) with FINRA, and was involved in implementing the CARDS transactions into which Defendants were defrauded.

**ANSWER:**   Plaintiffs deny the allegations contained in this paragraph,

except admit that DBSI is a Delaware corporation with an office in New York, New

York, and is registered with FINRA as a broker-dealer firm (CRD #2525).

7.    DB Alex. Brown is a Delaware corporation, was a registered broker-dealer firm (CRD #17790) with FINRA, and was involved in implementing the CARDS transactions into which Defendants were defrauded.

**ANSWER:**   Plaintiffs deny the allegations contained in this paragraph,

except admit that DB Alex. Brown is a Delaware subsidiary of DBSI and was

previously registered with FINRA as a broker-dealer firm (CRD #17790).

7.    Sible (CRD #19310300) is a broker-dealer employed by DBSI who helped market and implement the CARDS transactions into which Defendants were defrauded, and is based in DBSI's Chicago office.

**ANSWER:**   Plaintiffs deny the allegations contained in this paragraph,

except admit that Sible is registered with FINRA as a broker-dealer (CRD #1931030).

8.     Westhoff (CRD #4368008) is a broker-dealer employed by DBSI who helped market and implement the CARDS transactions into which Defendants were defrauded, and is based in DBSI's Chicago office.

**ANSWER:**    Plaintiffs deny the allegations contained in this paragraph,

except admit that Westhoff is registered with FINRA as a broker-dealer (CRD

#4368008).

9.     Jacoby (CRD #1506392) is a broker-dealer employed by DBSI who helped market and implement the CARDS transactions into which Defendants were defrauded, and is based in DBSI's Chicago office.

**ANSWER:**    Plaintiffs deny the allegations contained in this paragraph,

except admit that Jacoby is registered with FINRA as a broker-dealer (CRD

#1506392).

10.    Parker (CRD #356664) is a broker-dealer who was registered with DB Alex. Brown and helped market and implement the CARDS transactions into which Vaden was defrauded.

**ANSWER:**    Plaintiffs deny the allegations contained in this paragraph,

except admit that Parker is registered with FINRA as a broker-dealer (CRD #356664).

11.    Fahmy (CRD # 2689751) is a broker-dealer who was registered with DBSI and helped market and implement the CARDS transaction to Claimants.

**ANSWER:**    Plaintiffs deny the allegations contained in this paragraph,

except admit that Fahmy is registered with FINRA as a broker-dealer (CRD

#2689751).

12.    Raphael (CRD #4372124) is a broker-dealer who was registered with DBSI and helped market and implement the CARDS transaction to Claimants.

**ANSWER:**    Plaintiffs deny the allegations contained in this paragraph,

except admit that Raphael is registered with FINRA as a broker-dealer (CRD

#4372124).

13.     Coleman (CRD #1677646) is a broker-dealer who was registered with DBSI and DB Alex. Brown, and helped market and implement the CARDS transaction to Claimants.

**ANSWER:**     Plaintiffs deny the allegations contained in this paragraph, except admit that Coleman is registered with FINRA as a broker-dealer (CRD #1677646).

10.     Thomas M. Roskos, Jr. is an individual and, at all relevant times, has been a resident of Scottsdale, Arizona.

**ANSWER:**     Plaintiffs lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph, and on that basis deny any such allegations.

11.     Dr. Thomas Roskos Sr. is an individual and, at all relevant times, has been a resident of Scottsdale, Arizona.

**ANSWER:**     Plaintiffs lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph, and on that basis deny any such allegations.

12.     Brion Applegate is an individual and, at all relevant times has been a resident of Menlo Park, California.

**ANSWER:**     Plaintiffs lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph, and on that basis deny any such allegations.

13.     Eddy Aslanian is an individual and, at all relevant times has been a resident of Las Vegas, Nevada.

**ANSWER:**     Plaintiffs lack knowledge or information sufficient to form a

5

belief as to the truth of the allegations contained in this paragraph, and on that basis deny any such allegations.

14.     Tom Jermoluk is an individual and resides in Miami, Florida.

**ANSWER:**   Plaintiffs lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph, and on that basis deny any such allegations.

15.     Val Vaden is an individual and currently resides in Bryn Mawr, Pennsylvania.

**ANSWER:**   Plaintiffs lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph, and on that basis deny any such allegations.

16.     Lilli J. Rey is an individual who was the spouse of Val Vaden during the tax years in which Plaintiffs and their co-conspirators perpetrated their fraud and, at all relevant times, has been a resident of Hillsborough, California. Ms. Rey is a claimant in the FINRA Arbitration and a party here solely on the bases of (a) having filed joint federal income tax returns with Mr. Vaden for the tax years 2000 and 2001 that reflected the CARDS transaction, and (b) her interests in any recovery resulting from the claims against Plaintiffs, which interests arise under the community property laws of the State of California.

**ANSWER:**   Plaintiffs lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph, and on that basis deny any such allegations.

## **Factual Background**

17.     As more specifically alleged in Defendants' Amended Statement of Claims in the FINRA Arbitration, DBSI, DB Alex. Brown, Sible, Westhoff, Jacoby, Parker, Fahmy, Raphael, Coleman and their other co-conspirators—including Deutsche Bank's Bankers Trust Company, Deutsche Bank AG, Sidley LLP, f/k/a Sidley Brown & Wood LLP, f/k/a Brown & Wood LLP ("Sidley"), Raymond J.

Ruble ("Ruble"); Dewey & LeBoeuf LLP, f/k/a LeBoeuf, Lamb, Greene & MacRae LLP ("LeBoeuf"); Graham Taylor ("Taylor"); Sussex Financial Enterprises, f/k/a Chenery Associates, Inc. ("Chenery"); and Roy Hahn ("Hahn") (collectively with Plaintiffs, the "CARDS Dealers")—conspired to defraud Defendants into six separate CARDS transactions, which Defendants believed were loans with legitimate tax benefits, but, as Plaintiffs and their co-conspirators knew, were nothing more than illegal tax shelters.

**ANSWER:**  Denied.

18.     These are far from the only six fraudulent tax shelters that Deutsche Bank was involved in from 1996 to 2002. Indeed, Deutsche Bank (defined to include DBSI, Deutsche Bank's Bankers Trust Company, and Deutsche Bank AG) has entered into a non-prosecution agreement with the U.S. Government in which Deutsche Bank agreed to pay the Government more than a half-billion dollars in fines and penalties based on Deutsche Bank's participation in CARDS and numerous other tax shelters, including: Foreign Leveraged Investment Program ("FLIP"), Offshore Portfolio Investment Strategy ("OPIS"), Bond Linked Issue Premium Structure ("BLIPS"), Currency Option Investment Strategy ("COINS"), Family Office Customized Partnerships ("FOCUS"), and many others. (*See* Deutsche Bank Non-Prosecution Agreement ("NPA"), at 1-3.) In all, Deutsche Bank admitted that it "implemented over 2,300 financial transactions related to these shelters." (NPA at 2.)

**ANSWER:**  Plaintiffs deny the allegations contained in this paragraph,

except admit that non-party Deutsche Bank AG entered into a non-prosecution

agreement with the U.S. Government (the "NPA") and respectfully refer the Court to

the NPA for its complete, true and correct contents.

19.     Deutsche Bank also explicitly admitted that "during the period between approximately 1996 and 2002, through the conduct of certain Deutsche Bank employees, **Deutsche Bank participated in and implemented fraudulent tax shelters.**" (NPA at 1-2.) Deutsche Bank admitted it "**unlawfully, willfully and knowingly participated**" in fraudulent tax shelters like the ones it sold Defendants, and that "**it was wrong and unlawful** [for Deutsche Bank] **to have engaged in these transactions and it regrets having done so.**" (NPA Internal Ex. A at 1.) By the NPA, Deutsche Bank resolved its criminal liability arising out of its involvement in CARDS.

**ANSWER:**  Plaintiffs deny the allegations contained in this paragraph,

except admit that non-party Deutsche Bank AG entered into the NPA and respectfully

refer the Court to that document for its complete, true and correct contents.

20. As established in guilty pleas and criminal convictions, Deutsche Bank and its brokers, along with the law firm Sidley & Austin, and former Sidley partner R.J. Ruble, convicted of multiple federal crimes for his role in this scheme, conspired to perpetrate one of the largest tax frauds in the history of this country. Deutsche Bank and Sidley pushed a supposed loophole in the tax code they knew would not withstand IRS scrutiny. They did so for the sole purpose of enriching themselves and their co-conspirators with unconscionable fees—in excess of $330 million to Deutsche Bank alone, and without regard to the monetary and reputational damage their conduct would cause their clients, including Defendants here.

**ANSWER:** Denied.

21. Defendants reasonably relied on the advice and actions of Deutsche Bank, one of the most well-respected banks in the world, its brokers, and the Sidley lawyers with whom Deutsche Bank conspired, when they agreed to participate in the CARDS strategy.

**ANSWER:** The allegations contained in this paragraph constitute legal

conclusions to which no response is required. To the extent a response is required,

Plaintiffs deny such allegations.

22. Because of Plaintiffs' and their co-conspirators' fraud, each of the Defendants has paid a heavy price, including, to the extent applicable, (1) excessive fees to participate in the CARDS strategy, (2) huge penalties and interest assessed by the IRS and state internal revenue agencies, and (3) significant clean-up costs to extricate themselves from the mess created by Deutsche Bank and its partners-in-crime.

**ANSWER:** Denied.

23. During the implementation of the CARDS transactions into which Defendants were defrauded, Sible, Westhoff, Fahmy, Raphael and Jacoby were registered with FINRA with DBSI (and, upon information and belief, were employed by DBSI), Parker was registered with FINRA with DB Alex. Brown (and, upon information and belief, was employed by DB Alex. Brown), and Coleman was registered with FINRA with both DBSI and DB Alex. Brown (and, upon information

and belief, was employed by both DBSI and DB Alex. Brown).

**ANSWER:**    Plaintiffs deny the allegations contained in this paragraph,

except admit that Sible, Westhoff, Fahmy, Raphael, Parker, Coleman and Jacoby

were registered with FINRA during the time period relevant to this Action.

24.    Sible, Westhoff, Fahmy, Raphael, Parker, Coleman and Jacoby
performed brokerage services for Defendants in connection with their CARDS
transactions, including executing and/or supervising the execution of the CARDS
transactions' securities trades.

**ANSWER:**    Plaintiffs deny the allegations contained in this paragraph,

except admit that Sible, Westhoff, Fahmy, Raphael, Parker, Coleman and/or Jacoby,

acting on behalf of non-parties Deutsche Bank AG and Deutsche Bank Private Bank,

performed certain administrative services related to the referenced securities trades.

25.    Deutsche Bank saw the participation of such FINRA-registered brokers
as a necessary part of its implementation of CARDS transactions.

**ANSWER:**    Denied.

26.    Defendants paid Deutsche Bank millions of dollars of fees for its
services in implementing their CARDS transactions, including the services of DBSI
and its broker-dealers.

**ANSWER:**    Denied, except admit that Defendants each paid a fee to non-

party Deutsche Bank AG and/or its non-party affiliates with respect to the

transactions described in the Complaint.

27.    Upon information and belief, DBSI, DB Alex. Brown, Sible, Westhoff,
Jacoby, Parker, Fahmy, Raphael, and/or Coleman received a portion of those fees,
directly or indirectly.

**ANSWER:**    Denied.

## **Claim for Declaratory Judgment**

28.    Defendants repeat and reallege the allegations of paragraphs 1 to 27 of the Counterclaim above, as if fully set forth here.

**ANSWER:**    Plaintiffs repeat and reallege their responses to paragraphs 1 to 27 of the Counterclaim, as if fully set forth here.

29.    FINRA Rule 12200 provides that FINRA members (such as DBSI, Sible, Westhoff and Jacoby) must arbitrate disputes when requested by their customers (such as Defendants here) if the "dispute arises in connection with the business activities of the member or associated person."

**ANSWER:**    The allegations contained in this paragraph constitute legal conclusions to which no response is required.  To the extent a response is required, Plaintiffs deny such allegations  and respectfully refer the Court to the referenced provision for a true, accurate and complete understanding of its contents.

30.    A party is a "customer" of a FINRA member for purposes of FINRA Rule 12200 where the party purchases services, directly or indirectly, from the FINRA member.

**ANSWER:**    The allegations contained in this paragraph constitute legal conclusions to which no response is required.  To the extent a response is required, Plaintiffs deny such allegations and respectfully refer the Court to the referenced provision for a true, accurate and complete understanding of its contents.

31.    Plaintiffs provided services to Defendants in connection with the CARDS transactions and, upon information and belief, Plaintiffs were paid for it.

**ANSWER:**    Denied.

32.    As such, Plaintiffs must arbitrate the claims asserted against them by Defendants in the FINRA Arbitration.

**ANSWER:**    The allegations contained in this paragraph constitute legal

conclusions to which no response is required.  To the extent a response is required,

Plaintiffs deny such allegations.

Dated:  New York, New York
         June 19, 2015

                                     DUVAL & STACHENFELD LLP


By:   _____

                    Allan N. Taffet
                    Keith Blackman
                    555 Madison Avenue, 6th Floor
                    New York, New York 10022
                    Tel No.: (212) 883-1700

                    *Attorneys for Plaintiffs*

# EXHIBIT

# 8

| **From:** | Michael Raphael |
|---|---|
| **Sent:** | Monday, December 23, 2002 5:31 PM |
| **To:** | Janet Sible |
| **Subject:** | December 17 & 19, 2002 Settlements |
| **Attach:** | Redacted |

Please arrange for signature by the respective counterparties.

Regards,
Michael Raphael
Deutsche Bank Private Wealth Management
Product Management and Investment Solutions
280 Park Avenue, New York, N.Y. 10017 Fl. 22 East
Mail Stop NYC03-2204
P - 212-454-9947
F - 212-454-0542

----- Forwarded by Michael Raphael/NewYork/DBNA/DeuBa on 12/23/2002 05:26 PM -----

> Michael Raphael
> 12/12/2002 04:52 PM
>
> To: Jason Ang/NewYork/DBNA/DeuBa@DBNA, Carlos Moya/NewYork/DBNA/DeuBa@DBNA, Kareim Emam/NewYork/DBNA/DeuBa@DBNA, Patricia Peschiulli/NewYork/DBNA/DeuBa@DBNA, Fazal Nabbie/NewYork/DBNA/DeuBa@DBNA, Caroline E Adeshola/NewYork/DBNA/DeuBa@DBNA
> cc: Janet Sible/NewYork/DBNA/DeuBa@DBNA, Guido Graff/NewYork/DBNA/DeuBa@DBNA, Susan Berry/NewYork/DBNA/DeuBa@DBNA, Mark R Westhoff/NewYork/DBNA/DeuBa@DBNA
> Subject: December 17 & 19, 2002 Settlements

Existing Trades to be settled on 12.17.02

1. Redacted Client buys EUR 61,177,446 at .8891. Sells USD 54,392,867.24.

Please pair off EUR 61,177,446 due to Redacted as a result of maturing forward contract with spot trade executed today for value 12-17-02.

See further instructions below (Point 1 New Trades done today to be settled on 12.17.02).

2. Thomas Jermoluk. Cust. No. 0570022. Client buys EUR 4,558,172.10 at .8875. Sells USD 4,045,377.74.

Please deliver EUR 4,558,172.10 to: DB NY Internet Account No. 104 119 260 008. USD 4,045,377.74 will be paid by C/P to DBTCA London Account 04-411-739 with Ref. DBI No. 0570022 Jermoluk.

DB0003710

3.  Thomas Jermoluk.  Cust. No. 0570022.  Client buys EUR 3,479,557.33 at .9771.  Sells USD 3,399,875.46.

Please deliver EUR 3,479,557.33 to:  DB NY Internet Account No. 104 119 260 008.  USD 3,399,875.46 will be paid by C/P to DBTCA London Account 04-411-739 with Ref. DBI No. 0570022 Jermoluk.

Existing Trades to be settled on 12.19.02



New Trades done today to be settled on 12.17.02



2.  Thomas Jermoluk.  Cust. No. 0570022.  Trade Date:  12/12/2002, Settlement Date:  12/17/2002.

Client buys EUR 197,309.37 at 1.0210.  Sells USD 201,452.87.

Please deliver EUR 197,309.37 to:  DB NY Internet Account No. 104 119 260 008.  USD 201,452.87 will be paid by C/P to DBTCA London Account 04-411-739 with Ref. DBI No. 0570022 Jermoluk.

New Trades done today to be settled on 12.19.02





New Trades done today to be settled on 12.17.03



New Trades done today to be settled on 12.19.03



Instructions at you fax 469-3240.  Let me know if you have any questions or concerns.

Regards,
Michael Raphael
Deutsche Bank Private Wealth Management
Product Management and Investment Solutions
280 Park Avenue, New York, N.Y. 10017 Fl. 22 East
Mail Stop NYC03-2204
P - 212-454-9947
F - 212-454-0542


<<...>> <<...>>

Confidential

# EXHIBIT
# 9

**From:**      Michael Raphael
**Sent:**      Tuesday, September 10, 2002 10:55 AM
**To:**        Janet Sible; Fazal Nabbie; Gardenia Salguero
**Cc:**        Sven Schwuchow; Jason Ang
**Subject:**   Re: Execution Notice - Thomas Jermoluk - Spot and new Forward
**Attach:**    pic26439.jpg

Janet:  FX does not have access to PB accounts for automatic debits to take place.  Please arrange for EUR 3,479,557.33 to be transferred to:

Deutsche Bank AG, Frankfurt
Swift DEUTDEFF
Deutsche Bank AG, London
Acct. No. 925799900
Val 9.11.02

Fazal:  Please arrange for USD 3,409,966.18 to be transferred to client.
Instructions are as follows:

DBTCO Americas NYC/Cust
ABA# 021 001 033
New York, NY
A/C 99-401-380
FFC 140362 Thomas Jermoluk
Val 9.11.02

Regards,
Michael Raphael
Deutsche Bank Private Wealth Management
Product Management and Investment Solutions
280 Park Avenue, New York, N.Y. 10017 Fl. 22 East
Mail Stop NYC03-2204
P - 212-454-9947
F - 212-454-0542

          Janet Sible
                          To:     Susan Berry/NewYork/DBNA/DeuBa@DBNA,
Michael
               09/09/2002 05:30
Raphael/NewYork/DBNA/DeuBa@DBNA

Confidential                                                                 DB0002866

PM                    cc:      Christine Cronin/NewYork/DBNA/DeuBa@DBNA, Jeanette
K
                               Sadlon/NewYork/DBNA/DeuBa@DBNA, Mark R
Westhoff/NewYork/DBNA/DeuBa@DBNA, Nancy
                               M Fahmy/NewYork/DBNA/DeuBa@DBNA, Sven
Schwuchow/NewYork/DBNA/DeuBa@DBNA
                               Subject: Re: Execution Notice - Thomas Jermoluk - Spot and new
Forward(Document
                               link: Michael Raphael)




Sue, you're the best.  Thanks!!

Mike,
This client has been very good about signing long form confirms so I don't
anticipate any problems there.
His Euros are sitting in DB Custody account 140362.  Can London debit Euros
from that account or will we need to send a wire out for value 9/11/02?
Please advise.

Dollars should be paid to:
DBTCO Americas NYC/Cust
ABA# 021 001 033
New York, NY
A/C 99-401-380
FFC 140362 Thomas Jermoluk


The old instructions that I have for payment are as follows:

Deutsche Bank AG, Frankfurt
Swift DEUTDEFF
Deutsche Bank AG, London
Acct. No. 925799900


Again, Mike, are these the correct instructions for a EUR wire or can the
money be debited from the client's DB Custody account?

Regards,

Janet




                    Susan Berry

Confidential

To:     Janet Sible/NewYork/DBNA/DeuBa@DBNA
09/09/2002 04:13      cc:     Michael Raphael/NewYork/DBNA/DeuBa@DBNA, Nancy
M
PM             Fahmy/NewYork/DBNA/DeuBa@DBNA, Mark R
Westhoff/NewYork/DBNA/DeuBa@DBNA, Sven
Schwuchow/NewYork/DBNA/DeuBa@DBNA, Christine
Cronin/NewYork/DBNA/DeuBa@DBNA,
Jeanette K
Sadlon/NewYork/DBNA/DeuBa@DBNA
Subject:  Execution Notice - Thomas Jermoluk - Spot and new
Forward

We executed the below transaction this afternoon:

CLIENT TRANSACTION

Client: Thomas Jermoluk
Customer Number: 0570022

A)Spot Trade
Trade Date: 9/9/02
Value Date:  9/11/02
Spot: 0.9800
Client Sells EUR 3,479,557.33 / Buys USD3,409,966.18

B)
New Forward
Trade Date: 9/9/02
Value Date: 12/17/02
Spot: 0.9800
Frd Points: (-29 )
All-in Rate: 0.9771
Client Buys EUR 3,479,557.33   / Sells USD3,399,875.46

(Embedded image moved to file: pic26439.jpg)

DB0002868

# EXHIBIT
# 10

**From:**     Janet Sible
**Sent:**     Friday, August 3, 2001 4:36 PM
**To:**       Nancy M Fahmy@Bankers_Trust
**Cc:**       John R Marson@Bankers_Trust; Mark R Westhoff@Bankers_Trust
**Subject:**  myCFO - Confirmations

---

Nancy,

I am sending (via Federal Express tonight) original executed:
1) Deliverable Forward Rate FX Transactions - Long Form Confirm
2) First Ammendment to the Master Security Agreement

for the following clients:



Val Vaden
Thomas Jermoluk

Please confirm upon receipt.

**We are still waiting on the Long Form Confirms for the Redacted
forward  executed 3/20/01
and the two Roskos trades done on 6/28/01.

As per our conversation earlier this afternoon, we will retrieve the Redac
Reda revised confirm
previously sent to myCFO and I will expect to get from you a new confirm including
the forward transaction done on 8/3/01.


Regards,

Janet

DB0001195

# EXHIBIT
# 11

| | |
|---|---|
| **From:** | Janet Sible |
| **Sent:** | Wednesday, June 5, 2002 9:57 AM |
| **To:** | Michael Raphael |
| **Cc:** | John R Marson @ BANKERS_TRUST; Mark R Westhoff; Nancy M Fahmy; Susan Berry; Jeanette K Sadlon |
| **Subject:** | FX Forwards for Roskos - Dr. and Jr. |
| **Attach:** | pic18007.jpg |

Great timing Mike!

We were just talking about these forwards yesterday.  We will want to pair them off against new forwards to 6/13/2003.
The notional amount of Euros may need to be increased a bit, we won't have the exact numbers until next week.

If it is possible, we would prefer to execute both forwards on June 11th or 12th.  There are two different maturity dates, (June 13 & 17) for the maturing forwards, but hopefully we can do whatever spot trades are necessary and then do one new forward for each of the two clients.

Regards,

Janet


--------------------- Forwarded by Janet Sible on 06/05/2002 08:39 AM
--------------------------


From:  Michael Raphael on 06/05/2002 09:04 AM EDT

To:   Janet Sible/NewYork/DBNA/DeuBa@DBNA
cc:   Nancy M Fahmy/NewYork/DBNA/DeuBa@DBNA; Susan
      Berry/NewYork/DBNA/DeuBa@DBNA; Jeanette K
      Sadlon/NewYork/DBNA/DeuBa@DBNA
Subject:   Roskos - Dr. and Jr.

Janet:  We have some transactions coming due mid-month.  Is there potential for these trades
to be unwound or will these transactions settle physically.  If physical, please provide client
EUR instructions.

DB0010505

(Embedded image moved to file: pic18007.jpg)

Regards,
Michael Raphael
Deutsche Bank Private Banking
Structured Products and Alternative Investments Group
280 Park Avenue, NY NY 10017 Fl. 22 East
NYC03-2204  Mail Stop
212-454-9947 Phone
212-454-0542 Fax

Confidential

# EXHIBIT 12

| | |
|---|---|
| **From:** | Jens Krause |
| **Sent:** | Monday, October 1, 2001 2:11 PM |
| **To:** | John R Marson@Bankers_Trust |
| **Cc:** | Sven Schwuchow |
| **Subject:** | FX Forward Long Form Confirmation Amendments |
| **Attach:** | ████████ Redacted ████████ FX Confirm Thomas Jermoluk_Final_092601.doc; FX Confirm Val Vaden_Final_092601.doc |

John,

I think this issue should have been addressed to you.

Regards

Jens

Jens Krause
Assistant Vice President
Deutsche Bank AG New York
Private Banking / Lending Group
280 Park Avenue, 6 Middle
Mailstop NYC03-0603
New York, NY 10017
Phone: (212) 454-2780
Fax: (212) 454-4740


--------------------- Forwarded by Jens Krause on 10/01/2001 02:10 PM
---------------------------


From:  Michael Raphael on 10/01/2001 01:35 PM

To:    Jens Krause/NewYork/DBNA/DeuBa@DBNA
cc:
Subject:   FX Forward Long Form Confirmation Amendments

Jens:  Please provide settlement instructions for each of these
transactions which come due in Dec.  I'll need to pass instructions along
to FX Ops.

Regards,
Michael Raphael

Confidential

Bankers Trust Private Banking
Structured Products Group
NYC03-2204  Mail Stop
212-454-9947 Phone
212-454-0542 Fax


--------------------- Forwarded by Michael Raphael on 10/01/2001 01:34 PM
--------------------------


Michael Raphael on 09/26/2001 12:18:32 PM

To:   Nancy M Fahmy@Bankers_Trust
cc:
Subject:   FX Forward Long Form Confirmation Amendments

Nancy:  See attached USD amounts.  They have been amended to reflect the
exact dollar amount... to the penny.  Please advise Kevin of this change if
you deem necessary.

Regards,
Michael Raphael
Bankers Trust Private Banking
Structured Products Group
NYC03-2204  Mail Stop
212-454-9947 Phone
212-454-0542 Fax


--------------------- Forwarded by Michael Raphael on 09/26/2001 12:17 PM
--------------------------


Nancy M Fahmy
09/26/2001 11:40 AM

To:   Kevin M Heidel@Bankers_Trust
cc:   Michael Raphael@Bankers_Trust
Subject:   FX Forward Long Form Confirmation Amendments


Kevin,

We executed the following FX forward transactions where the client bought
EUR/Sells USD forward for Value 12/20/01.  This value
date was amended yesterday to 12/14/01.  We sent the client's long form
confirmations and I was wondering if you could please
take a look at the following confirmations and let me know if they're ok to

Confidential

send out.  Also, please advise where you suggest adding amendment on the confirmation.

| Client Name | Cust# | EUR Amt | Rate | USD Amt | Orig Val Date | New Val Date |
|---|---|---|---|---|---|---|
| Val E. Vaden | 140359 | 8,300,000 | 0.940475 | | | |
| $7,805,943.50 | 20-Dec-01 | 12/14/2001 | | | | |

<div style="background:black;color:white">Redacted</div>

| | | | | | | |
|---|---|---|---|---|---|---|
| Thomas A. Jermoluk | 140362 | 3,848,000 | 0.940475 | | | |
| $3,618,947.80 | 20-Dec-01 | 12/14/2001 | | | | |

Also, I've added the following transaction to the original Vak E Vaden confirmation as well as changing the valuation on the initial transaction if you could please add the transaction number and check my information before it goes out to the client.

| Client Name | Cust# | EUR Amt | Rate | USD Amt | Orig Val Date | New Val Date |
|---|---|---|---|---|---|---|
| Val E. Vaden | 140359 | 2,085,044 | 0.883900 | | | |
| $1,842,970.39 | 20-Dec-01 | 12/14/2001 | | | | |

<div style="background:black;color:white">Redacted</div>

(See attached file: FX Confirm Thomas Jermoluk_Final_092601.doc)(See attached file: FX Confirm Val Vaden_Final_092601.doc)

Please let me know if you need any additional information.

Thanks for your help,

Nancy Fahmy
Bankers Trust Private Banking
Structured Products Group
280 Park Ave, 22E
New York, NY 10017
Phone: 212-454-1142
Fax: 212-454-0542

Confidential

# EXHIBIT 13

| | A | B | C |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | **BIGGLESWORTH - Thomas Jermoluk** | | |
| 4 | *Loan pays down on 12/18/02* | | |
| 5 | Loan Interest due 12/18/02 | EUR 1,876,355.66 | Interest on Loan of EUR 46,370,638 @ 3.991 - 12/18/01 to 12/18/02 - 365 days |
| 6 | Loan principal due | EUR 46,370,638 | |
| 7 | CD (85%) principal | EUR 38,718,615 | CD Face amount (85%) |
| 8 | Interest on CD (85%) deposit paid 12/18/02 | EUR 1,291,927.25 | 85% CD interest amount (365 days @ 3.291 Euribor) |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | Custody fee a/c 140362 | USD 7,025 | 2002 Custody fee - Thomas Jermoluk (7bps on avg balance of $9,900,000) |
| 13 | Custody fee a/c 191234 | USD 3,000 | 2002 Custody fee -Bigglesworth Financial Trading LLC |
| 14 | | | |
| 15 | Euro balance in Bigglesworth DBI account | EUR 0 | |
| 16 | Euro cash in Bigglesworth's Global Plus Cust A/C | EUR 4,722.62 | |
| 17 | Euro cash in Thomas Jermoluk's DBI account | EUR 0 | |
| 18 | Euro cash in  Thomas Jermoluk's G+ Custody account | EUR 1,412.61 | |
| 19 | USD in  TJ's G+ Custody account | $26,413.39 | |
| 20 | | | |
| 21 | Forward contracts maturing: | | |
| 22 | *On 12/17/02* | *client owes US Dollars* | *$7,445,253.20* |
| 23 | *12/17/2002* | *client receives EUROS* | *EUR 8,037,729.43* |

DB0002707

|    | A        | B          | C                                  | D                     | E                | F      |
|----|----------|------------|------------------------------------|-----------------------|------------------|--------|
| 1  | LWH 3.3  |            | **Thomas Jermoluk**                | **# 0570022**         |                  |        |
| 2  |          |            | Original Amount of Promissory Note: |                      | EUR 7,137,368    |        |
| 3  |          | 12/13/2001 | **New Forward for Val 12/17/02**   | **Client buys Euros** | **EUR 4,558,172.10** | 0.8951 |
| 4  |          | 12/13/2001 | **New Forward for Val 12/17/02**   | **Client sells US Dollars** | **$4,045,377.74** | 0.8951 |
| 5  |          |            |                                    |                       |                  |        |
| 6  |          | 9/9/2002   | **Forward for Value 12/17/02**     | **Client sells US Dollars** | **$3,399,875.46** | 0.9771 |
| 7  |          | 9/9/2002   | **Forward for Value 12/17/02**     | **Client buys Euros** | **EUR 3,479,557.33** | 0.9771 |
| 8  |          |            |                                    |                       |                  |        |
| 9  |          | 12/12/2002 | Spot for Value 12/17/02            | Client buys Euros     | **EUR 197,309.37** | 1.02   |
| 10 |          | 12/12/2002 | Spot for Value 12/17/02            | Client owes US Dollars | **USD 201,452.87** | 1.02   |

DB0002708

| | A | B |
|---|---|---|
| 1 | TJ | Numbers in Euros |
| 2 | | |
| 3 | Loan Amt | 46,370,638 |
| 4 | Loan Int Exp | 1,876,355.66 |
| 5 | | **48,246,993.66** |
| 6 | | |
| 7 | CD Amount | 38,718,615.00 |
| 8 | CD Int Income | 1,291,927.25 |
| 9 | | **40,010,542.25** |
| 10 | | |
| 11 | EUR Shortfall | **8,236,451.41** |
| 12 | Total FX Contract Euros | 8,037,729.43 |
| 13 | Excess Euros in TJ G+ Acct | 1,412.61 |
| 14 | **Euro Shortfall** | **197,309.37** |
| 15 | | |
| 16 | | |
| 17 | **USD Needed to pay for FX Contract** | **$7,445,253.20** |
| 18 | | |
| 19 | | |
| 20 | Client purchased EUR 197,309.37 for settlement 12/17/02 | |
| 21 | Client owes an additional $201,452.87 to DB London on 12/17/02 | |
| 22 | | |
| 23 | | |
| 24 | FX Forward contracts paymt | $7,445,253.20 |
| 25 | Spot trade paymt | $201,452.87 |
| 26 | | |
| 27 | Wire to DB London 12/17/02 | **$7,646,706.07** |

Confidential

| | A | B | C |
|---|---|---|---|
| 1 | **Jermoluk Fund Analysis** | **KERRY BRATTON ANALYSIS** | |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | Loan Amt | 46,370,638.00 EUR | |
| 6 | Loan Int Exp | 1,876,355.66 EUR | |
| 7 | | **48,246,993.66** EUR | |
| 8 | | | |
| 9 | CD Amount | 38,718,615.00 EUR | |
| 10 | CD Int Income | 1,291,927.25 EUR | |
| 11 | | **40,010,542.25** EUR | |
| 12 | | | |
| 13 | EUR Shortfall | **8,236,451.41** EUR | |
| 14 | Total FX Contract Euros | 8,037,729.43 EUR | |
| 15 | Excess Euros in Acct #140362 | 1,412.61 EUR | |
| 16 | **Euro Shortfall** | **197,309.37** | |
| 17 | **Rate as of 12/6/02** | **1.007** | |
| 18 | **USD to Convert to EUR** | $   **198,690.54** | A |
| 19 | | | |
| 20 | Required Funds in #140362 | | |
| 21 | USD Needed to pay for FX **Contract** | **$7,445,253.20** | |
| 22 | **Fees 140362** | **$7,025.00** | |
| 23 | **Fees 191234** | **$3,000.00** | |
| 24 | **USD to over EUR Shortfall** | **$198,690.54** | A |
| 25 | **Total USD needed in #140362** | **$7,653,968.74** | |
| 26 | **Say** | **$7,660,000.00** | |
| 27 | | | |
| 28 | | | |
| 29 | **Available Funds in #140362** | | |
| 30 | Total DB account #140362 | $9,950,504.00 at 10/31 | |
| 31 | Detail of acct: | | |
| 32 | USD | $25,244.00 | |
| 33 | EUR | $1,394.00 | |
| 34 | US T-Bills | $2,592,694.00 | |
| 35 | Fixed Income | $7,331,172.00 | |

Confidential

# EXHIBIT 14

Reese M. JONES, Plaintiff, v. DEUTSCHE BANK AG, A..., 2005 WL 6128641...

Case 1:15-cv-00534-LTS   Document 42-3   Filed 01/18/16   Page 100 of 205

2005 WL 6128641 (N.D.Cal.) (Trial Motion, Memorandum and Affidavit)
United States District Court, N.D. California.

Reese M. JONES, Plaintiff,

v.

DEUTSCHE BANK AG, A Corporation; Deutsche Bank Securities, Inc, a Corporation; Mio Sylvester, An
Individual; Michael Sherry, An Individual; Stars Holding Company (Formerly Known As Mycfo, Inc.,
Myinvestment Manager, LLC, myCFO Investment Advisory Services, myCFO Securities, and myCPA,
LLP, and Doing Business In California As Delaware Stars Holding Company); Chenery Associates, a
General Partnership; Chenery Associates, Inc., a California Corporation; Chenery Management, Inc.,
a California Corporation; Chenery Investments, Inc., a California Corporation; Chenery Services,
Inc., a California Corporation; Chenery Capital, Inc., a California Corporation; Sussex Financial
Enterprises, Inc., a California Corporation; Roy E. Hahn, An Individual; Leboeuf, Lamb, Greene
& Macrae, LLP, a Limited Liability Partnership; Does One Through Thirty, Inclusive; Defendants.

No. 504CV05357.
May 6, 2005.

Date: June 27, 2005
Time: 9:00 A.M.
Courtroom: 8

**Deutsche Bank AG's and Deutsche Bank Securities Inc.'s Motion to Dismiss Plaintiff's First Amended Complaint**

David S. McLeod (SBN 66808), Dewey Ballantine LLP, 333 South Grand Avenue, Suite 2600, Los Angeles, California
90071-1530, Telephone: (213) 621-6000, Facsimile: (213) 621-6100.

Lawrence M. Hill, Seth C. Farber, Dewey Ballantine LLP, 1301 Avenue of the Americas, New York, New York 10019-6092,
Telephone: (212) 259-8000, Facsimile: (212) 259-6333, Attorneys for Defendants Deutsche Bank Ag, Deutsche Bank Securities
Inc., d/b/a Deutsche Bank Alex. Brown, a Division of Deutsche Bank Securities Inc.

Honorable James Ware.

TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1
PRELIMINARY STATEMENT. ......................................................................................... 1
I. COUNT I SHOULD BE DISMISSED AS A MATTER OF LAW ...................................... 3
A. The PSLRA Bars Plaintiffs RICO Claim.... ................................................................ 3
B. Plaintiff Cannot Establish RICO Standing In Light Of Signed Representations That He Was Not      6
Receiving or Relying Upon Advice or Representations From Deutsche Bank About the CARDS
Investment Strategy .......................................................................................................
C. Plaintiff Fails to Allege a Pattern of Racketeering Activity ............................................. 8
1. Plaintiff Does Not Allege Closed-Ended Continuity... .................................................... 8
2. Plaintiff Does Not Allege Open-Ended Continuity.... ..................................................... 10
D. Plaintiff Does Not Allege A Cognizable RICO Enterprise.... .......................................... 11
E. Deutsche Bank's Alleged Participation Does Not Rise To The Requisite Level of Operation Or     12
Management ...................................................................................................................
II. COUNT II SHOULD BE DISMISSED AS A MATTER OF LAW ..................................... 13
A. The Securities Law Violation Alleged in Count II Does Not Satisf The Heightened Pleading        13
Requirements Of The PSLRA ...........................................................................................

Reese M. JONES, Plaintiff, v. DEUTSCHE BANK AG, A..., 2005 WL 6124628...

Case 1:15-cv-00534-LTS  Document 42-3  Filed 01/18/16  Page 101 of 205

1. The Complaint Fails To Satisfy the PSLRA Mandate That It Specify Statements Attributable To Deutsche Bank That Are Allegedly Misleading... .................................................................... 14

2. The Complaint Fails to Satisfy the PSLRA Mandate That It State With Particularity All Facts On Which Allegations Upon Information and Belief Are Formed. ................................................ 16

3. The Complaint Fails To Allege Scienter .................................................................................. 17

B. Count II Is Barred By The Applicable Statute Of Limitations ................................................ 19

III. COUNTS I AND II DO NOT SATISFY THE PLEADING REQUIREMENTS UNDER RULE 9(b). .............................................................................................................................................. 20

CONCLUSION ............................................................................................................................. .21

## TABLE OF AUTHORITIES

Cases

*Adams v. Intralinks, Inc.* No. 03 Civ. 5384 SAS, 2004 WL 1627313 (S.D.N.Y. July 20, 2004)., .......................................................................................................................... 19

*Allison v. Brooktree Corp.,* 999 F. Supp. 1342, 1350 (S.D. Cal. 1998)., ........... 16

*Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.,* 189 F.3d 321 (3d Cir. 1999). ...................................................................................................................................................... 3

*Baumer v. Pachl,* 8 F.3d 341 (9th Cir. 1993) ............................................................ 12

*Berry v. Valence Tech., Inc.,* 175 F.3d 699 (9th Cir. 1999) ...................................... 19

*Carol Gamble Trust 86 v. E-Rex, Inc.,* No. 03-15032, 2004 WL 43216 (9th Cir. Jan. 5, 2004) ...................................................................................................... 14, 16, 17

*Chang v. Chen,* 80 F.3d 1293 (9th Cir. 1996). ................................................ 11, 12

*Chaset v. Fleer/Skybox Int 'l, LP,* 300 F.3d 1083 (9th Cir. 2002) ..................... 6

*Danann Realty Corp. v. Harris,* 5 N.Y.2d 317 (N.Y. 1959) ............................... 8

*Dep 't of Econ. Dev. v. Arthur Andersen & Co.,* 924 F. Supp. 449 (S.D.N.Y. 1996) .................................................................................................................... 12, 13

*Dodds v. Cigna Sec., Inc.,* 12 F.3d 346 (2d Cir. 1993) ...................................... 19

*DSAM Global Value Fund v. Altris Software, Inc.,* 288 F.3d 385 (9th Cir. 2002) ...................................................................................................................... 17

*Dura Pharmaceuticals, Inc. v. Broudo,* 125 S. Ct. 1627 (2005). ....................... 13

*Durning v. Citibank, Int 'l,* 990 F.2d 1133 (9th Cir. 1993). ......................... 9, 10

*Feeley v. Whitman Corp.,* 65 F. Supp. 2d 164 (S.D.N.Y. 1999). ......................... 8

*Fezzani v. Bear, Stearns & Co., Inc.,* No. 99 Civ. 0793 (RCC), 2005 WL 500377 (S.D.N.Y. March 2, 2005) ................................................................................ 3

*Goren v. New Vision Int 'l,* 156 F.3d 721 (7th Cir. 1998) ................................. 12

*Grauberger v. St. Francis Hospital,* 169 F. Supp. 2d 1172 (N.D. Cal. 2001)., .. 10

*H. Inc v. Northwestern Bell Tel. Co.,* 492 U.S. 229 (1989) ........................... .8, 10

*Hokama v. E.F. Hutton & Co.,* 566 F. Supp. 636 (C.D. Cal. 1983) ................... 21

*Holmes v. Sec. Investor Prot. Corp.,* 503 U.S. 258 (1992) ................................. 6

*Howard v. AOL, Inc.,* 208 F.3d 741 (9th Cir. 2000) ........................................... 3

*In re Blech Secs. Litig.,* 928 F. Supp. 1279 (S.D.N.Y. 1996) ........................... 15

*In re Daou Systems, Inc. Securities Litigation,* 397 F.3d 704 (9th Cir. 2005). ... 16

*In re Harmonic Inc. Sec. Litig.,* 163 F. Supp. 2d 1079 (N.D. Cal. 2001). .......... 14

*In re Initial Public Offering Securities Litigation,* 358 F. Supp. 2d 189 (S.D.N.Y. 2004) ................................................................................................... 15

*In re Scholastic Corp. Secs. Litig.,* 252 F.3d 63 (2d Cir. 2001). ....................... 15

*In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970 (9th Cir. 1999) .......... 14, 17, 18

*In re Tyco IntLtd., Sec. Litig.,* 185 F. Supp. 2d 102 (D.N.H.2002); *Allison v. Brooktree Corp.,* 999 F. Supp. 1342, 1350(S.D.Cal.1998) ........................................... 16

*Kahn v. Salomon Bros Inc.,* 813 F. Supp. 191 (E.D.N.Y. 1993) ......................... 4

*Kinsey v. Cendant Corp.,* 2004 WL 2591946 (S.D.N.Y. Nov. 16, 2004). .......... 14

*Kolbeck v. LIT America, Inc.,* 923 F. Supp. 557 (S.D.N.Y. 1996) ..................... 16

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350 (1991) ... 21

*McNabb v. S.E.C.,* 298 F.3d 1126 (9th Cir. 2002) ............................................... 4

*Moniz v. GM Corp.,* No. C98-4913, 2000 WL 1375285 (N.D. Cal. Sept. 18, 2000) ............................................................................................................................. 8

*Moore v. Kayport Pkg. Express, Inc.,* 885 F.2d 531 (9th Cir. 1989) ................. 20

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*

Reese M. JONES, Plaintiff, v. DEUTSCHE BANK AG, A..., 2005 WL 6142694...

Case 1:15-cv-00534-LTS   Document 42-3   Filed 01/18/16   Page 102 of 205

| | |
|---|---|
| *380 F.3d 1226, 1230 (9th Cir. 2004).* ......................................................... | 13 |
| *Parrino v. FHP, Inc.,* 146 F.3d 699 (9th Cir. 1998) ......................................... | 5, 7 |
| *Pillsbury, Madison & Sutro v. Lerner,* 31 F.3d 924 (9th Cir. 1994) .................. | 6 |
| *Reves v. Ernst & Young,* 507 U.S. 170 (1993)... .......................................... | 12 |
| *Schlaifer Nance & Co. v. Estate of Andy Warhol.* 119 F.3d 91 (2dCir. 1997)... | 9 |
| *Spira v. Curtin,* 97 Civ. 2637, 2001 WL 611386 (S.D.N.Y. June 5, 2001). ....... | 14 |
| *Superintendent of Ins. of State of N. Y. v. Bankers Life & Cas. Co.,* 404 U.S. 6, 10 n. 6, 92 S.Ct. 165 (1971) ...................................................................... | 4 |
| *Swartz v. KPMG, LLP,* et al., No. C03-1252P, slip. op. at 8 (W.D. Wash. Feb. 13, 2004)., | 8 |
| *Tate v. PG&E Co.,* 230 F. Supp. 2d 1072 (N.D. Cal. 2002) ............................ | 8 |
| *Tcherepnin v. Knight,* 389 U.S. 332.............................................................. | 4 |
| *United States v. Turkette,* 452 U.S. 576 (1981) ............................................. | 11 |
| *Vess v. Ciba-Geigy Corp. USA,* 317 F.3d 1097 (9th Cir. 2003) ....................... | 21 |
| *Weiss v. Mentor Graphics Corp.,* 1999 WL 985141 (D. Or. Oct. 6, 1999) ........ | 18 |
| *Westinghouse Elec. Corp. v. '21 Int'l Holdings, Inc.,* 821 F. Supp. 212 (S.D.N.Y. 1993) | 19 |
| *White v. H&R Block, Inc.,* No. 02 Civ. 8965 (MBM), 2004 WL 1698628 (S.D.N.Y. July 28, 2004)... ........................................................................ | 19 |
| *Wietschner v. Monterey Pasta Co.,* 294 F. Supp. 2d 1102 (N.D. Cal. 2003) ...... | 17 |
| Statutes | 15 |
| U.S.C. § 78c(a)(10) | 4 |
| 15 U.S.C. § 78i(e) ...................................................................................... | 19 |
| 15 U.S.C. § 78u-4(b)(1) ............................................................................. | 14, 16 |
| 18 U.S.C. § 1956(a)(1)(A)(ii) .................................................................... | 9 |
| 18 U.S.C. § 1961(4)., ................................................................................. | 11 |
| 18 U.S.C. § 1962(c) .................................................................................. | 2, 12 |
| 18 U.S.C. § 1962(d). ................................................................................. | 2 |
| 18 U.S.C. § 1964(c). ................................................................................. | 3 |
| 26 I.R.C. § 6700 ....................................................................................... | 17 |
| 26 I.R.C. § 7201. ...................................................................................... | 9 |
| 26 I.R.C. § 7206 ....................................................................................... | 9 |
| 26 I.R.C. § 7206(2). ................................................................................. | 9 |
| 28 U.S.C. § 1658(b). ................................................................................. | 19 |
| Federal Rule of Civil Procedure Rule 10b-5 ............................................... | 1, 2, 13 |
| Federal Rules of Civil Procedure 9(b)., ..................................................... | 1, 2, 12 |
| Federal Rules of Civil Procedure Rule 12(b)(6). .......................................... | 1, 5 |
| Notice 2002-21 ......................................................................................... | 4, 5 |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on June 27, 2005 at 9:00 a.m., or as soon thereafter as this matter may be heard, in Courtroom 8 of the above-entitled court, located at 280 S. First St., #2112, San Jose, California, Defendants Deutsche Bank AG and Deutsche Bank Securities Inc. (collectively "Deutsche Bank" or the "Deutsche Bank Defendants"), will and hereby do move to dismiss the plaintiff's claims pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).

Deutsche Bank moves to dismiss on the grounds that (1) Plaintiff's RICO claim is barred by federal statute; (2) Plaintiff fails to state a cognizable RICO claim; (3) Plaintiff's federal securities fraud claim under Rule 10b-5 is barred by the applicable statute of limitations; (4) Plaintiff fails to state a federal securities fraud claim under Rule 10b-5; and (5) Plaintiff fails to plead the fraud-based claims with the degree of particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. Accordingly, Plaintiff's First Amended Complaint should be dismissed as to Deutsche Bank.

Deutsche Bank's Motion to Dismiss is based upon this Memorandum of Points and Authorities, the declaration of David S. McLeod filed concurrently herewith and the exhibits attached thereto.

Reese M. JONES, Plaintiff, v. DEUTSCHE BANK AG, A..., 2005 WL 6182604...

Case 1:15-cv-00534-LTS Document 42-3 Filed 01/18/16 Page 103 of 205

## INTRODUCTION

Defendants Deutsche Bank AG and Deutsche Bank Securities Inc. d/b/a Deutsche Bank Alex. Brown (together with Deutsche Bank AG, "Deutsche Bank" or the "Bank") move pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure to dismiss the First Amended Complaint ("Complaint") with prejudice.

## PRELIMINARY STATEMENT

Plaintiff Reese M. Jones ("Jones" or "Plaintiff") pursued a tax-advantaged strategy known as the "CARDS facility," between December 2000 and November 2002 in order to reduce his tax liabilities. Now that the IRS has challenged the CARDS facility, Plaintiff claims that he was misled by the attorneys and financial advisors who provided advice about the CARDS facility and by Deutsche Bank, the financial institution that provided a loan and executed certain securities transactions that were part of the collateral for the loan. In Count I, Plaintiff alleges that Deutsche Bank and the other defendants violated RICO; Count II alleges that defendants are liable for securities fraud under Rule 10b-5. Both the RICO and securities fraud counts are predicated upon the identical factual allegations -- in essence, that defendants, collectively, engaged in a fraudulent scheme to induce Plaintiff to pursue the CARDS facility. Both counts of the Complaint must be dismissed.

Count I should be dismissed because the Private Securities Litigation Reform Act ("PSLRA") bars actions under RICO that are based upon conduct that would have been actionable as securities fraud. As demonstrated below, the factual allegations of the Complaint, if taken as true for purposes of this motion, allege securities fraud and, as such, cannot form the basis of a cognizable RICO action. Moreover, even if the PSLRA did not bar the RICO claim, Count I, as alleged, fails to satisfy the elements of a civil action under 18 U.S.C. §§ 1962(c) and (d). Finally, the allegations set forth in support of Count I of the Complaint fail to satisfy the specificity of pleading required by Federal Rule of Civil Procedure Rule 9(b).

Count II, Plaintiff's "alternative" securities fraud claim, is equally flawed and must be dismissed. Count II fails to allege any particularized facts connecting each of the Deutsche Bank Defendants to any of the alleged misrepresentations but relies instead on blanket allegations about "all defendants." Such generalized allegations fail under the heightened pleading requirements established by the PSLRA. Likewise, under Rule 9(b), the generalized allegations of the Complaint also fall short of the mark. Even if such pleading deficiencies did not exist, Count II still would not survive a motion to dismiss because it is barred by the applicable two-year statute of limitations. Based upon the allegations in the Complaint, Plaintiff was on discovery notice of the alleged fraud at least as of March 18, 2002, when the IRS published Notice 2002-21, which addressed the tax consequences of the CARDS investment strategy, and no later than April 16, 2002, when Plaintiff filed a claim for amnesty with the IRS in connection with his CARDS investment. Filed on December 17, 2004, the Complaint thus is barred by the two-year statute of limitations which expired no later than April 16, 2004.

For all of these reasons, as shown below, the Complaint should be dismissed in its entirety.

## I. COUNT I SHOULD BE DISMISSED AS A MATTER OF LAW

### A. The PSLRA Bars Plaintiffs RICO Claim

The PSLRA amended the RICO statute to provide that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962" unless there has been a prior criminal conviction for that conduct. 18 U.S.C. § 1964(c); *see also Howard v. AOL, Inc.,* 208 F.3d 741, 749-50 (9th Cir. 2000) (plaintiffs who had no standing to assert securities fraud claims were still barred by the RICO amendment from alleging securities fraud as a predicate act under RICO). This amendment not only bars RICO claims that explicitly allege securities fraud but also bars RICO claims that could have been pled as securities fraud. The PSLRA test "is not whether Plaintiff has in fact alleged a viable securities fraud claim, but rather, whether the nature of the conduct is such that, if properly plead and supported by proper

Reese M. JONES, Plaintiff, v. DEUTSCHE BANK AG, A..., 2005 WL 6128414...

Case 1:15-cv-00534-LTS   Document 42-3   Filed 01/18/16   Page 104 of 205

evidence, it could form the basis for a viable securities claim." *Howard v. AOL, Inc.,* 208 F.3d at 749. *See, e.g., Fezzani v. Bear, Stearns & Co., Inc.,* No. 99 Civ. 0793 (RCC), 2005 WL 500377, at *6 (S.D.N.Y. March 2, 2005) (denying leave to amend with additional RICO claims pled in the alternative because "[p]laintiffs [could not] seriously claim that their RICO cause of action incorporating over 300 paragraphs of alleged securities fraud centered on [defendant's] securities-fraud schemes, does not rely on any such conduct").

Congress intended that this amendment to the RICO statute be applied to prevent plaintiffs from dressing up what, at bottom, are securities fraud claims as RICO claims. In the words of the Third Circuit, based upon the legislative history of the PSLRA, "the amendment was intended not simply to 'eliminate securities fraud as a predicate offense in a civil RICO action,' but also to prevent a plaintiff from 'plead[ing] other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud." *Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.,* 189 F.3d 321, 327 (3d Cir. 1999) (quoting H.R. Conf. Rep. No. 104-369, at 47 (1995)).

Plaintiff seeks to achieve in Count I exactly what Congress wanted to prevent when it amended the RICO statute. The Complaint alleges that the defendants worked together for their own benefit in order to mislead the Plaintiff to invest in a tax-advantaged strategy known as "CARDS." Because the CARDS investment strategy involved the purchase and sale of securities, these allegations amount to an allegation of false statements in connection with the purchase or sale of securities. Plaintiff conceded as much by alleging a securities law violation in Count II that is based on the same conduct as is offered in support of Count I. Thus, Plaintiff's RICO claim is clearly barred.

The Complaint itself states that the CARDS transaction involved a security -- promissory notes -- and alleges that defendants fraudulently induced Plaintiff to invest in this securities transaction. (Compl. ¶ 32) Specifically, the Complaint alleges:

> . Deutsche Bank personnel assisted in formulating the manner in which a taxable event would be created and a method by which Deutsche Bank promissory notes would be utilized for the purpose of creating capital assets that could be purportedly sold at a loss so that a large tax benefit could be claimed on behalf of the taxpayers who participated in the program.

Notes are securities. *See* 15 U.S.C. § 78c(a)(10) (defining a "security" as, among other things, "any note"). Thus, the Complaint itself alleges a scheme involving securities.

Moreover, according to the Complaint, IRS Notice 2002-21 describes the CARDS transaction. (A copy of IRS Notice 2002-21 is attached to the Declaration of D. McLeod ("McLeod Decl.") as Exhibit 1.) IRS Notice 2002-21 makes clear that CARDS involves the purchase or sale of, among other things, government bonds, which are clearly securities. *Superintendent of Ins. of State of N. Y. v. Bankers Life & Cas. Co.,* 404 U.S. 6, 10 n. 6, 92 S.Ct. 165 (1971) ("Section 3(a)(10) of the 1934 Act defines 'security' very broadly (see *Tcherepnin v. Knight,* 389 U.S. 332, 88 S. Ct. 548, 19 L.Ed.2d 564) and clearly embraces Treasury bonds."); *Kahn v. Salomon Bros Inc.,* 813 F. Supp. 191, 196 (E.D.N.Y. 1993) ("Under the Securities Exchange Act of 1934 ... the term 'security' includes Treasury bonds."). Specifically, IRS Notice 2002-21 provides, in part that:

> "[T]he [CARDS] transaction involves the use of a loan assumption agreement to claim an inflated basis in assets acquired from another party. This inflated basis is claimed as a result of a transfer of assets in which a U.S. taxpayer (Taxpayer) becomes jointly and severally liable on indebtedness of the transferor of the assets (Transferor), with the indebtedness having a stated principal amount substantially in excess of the fair market value of the assets transferred... Transferor uses the proceeds to purchase assets ... such as short-term deposits, **government bonds,** or high-grade corporate debt, which may be denominated in a foreign currency...."

McLeod Decl., Exh. 1 (I.R.S. Notice 2002-21, 2002-14 I.R.B. 730) (emphasis added).

Reese M. JONES, Plaintiff, v. DEUTSCHE BANK AG, A..., 2005 WL 6129544...

Case 1:15-cv-00534-LES   Document 42-3   Filed 01/18/16   Page 105 of 205

Finally, the Complaint describes Jones' CARDS investment in a way that is generally consistent with IRS Notice 2002-21, but simply and purposefully omits the government bonds that Plaintiff purchased as part of his CARDS investment strategy. [1] Such artful pleading should not be permitted to avoid the intent of the PSLRA to preclude RICO claims predicated upon alleged securities fraud violations.

[1]     Jones assumed a portion of the loan referenced in the Complaint (Compl., ¶ 31), pursuant to a Securities Account Control Agreement and an Assumption Agreement on or about December 20, 2000, under which all assets, including cash and securities, deposited into or purchased through Jones's securities account were designated as collateral for the loan. Among the assets that served as collateral were U.S. Treasury bonds. Thus, the documentation of Jones' CARDS investment strategy outlined in the Complaint makes clear that it involved Treasury bonds. See Parrino v. FHP, Inc., 146 F.3d 699, 705-06 (9th Cir. 1998) (district court may consider documents upon which complaint necessarily relies in order to "[p]revent[ ] plaintiffs from surviving a Rule 12(b)(6) motion by deliberately omitting references to documents upon which their claims are based")).

In sum, the CARDS investment strategy involved the purchase and sale of securities, as described in Paragraphs 31 and 32 of the Complaint (promissory notes) and in IRS Notice 2002-21 (government bonds). By alleging that defendants made false and misleading statements to induce Plaintiff to invest in the CARDS transaction, the Complaint alleges conduct that, if true, would be actionable as securities fraud. The RICO claim alleged in Count I therefore is barred by the PSLRA because the factual allegations offered in support of Count I, if taken as true and if supported by proper evidence, would be actionable under Rule 10b-5.

**B. Plaintiff Cannot Establish RICO Standing In Light Of Signed Representations That He Was Not Receiving or Relying Upon Advice or Representations From Deutsche Bank About the CARDS Investment Strategy**

Even if the PSLRA did not bar Plaintiff's RICO claim, the claim still should be dismissed because it fails to allege RICO standing. In order to establish RICO standing, Plaintiff must allege that his injuries were proximately caused by prohibited conduct and that he suffered a concrete financial loss. Chaset v. Fleer/Skybox Int'l, LP, 300 F.3d 1083, 1086 (9th Cir. 2002). Under the proximate causation requirement, "there must be a direct relationship between the injury asserted and the injurious conduct alleged." Pillsbury, Madison & Sutro v. Lerner, 31 F.3d 924, 928 (9th Cir. 1994) (internal citation omitted); see also Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268 (1992).

As part of the CARDS strategy, Plaintiff alleges that he received written legal opinions from two separate law firms -- Sidley Austin Brown & Wood ("Sidley") and Leboeuf, Lamb, Greene & MacRae LLP ("LeBoeuf"), and that he was "instructed" by his investment advisor, defendant myCFO, to invest in CARDS. (Compl. ¶¶ 29, 33, 35-38). Nowhere does the Complaint allege that Deutsche Bank provided any legal or tax advice in connection with Plaintiff's decision to invest in the CARDS strategy. That is because Deutsche Bank did not provide such advice, but rather played a circumscribed role limited to providing a loan and assisting in the execution of certain related trades, including in government bonds. Plaintiff's decision to invest in the CARDS strategy was thus predicated upon advice received from Sidley and LeBoeuf, as well as from Plaintiff's investment advisor, myCFO. Because Plaintiff has failed to show "some direct relation between the injury asserted and the injurious conduct alleged," none of Deutsche Bank's alleged conduct can be found to have proximately caused Plaintiff's alleged injuries. Holmes, 503 U.S. at 268; Pillsbury, Madison & Sutro, 31 F.3d at 928.

In fact, Plaintiff executed a letter agreement ("Confirmation") that acknowledges Deutsche Bank's limited role and thereby further establishes that Deutsche Bank cannot have caused his alleged injuries. In the Confirmation, Plaintiff acknowledges that Deutsche Bank is not providing any advice to him. Specifically, the Confirmation provides:

Party A [Deutsche Bank AG] has made no representations, guarantees, or assurances whatsoever as to the expected or projected profitability, return, success, performance result, effect, consequence or benefit (whether legal, regulatory, tax, financial, accounting or otherwise) of the Transaction. Party B [Plaintiff] will be relying upon its own judgment and its own advisors with respect to the Transaction and Party B

Reese M. JONES, Plaintiff, v. DEUTSCHE BANK AG, A..., 2005 WL 6720041...

Case 1:15-cv-00534-LTS   Document 42-3   Filed 01/18/16   Page 106 of 205

[Plaintiff] has not sought and is not relying on any views of Party A [Deutsche Bank] with respect to the Transaction. All terms of, and the documentation evidencing, this Agreement and the Transaction have been the result of arm's length negotiations between the parties.

McLeod Decl., Exh. 2. [2]

[2]   This Court may consider the Confirmations because the "representations" made therein are integral to and form the basis of the CARDS facility transactions. *See Parrino,* 146 F.3d at 705-06 (district court may consider documents upon which complaint necessarily relies in order to "[p]revent [] plaintiffs from surviving a Rule 12(b)(6) motion by deliberately omitting references to documents upon which their claims are based").

In addition to failing to show proximate cause, Plaintiff also cannot establish that he reasonably relied on any representations he seeks to attribute to Deutsche Bank, in light of the Confirmation. In the Confirmation, Plaintiff also represented, among other things, that he was a sophisticated investor, had evaluated the investment, and was knowingly assuming all financial risks associated with the transaction, as follows:

Party B [Plaintiff] is a sophisticated investor and has sufficient knowledge, experience, and professional advice to make its own legal, regulatory, tax, business, investment, financial, and accounting evaluations of the merits and risks of entering into the Agreement and the Transaction. Party B [Plaintiff] will determine or has determined that each Transaction hereunder is suitable for Party B [Plaintiff] in light of Party B's [Plaintiff's] investment objectives, financial situation, and level of investment sophistication.

McLeod Decl., Exh. 2.

These written representations that Plaintiff was not relying on Deutsche Bank for tax or investment advice preclude a claim that requires a showing of reasonable reliance on representations alleged to have been made by Deutsche Bank. *See, e.g., Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 320-21 (N.Y. 1959) ("[P]laintiff has in the plainest language announced and stipulated that it is not relying on any representations as to the very matter as to which it now claims it was defrauded. Such a specific disclaimer destroys the allegations in plaintiff's complaint that the agreement was executed in reliance upon these contrary oral representations."). In sum, because Plaintiff cannot demonstrate the causation necessary to establish RICO standing, Count I should be dismissed. *Swartz v. KPMG, LLP, et al.,* No. C03- 1252P, slip. op. at 8 (W.D. Wash. Feb. 13, 2004) (dismissing RICO claim with prejudice in case involving similar tax strategy and finding no reasonable reliance as a matter of law "where there are written documents which contradict any oral statements"); *see also Moniz v. GM Corp.,* No. C98-4913, 2000 WL 1375285, at *4 (N.D. Cal. Sept. 18, 2000) (unambiguous disclaimers in written agreement "decisively refute any allegations of reasonable reliance"; *Feeley v. Whitman Corp* 65 F. Supp. 2d 164, 175 (S.D.N.Y. 1999)

## C. Plaintiff Fails to Allege a Pattern of Racketeering Activity

Count I also fails because it does not adequately allege a pattern of racketeering activity. A § 1962 claim must allege that the defendant engaged in a "pattern of racketeering activity." *H.J Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 232 (1989). To do so, the complaint must allege that "the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Id.* at 239. "Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241. Here, Plaintiff does not allege predicate acts with the requisite continuity. [3]

Reese M. JONES, Plaintiff, v. DEUTSCHE BANK AG, A..., 2005 WL 6132544...

Case 1:15-cv-00534-LTS   Document 42-3   Filed 01/18/16   Page 107 of 205

3      As shown below, Plaintiff does not allege with the requisite particularity even one predicate act by either Deutsche Bank Defendants, much less a pattern. *See Tate v. PG&E Co.,* 230 F. Supp. 2d 1072, 1084-85 (N.D. Cal. 2002).

## 1. Plaintiff Does Not Allege Closed-Ended Continuity

A party may demonstrate closed-ended continuity "by proving a series of related predicates extending over a substantial period of time." *H.J. Inc.,* 492 U.S. at 242. In this case, Plaintiff merely alleges limited conduct and, at most, alleges that defendants collectively engaged in a single scheme to extract fees from Plaintiff by fraudulently promoting the CARDS investment strategy.

At most, the Complaint alleges that the defendants acted together to defraud Plaintiff into believing that the CARDS investment strategy would not be challenged by the IRS. The Complaint attempts to allege a pattern of racketeering activity in Paragraphs 63 and 64, stating in conclusory fashion that the pattern was made up of "more than two acts of mail fraud, wire fraud and engaging in monetary transactions in property derived from specified unlawful activity[.]" [4] (Compl. ¶ 63). However, the activity alleged amounts to nothing more than an agreement between the defendants to act in concert to convince the Plaintiff to invest in the CARDS transaction, which the Plaintiff did, in three steps between December 2000 and November 2002. (Compl. ¶ 39). These three steps are all part of a singled, alleged scheme. While allegations of a single scheme may, in special circumstances, suffice to state a RICO claim, courts rarely find a pattern where only one scheme is alleged. *See, e.g., Durning v. Citibank, Int'l,* 990 F.2d 1133, 1138-39 (9th Cir. 1993) (plaintiffs failed to allege pattern where all predicate acts arose from single, isolated event); *Schlafer Nance & Co. v. Estate of Andy Warhol,* 119 F.3d 91, 98 (2d Cir. 1997) ("The acts complained of... are subparts of the singular act, and not a 'pattern' of separate acts with an underlying purpose. Consequently, there is no closed-ended continuity.").

4      In order to allege money laundering, Plaintiff must show that a financial transaction involved the "proceeds of specified unlawful activity." Such activity is listed in Title 18, United States Code, Section 1956. The only tax offenses listed are 26 I.R.C. § 7201 and 7206. See 18 U.S.C. § 1956(a)(1)(A)(ii). Section 1956 requires that the "financial transaction" alleged to constitute money laundering involved "proceeds" of specified unlawful activity, including proceeds of a willful attempt to evade payment of taxes, 26 I.R.C. § 7201, or proceeds of aiding and abetting the filing of a false tax return, 26 I.R.C. § 7206(2). Plaintiff has failed to allege facts sufficient to establish violations of either of these provisions by Deutsche Bank (or, indeed, by any of the defendants) and thus has failed to establish that money laundering can be a predicate act for their RICO claim.

In an attempt to transform this single scheme into a pattern, the Complaint alleges in a broad, conclusory paragraph that "the CARDS promoters have also been involved in the development, creation and promotion of other similar tax shelters" which "should have been registered as tax shelters ... (Compl. ¶ 46). However, the Complaint alleges no specific facts about these other "tax shelters," let alone facts that would constitute proper allegations that the Deutsche Bank Defendants committed other predicate acts that might support a pattern. So too the blanket allegation that the defendants used "collective resources ... to prepare dozens of other customized CARDS transactions", (Compl. ¶ 67), falls far short of being a satisfactory allegation of additional fraudulent activity that might amount to a RICO predicate. The Complaint also alleges that defendants have filed "frivolous lawsuits for the purpose of delaying the collection of taxes from other taxpayers who have purchased the customized CARDS programs," (Compl. ¶ 67), but courts, including this one, have long held that filing lawsuits does not qualify as an act of racketeering. *See, e.g., Grauberger v. St. Francis Hospital,* 169 F. Supp. 2d 1172, 1178 (N.D. Cal. 2001) ("[T]his Court readily agrees that allegations of improper legal filings, which are inevitably ubiquitous in a litigious society, are best addressed through state law tort remedies rather than resort to criminal statutes and RICO claims.") (collecting cases).

## 2. Plaintiff Does Not Allege Open-Ended Continuity

Plaintiff has not pled open-ended continuity, which concerns the threat that alleged wrongful conduct will continue into the future and may be demonstrated by pleading "past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.,* 492 U.S. at 241-42. The Complaint has no specific allegations indicating open-ended continuity. None of the alleged

Reese M. JONES, Plaintiff, v. DEUTSCHE BANK AG, A..., 2005 WL 6122614...

Case 1:15-cv-00534-LTS   Document 42-3   Filed 01/18/16   Page 108 of 205

predicate acts threatens to recur. Indeed, the Complaint alleges that the defendants acted in concert for the purpose of defrauding the Plaintiff into investing in the CARDS strategy. Plaintiff completed this investment strategy no later than November 2002, and there is no allegation that this scheme to defraud Plaintiff is continuing. To the contrary, Plaintiff alleges that IRS Notice 2002-21, which was published on March 18, 2002, provided public notice of this alleged scheme. Under these circumstances, there is no basis for concluding that there is any threat of repetition of the conduct alleged in the Complaint and, accordingly, there is no closed-ended continuity. *See, e.g., Durning,* 990 F.2d at 1139.

### D. Plaintiff Does Not Allege A Cognizable RICO Enterprise

To state a RICO claim under 18 U.S.C. § 1962(c) and (d), the Complaint must allege that each Deutsche Bank Defendant participated in the conduct of an enterprise through a pattern of racketeering activity. An "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Additionally, an association-in-fact enterprise must have "an ongoing organization, formal or informal," with "the various associates [that] function as a continuing unit." *United States v. Turkette,* 452 U.S. 576, 583 (1981). Thus, facts must be alleged establishing "an entity separate and apart from the pattern of activity in which it engages." *Turkette,* 452 U.S. at 583 ("[t]he 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proved by the [plaintiff].");  *see also Chang v. Chen,* 80 F.3d 1293, 1299 (9th Cir. 1996) ("predicate acts of racketeering activity, by themselves, do not satisfy the RICO enterprise element"). "At a minimum, to be an enterprise, an entity must exhibit 'some sort of structure... for the making of decisions, whether it be hierarchical or consensual.'" *Chang,* 80 F.3d at 1299 (internal citation omitted).

The Complaint makes limited references to the Deutsche Bank Defendants specifically. Indeed, there are no allegations of a racketeering enterprise separate and apart from the alleged pattern of activity. For example, there are no allegations of any participation in the affairs of the enterprises separate and distinct from the Deutsche Bank Defendants' alleged participation in the racketeering acts themselves. *See Chang,* 80 F.3d at 1299-1300 (finding appellants failed to plead cognizable enterprise where they did not allege structure to organization beyond alleged acts of racketeering activity). Furthermore, the Complaint is devoid of any facts which "allege the existence of a system of authority that guided the operation of the alleged enterprise." *Chang,* 80 F.3d at 1300. Rather, the Complaint merely alleges that the various defendants "entered into an arrangement to market and promote various fraudulent tax strategies... [and]...arranged for financial advisory and investment firms, including myCFO and Chenery and Deutsche Bank, to identify and then solicit potential participants...." (Compl. ¶¶ 22, 24).

In sum, while the Complaint attempts to satisfy the RICO statute by setting forth acts purportedly engaged in by the various defendants, Plaintiff fails to allege "an organization, formal or informal, with sufficient structure to satisfy RICO's enterprise element"; nor does it "indicate that there was a mechanism 'for controlling and directing the affairs of the group on an on-going, rather than an ad hoc, basis.'" *Chang v. Chen,* 80 F.3d at 1300. Without a proper allegation of an enterprise, neither the § 1962(c) and 1962(d) claims can survive a motion to dismiss. *Id.* at 1301.

### E. Deutsche Bank's Alleged Participation Does Not Rise To The Requisite Level Of Operation Or Management

While the Complaint alleges that Deutsche Bank provided services in connection with the alleged enterprise, that alleged activity does not rise to the level of operation or management of the enterprise. In *Reves v. Ernst & Young,* 507 U.S. 170, 179 (1993), the Supreme Court stated that in order to "participate, directly or indirectly, in the conduct of such enterprise's affairs," a defendant must have *some* part in "directing" the enterprise's affairs.

With respect to Deutsche Bank's role, the only specific acts attributed to Deutsche Bank relate to the structuring of the financial transactions and the facilitation and implementation of the transactions themselves. (Compl. ¶¶ 32, 40, 57). To the extent that these allegations state that Deutsche Bank acted as a lender or made "loans," such acts are part of any bank's regular business

Reese M. JONES, Plaintiff, v. DEUTSCHE BANK AG, A..., 2005 WL 6192084...

Case 1:15-cv-00534-LTS Document 42-3 Filed 01/18/16 Page 109 of 205

and amount to nothing more than banking services. Providing such services, even if a defendant allegedly has knowledge of the enterprise's illicit nature, does not rise to the level of participation in the operation and management required by statute. *Goren v. New Vision Int 'l,* 156 F.3d 721, 728 (7th Cir. 1998). *See also Baumer v. Pachl,* 8 F.3d 1341, 1344 (9th Cir. 1993) (limited involvement of attorney in real estate fraud, consisting of allegedly preparing and mailing two letters for the purpose of covering up a fraudulent scheme, did not satisfy the "direction" requirement of RICO); *Dep't of Econ. Dev. v. Arthur Andersen & Co.,* 924 F. Supp. 449, 468 (S.D.N.Y. 1996) ("the provision of services - even essential services - to a RICO enterprise is not the same as controlling an enterprise's affairs").

The only allegations that even hint at any involvement by either Deutsche Bank Defendant beyond the provision of banking services are found in Paragraphs 32, where it is suggested that Deutsche Bank "assisted in formulating the manner in which a taxable event would be created" and discussed how "Deutsche Bank promissory notes would be utilized for the purpose of creating capital assets that could be purportedly sold at a loss so that a large tax benefit could be claimed" (Compl. ¶ 32) and Paragraph 57, which similarly alleges that Deutsche Bank's role included "planning the structure" of the transactions. These allegations of an unspecified number of meetings, which vaguely hint at some alleged knowledge that the banking services being provided to Plaintiff might have a tax-related purpose, do not suffice to show each Deutsche Bank Defendant's participation in the operation or management of the affairs of any RICO enterprise. As one court has explained, "it is not enough to control even fraudulent activity that is ancillary to the fraud carried out by the RICO enterprise." *Dep 't of Econ. Dev.,* 924 F. Supp. at 467 (internal citation omitted). Accordingly, because the Complaint does not allege that each Deutsche Bank Defendant participated in the operation or management of the alleged enterprise - as opposed to simply providing banking services - Plaintiff's RICO claim must fail for this reason as well.

## II. COUNT II SHOULD BE DISMISSED AS A MATTER OF LAW

### A. The Securities Law Violation Alleged in Count II Does Not Satisfy The Heightened Pleading Requirements Of The PSLRA

Count II -- Plaintiff's securities fraud claim -- alleges a violation of Rule 10b-5, 17 C.F.R. § 240.10b-5, and thus must satisfy the "heightened pleading standards" both under Federal Rule of Civil Procedure 9(b) and the PSLRA. *Nursing Home Pension Fund, Local 144 v. Oracle Corp.,* 380 F.3d 1226, 1230 (9th Cir. 2004).

To allege a material misrepresentation or omission [5], the PSLRA requires that the complaint shall:

[5]     The elements of a securities fraud claim under Rule 10b-5 are: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation, i.e., a causal connection between the material misrepresentation and the loss. *Dura Pharmaceuticals, Inc. v. Broudo,* 125 S. Ct. 1627, 1631 (2005).

[i] specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, [ii] if an allegation regarding the statement or omission is *made on information and belief,* the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1) (emphasis added). This provision requires plaintiffs to plead sufficient *facts to justify their beliefs. See In re Silicon Graphics, Inc.,* 183 F.3d 970, 983-984 (9th Cir. 1999).

As explained below, Plaintiff's securities fraud claim fails to satisfy these heightened pleading requirements.

### 1. The Complaint Fails To Satisfy the PSLRA Mandate That It Specify Statements Attributable To Deutsche Bank That Are Allegedly Misleading

Reese M. JONES, Plaintiff, v. DEUTSCHE BANK AG, A..., 2005 WL 6132444...

Case 1:15-cv-00534-LTS Document 42-3 Filed 01/18/16 Page 110 of 205

The PSLRA requires that the complaint "*shall* specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading." 15 U.S.C. § 78u- 4(b)(1) (emphasis added). In cases such as this one, involving multiple defendants, the PSLRA also requires the complaint to identify "specific statements that were false, provide specific reasons why such statements were false, or ... attribute a specific statement to a specific defendant." *In re Harmonic Inc. Sec. Litig.,* 163 F. Supp. 2d 1079, 1090-91 (N.D. Cal. 2001). Plaintiffs must describe specifically each defendant's alleged participation in the fraud and not simply to lump the defendants together. *See Carol Gamble Trust* 86 *v. E-Rex, Inc.,* No. 03- 15032, 2004 WL 43216, at *2 (9th Cir. Jan. 5, 2004) ("By lumping defendants together throughout the complaint, the [plaintiffs] fail to make this minimal showing. The district court did not err in finding that the [plaintiffs'] claims arising under the 1934 Act failed to satisfy the strict pleading requirements of the PSLRA."); *see also Kinsey v. Cendant Corp.,* 2004 WL 2591946, at *10 (S.D.N.Y. Nov. 16, 2004) (emphasis added) (quoting *Spira v. Curtin,* 97 Civ. 2637, 2001 WL 611386, at *3 (S.D.N.Y. June 5, 2001)). A complaint that, in conclusory fashion, lumps the defendants together and claims that all defendants acted as "one" fails to satisfy the PSLRA. Kinsey, 2004 WL 2591946, at *10 (cursory allegation that the defendants shared "common ownership" and that all defendants acted as "one" found insufficient to satisfy PSLRA); *In re Blech Secs. Litig.,* 928 F. Supp. 1279, 1294 (S.D.N.Y. 1996) (dismissing Section 10(b) claim since pleading requirements not satisfied by a complaint in which "defendants are clumped together in vague allegations").

Plaintiff falls far short of these heightened pleading requirements. The Complaint here fails to attribute a single specific statement to either Deutsche Bank Defendant or their representatives and further fails to specify any way that any such statement was false. Indeed, in conclusory fashion, the Complaint lumps all defendants together (and indeed also lumps both Deutsche Bank Defendants together) and alleges throughout that they acted together. *See* Compl. ¶ 32 (creating defined term "CARDS promoters" to refer to all defendants, which is then invoked throughout the Complaint).

In addition to lumping defendants together under the defined term "CARDS promoters," Plaintiff also consistently refers to all defendants collectively by invoking the term "defendants," rather than specifying specific acts, misrepresentations, or omissions attributable to each defendant or to each Deutsche Bank Defendant, in particular. For example, the Complaint alleges that "in or about 1999, or earlier, the defendants entered into an arrangement to market and promote various fraudulent tax strategies, one of which was dubbed the CARDS facility, in order to generate huge fees." (Compl. ¶ 24). Plaintiff then alleges that "defendants arranged for financial advisory and investment firms, including myCFO and Chenery and Deutsche Bank, to identify and then solicit potential participants, like Plaintiff, who was induced to engage in CARDS and pay the defendants large fees by misrepresentations and legal advice that the defendants knew or should have known was improper and not disinterested." (Compl. ¶ 24). Such collective and conclusory references do not satisfy the requirement of the PSLRA that specific statements be attributed to specific defendants and that the manner in which such statements were fraudulent or misleading be spelled out with specificity.

The failure to plead any particularized facts connecting the alleged false statements and omissions to Deutsche Bank is further exhibited by Plaintiff's election to employ a method of pleading that refers to defendants collectively throughout. For example, the Complaint alleges that Chenery developed and promoted the CARDS facility, "with the assistance" of defendants, including Deutsche Bank, and that "other" CARDS facility promoters [including Deutsche Bank] also used interstate mail and wire transfers to facilitate, implement and/or promote numerous CARDS facility transactions...." (Compl. ¶¶ 32, 55). Unsupported and generalized allegations such as these do not satisfy the heightened pleading requirements of the PSLRA. The PSLRA pleading requirements deem insufficient "blanket assertions that all defendants are liable for false and misleading statements...." *Carol Gamble Trus 86 v. E-Rex, Inc.,* No. 03-15032, 2004 WL 43216, at *2 (9th Cir. Jan. 5, 2004). Instead, the PSLRA requires Plaintiff to plead specific facts attributing fraudulent acts to each of the named defendants in order to survive a motion to dismiss. *Id. See also In re Tyco Int'l Ltd., Sec. Litig.,* 185 F. Supp. 2d 102, 114 (D.N.H.2002; *Allison v. Brooktree Corp.,* 999 F. Supp. 1342, 1350 (S.D.Cal.1998). A "lumping" of defendants together necessarily fails to make the minimal showing required under the PSLRA's heightened pleading standards, *see Carol Gamble Trust,* 2004 WL 43216, at *2, and, accordingly, the Complaint must be dismissed.

Reese M. JONES, Plaintiff, v. DEUTSCHE BANK AG, A..., 2005 WL 6132604...

Case 1:15-cv-00534-LTS    Document 42-3    Filed 01/18/16    Page 111 of 205

**2. The Complaint Fails to Satisfy the PSLRA Mandate That It State With Particularity All Facts On Which Allegations Upon Information and Belief Are Formed**

Many of the allegations in the Complaint, including the allegation that Deutsche Bank was to "solicit potential participants," are alleged only upon information and belief. *See, e.g.,* Compl. ¶¶ 24, 32, 55, 57. Under the PSLRA, allegations made upon information and belief must state factual allegations sufficient to justify or support Plaintiff's belief. 15 U.S.C. § 78u- 4(b)(1); *In re Daou Systems, Inc.* Securities Litigation, 397 F.3d 704, 711 (9th Cir. 2005). The Complaint alleges no facts that support the professed "belief that Deutsche Bank (1) was involved in the development, marketing or promotion of the CARDS facility, or (2) made any false statements or omissions upon which Plaintiff relied in deciding to engage in the CARDS strategy. Rather, the Complaint rests on blanket assertions that all defendants are liable for false and misleading statements, none of which are directly attributed to Deutsche Bank. Such generalized allegations fall short of the PSLRA pleading requirements. *Kolbeck v. LIT America, Inc.,* 923 F. Supp. 557, 569 (S.D.N.Y. 1996) (broad allegations that defendants participated in a scheme and conclusory assertions that one defendant controlled another or were associated with others found insufficient to satisfy pleading requirements). Accordingly, the securities fraud claim alleged in Count II should be dismissed for this reason, as well.

**3. The Complaint Fails To Allege Scienter**

"Under the PSLRA's heightened pleading requirements, [plaintiff] cannot establish scienter [through] general and conclusory allegations." *Carol Gamble Trust 86 v. E-Rex, Inc.,* No. 03-15032, 2004 WL 43216, at *1 (9th Cir. Jan. 5, 2004); *see also DSAM Global Value Fund v. Altris Software, Inc.,* 288 F.3d 385, 390-91 (9th Cir. 2002). The PSLRA provides that a Complaint "must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent. *See In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 979 (9th Cir. 1999). Accordingly, a "private securities plaintiff proceeding under the PSLRA must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct...[and] ... particular facts giving rise to a strong inference... is required to satisfy the heightened pleading standard under the PSLRA."

The Complaint relies on "broad allegations and boilerplate conclusions." For example, it alleges that "Deutsche Bank, Mio Sylvester and Michael Sherry were all integral players in the defendants' fraudulent scheme and helped facilitate the CARDS facility," (Compl. ¶ 40), and that "Defendants knew or should have known... that the CARDS transaction constituted a tax shelter... and that they were illegally promoting, and aiding and abetting the promotion, of an unregistered tax shelter... [and] that their promotion and facilitation of the CARDS facility, by providing statements of any tax benefit obtained through participation in the CARDS facility even though defendants knew or had reason to know such statements were false...constitute a violation of I.R.C. § 6700." (Compl. ¶ 45).

There are, however, no allegations of specific facts that would evidence either of the Deutsche Bank Defendants' scienter. At best, the Complaint alleges that the defendants, collectively, "should have known" that the CARDS transaction would be successfully attacked by the IRS. Such allegations do not amount to recklessness. *See, e.g., Wietschner v. Monterey Pasta Co.,* 294 F. Supp. 2d 1102, 1115 (N.D. Cal. 2003) (knowledge or deliberate recklessness is not sufficiently alleged in blanket statements about what defendants knew or should have known); *Weiss v. Mentor Graphics Corp.,* 1999 WL 985141, at * 15-16 (D. Or. Oct. 6, 1999) (PSLRA requires complaint to allege that speaker of forward-looking statement have actual knowledge of falseness of representation; allegation that speaker merely "should have known" alleged misrepresentation was untrue is insufficient).

The Complaint does make blanket allegations about all "defendants," but none that are sufficient to establish scienter with regard to either Deutsche Bank Defendant. See Compl. ¶ 34 ("Plaintiff is informed and believes and therefore alleges that all of the CARDS promoters were aware of Chenery's and Roy Hahn's vested interest in the promotion of the CARDS facility"); ¶ 54 ("plaintiff is informed and believes and therefore alleges that defendants knew, at the time the CARDS facility was promoted to Jones, that it was not a legitimate transaction for income tax purposes."); ¶ 64 ("... defendants and the CARDS promoters also

Reese M. JONES, Plaintiff, v. DEUTSCHE BANK AG, A..., 2005 WL 6112604...

Case 1:15-cv-00534-LTS   Document 42-3   Filed 01/18/16   Page 112 of 205

engaged in monetary transactions in property derived from specified unlawful activity...by knowingly engaging or attempting to engage in the monetary transaction that constitute the CARDS facility and other tax shelter transactions described herein...and defendants knowingly designed, developed and/or facilitated the CARDS tax shelter to conceal or disguise the nature of the proceeds of this unlawful activity, representing it to be a legitimate business activity and credit facility instead of an unlawful attempt to evade income taxes, and avoiding reporting the CARDS transactions as tax shelters.). In the scant passages that mention Deutsche Bank specifically, and singularly, the allegations are not sufficient to establish the reckless or knowledge necessary to establish scienter. See Compl. ¶ 31 ("Plaintiff is informed and believes that Deutsche Bank acted as the third party purchaser in order to create the appearance of a taxable transaction. Deutsche Bank would also document the transaction as if it were a legitimate sale."); ¶32 ("...Plaintiff is informed and believes and therefore alleges that said founders met on numerous occasions...with officers of Deutsche Bank...in order to develop and refine the scheme. ..."). These allegations are far short of what is required under the PSLRA. *See In re Silicon Graphics Inc.,* 183 F.3d at 974.

In sum, the Complaint's conclusory allegations with regard to Deutsche Bank are insufficient to create the strong inference of deliberate recklessness that the PSLRA requires. Accordingly, on this ground as well, the securities fraud claim set forth in Count II should be dismissed.

## B. Count II Is Barred By The Applicable Statute Of Limitations

The statute of limitations for a securities fraud claim under Rule 10b-5 requires that a plaintiff file a claim within fives years after the violation and within two years after discovery of the facts constituting the violation. See 15 U.S.C. § 78i(e); 28 U.S.C. § 1658(b).

Under the two-year statute of limitations, "discovery of the facts" is determined according to an inquiry notice standard, such that a plaintiff in a § 10(b) claim is deemed to have discovered the fraud, thereby triggering the statute of limitations, "when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud." *Dodds v. Cigna Sec., Inc.,* 12 F.3d 346, 350 (2d Cir. 1993). With regard to notice, a plaintiff in a securities fraud case is charged with knowledge of public documents, such as IRS releases to taxpayers. *See, e.g., Berry v. Valence Tech., Inc.,* 175 F.3d 699, 703 n. 4 (9th Cir. 1999); *Adams v. Intralinks, Inc.* No. 03 Civ. 5384 SAS, 2004 WL 1627313 at *5 (S.D.N.Y. July 20, 2004); *White v. H&R Block, Inc.,* No. 02 Civ. 8965 (MBM), 2004 WL 1698628, at *5 (S.D.N.Y. July 28, 2004); *Westinghouse Elec. Corp. v. '21 Int'l Holdings, Inc.,* 821 F. Supp. 212, 222 (S.D.N.Y. 1993).

Plaintiff filed the original complaint ("Original Complaint") on December 17, 2004 and the pending amended Complaint on March 17, 2005. The allegations in both the original complaint and the Complaint make clear that Plaintiff was on notice of the alleged fraud at least as early as March 18, 2002, and not later than April 16, 2002. Specifically, both the original complaint and the Complaint allege that on or about March 18, 2002, the IRS issued a public disclosure in the form of Notice 2002-21, entitled "Tax Avoidance Using Inflated Basis," describing "the CARDS transaction and listing it as a tax shelter, or transaction that is 'not allowable for federal income tax purposes.'" (Orig. Compl. ¶ 50) (Compl. ¶ 51). The Complaint also states that Plaintiff filed a disclosure for amnesty pursuant to the voluntary IRS disclosure program on April 16, 2002, pursuant to letters from Chenery and myCFO urging him to do so. (Orig. Compl. ¶ 52) (Compl. ¶ 53). Plaintiff's disclosure to the IRS indicated that Plaintiff had engaged in a "listed transaction," i.e., a transaction covered by Notice 2002-21, in 2000 and 2001. *Id.*

Accepting the allegations of the Complaint as true, Plaintiff was on notice of the alleged fraudulent tax shelter scheme as early as March 18, 2002 when the IRS issued Notice 2002-21, and no later than April 16, 2002, the date of his disclosure to the IRS. Not only was IRS Notice 2002-21, on its face in the earlier part of 2002, a public notice to all taxpayers, but Plaintiff expressly concedes that he was put on actual notice by his very own financial advisors and investment firm, myCFO and Chenery in the earlier part of 2002. See Orig. Compl. ¶¶ 51- 52; Compl. ¶¶ 52-53. The two-year statute of limitations for a claim to be asserted under Rule 10b-5 in this matter therefore ran at least as of April 16, 2004, i.e., over two years after IRS Notice 2002-21 and exactly two years after Plaintiff's disclosure to the IRS seeking amnesty. Because Plaintiff's original complaint was filed on December 17, 2004, Plaintiff's securities fraud claim is time barred.

Reese M. JONES, Plaintiff, v. DEUTSCHE BANK AG, A..., 2005 WL 6192084...

Case 1:15-cv-00534-LTS   Document 42-3   Filed 01/18/16   Page 113 of 205

### III. COUNTS I AND II DO NOT SATISFY THE PLEADING REQUIREMENTS UNDER RULE 9(b)

As set forth in detail above, Plaintiff's RICO and securities fraud claims are premised upon alleged fraudulent conduct. As such, these claims are subject to the heightened pleading requirements of Rule 9(b). [6] To satisfy these more rigorous pleading requirements, a complaint must "state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Moore,* 885 F.2d at 541. Where multiple defendants are charged with fraudulent conduct, Rule 9(b) requires that the complaint inform each defendant of its alleged participation in the fraud and not simply attribute fraudulent conduct to "defendants" generally. *Id.*

[6]    Rule 9(b) applies to RICO claims premised on fraud. *See, e.g., Moore v. Kayport Pkg. Express, Inc.,* 885 F.2d 531, 541 (9th Cir. 1989) (applying Rule 9(b) to RICO allegations premised on mail fraud).

As set forth in detail above, the Complaint is replete with conclusory allegations regarding purported acts of mail and wire fraud [7] and other allegedly fraudulent conduct purportedly engaged in by Defendants collectively. However, the Complaint does not attribute even one specific statement to either Deutsche Bank Defendant. In short, with respect to Deutsche Bank, Plaintiff has not adequately articulated the "who, what, when, where, how" associated with the fraudulent conduct alleged. *See Vess v. Ciba-Geigy Corp. USA,* 317 F.3d 1097, 1106 (9th Cir. 2003). Moreover, to the extent that Plaintiffs fraud-based claims are premised upon alleged omissions, Plaintiff fails to specify, as required by Rule 9(b), the person associated with each Deutsche Bank Defendant responsible for the purported failure to speak, the precise context of the omission and the manner in which it misled Plaintiff. *See Hokama v. E.F. Hutton & Co.,* 566 F. Supp. 636, 646 (C.D. Cal. 1983) (complaint must specify alleged source of omissions claimed).

[7]    As stated above, Plaintiff does not allege with specificity even one predicate act by either Deutsche Bank Defendant, let alone multiple acts constituting continuity plus relationship. The mail and wire fraud allegations identify no speaker or the time or place of the alleged uses of the mail or wires. Allegations as to the nature of the fraud are similarly general. (Compl. ¶¶ 32, 55).

Accordingly, the RICO and federal securities law claims against the Deutsche Bank Defendants should be dismissed with prejudice.

### CONCLUSION

For the foregoing reasons, Deutsche Bank respectfully requests that this Court dismiss with prejudice the claims asserted against them.

Dated: May 6, 2005

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 15

Reese M. JONES, Plaintiff, v. DEUTSCHE BANK AG, a..., 2005 WL 6128629...

Case 1:15-cv-00534-LTS Document 42-3 Filed 01/18/16 Page 115 of 205

2005 WL 6128629 (N.D.Cal.) (Trial Motion, Memorandum and Affidavit)
United States District Court, N.D. California.

Reese M. JONES, Plaintiff,

v.

DEUTSCHE BANK AG, a corporation; Deutsche Bank Securities, Inc., a corporation; Mio Sylvester,
an individual; Michael Sherry, an individual; Stars Holding Company (formerly known as myCfo, Inc.,
myInvestment Manager, LLC, myCfo Investment Advisory Services, myCFO Securities, and myCPA,
LLP, and doing business in California as Delaware STARS Holding Company); Chenery Associates,
a general partnership; Chenery Associates, Inc., a California corporation; Chenery Management,
Inc., a California corporation; Chenery Investments, Inc., a California corporation; Chenery Services,
Inc., a California corporation; Chenery Capital, Inc., a California corporation; Sussex Financial
Enterprises, Inc., a California corporation; Roy E. Hahn, an individual; Leboeuf, Lamb, Greene
& Macrae, Llp, a limited liability partnership; Does One Through Thirty, inclusive;, Defendants.

No. 504CV05357.
June 14, 2005.

(Filed Concurrently With Declaration of Michael S. Mandel In Support of Deutsche Bank AG's and Deutsche Bank Securities
Inc.'s Reply Memorandum)
Date: June 27, 2005
Time: 9:00 a.m
Courtroom: 8

### Deutsche Bank Ag's and Deutsche Bank Securities, Inc.'s Reply Memorandum In
### Further Support of Their Motion to Dismiss Plaintiff's First Amended Complaint

David S. McLeod (SBN 66808), Dewey Ballantine LLP, 333 South Grand Avenue, Suit 2600, Los Angeles, California
90071-1530, Telephone: (213) 621-6000, Facsimile: (213) 621-6100, dmcleod@deweyballantine.com.

Lawrence M. Hill (Admitted pro hac vice), Seth C. Farber (Admitted pro hac vice), Dewey Ballantine LLP, 1301
Avenue of the Americas, New York, New York 10019-6092, Telephone: (212)25 9-8000, Facsimile: (212) 259-6333,
lhill @deweyballantine.com, sfarber@deweyballantine.com, Attorneys for Defendants Deutsche Bank Ag, Deutsche Bank
Securities Inc., d/b/a Deutsche Bank Alex. Brown, a Division of Deutsche Bank Securities Inc.

Honorable James Ware.

Table of Contents

| | |
|---|---|
| ARGUMENT ............................................................................................................ | 1 |
| I. PLAINTIFF'S RICO CLAIM MUST BE DISMISSED ............................................................... | 1 |
| A. Count I (RICO) Is Barred by the PSLRA ....................................................................... | 1 |
| 1. Treasury Bonds Are Securities. ............................................................................... | 1 |
| 2. Promissory Notes Are Securities .............................................................................. | 4 |
| B. Plaintiff Fails to Allege the Requisite Causation for RICO Standing. ......................................... | 5 |
| C. Plaintiff Fails to Allege a Pattern of Racketeering Activity ................................................. | 7 |
| D. Plaintiff Does Not Allege A Cognizable RICO Enterprise ..................................................... | 8 |
| E. Deutsche Bank's Alleged Participation Does Not Rise To The Requisite Level Of Operation Or Management ......................................................................................................... | 9 |
| II. COUNT II SHOULD BE DISMISSED AS A MATTER OF LAW ...................................................... | 10 |
| A. Count II (Securities Fraud) Does Not Satisfy The Heightened Pleading Requirements Of The PSLRA. .. | 10 |

Reese M. JONES, Plaintiff, v. DEUTSCHE BANK AG, a..., 2005 WL 6128029...

Case 1:15-cv-00534-LTS   Document 42-3   Filed 01/18/16   Page 116 of 205

1. The Complaint Fails to Properly Allege Scienter. ................................................................................. 10
2. The Complaint's "Information and Belief" Allegations Do Not Comply With the PSLRA ..................... 11
3. Count II Fails to Allege Fraud With Particularity ................................................................................. 12
B. Count II Is Barred By The Applicable Statute Of Limitations. ................................................................ 12
CONCLUSION ........................................................................................................................................... 14

Table of Authorities

Cases

*Baumer v. Pachl,* 8 F.3d 1341 (9th Cir. 1993)., .................... 9

*Blackie v. Barrack,* 524 F.2d 891 (9th Cir. 1975) ................. 5

*Carol Gamble Trust 86 v. E-Rex, Inc.,* No. 03-15032, 2004 WL 43216 (9th Cir. Jan. 5, 2004) ........................................ 12

*Chang v. Chen,* 80 F.3d 1293 (9th Cir. 1996). ...................... 8

*Chaset v. Fleer/Skybox Int'l, LP,* 300 F.3d 1083 (9th Cir. 2001). ....................................................................................... 5

*Dep't of Econ. Dev. v. Arthur Andersen & Co.,* 924 F. Supp. 449 (S.D.N.Y. 1996). ............................................................. 10

*Dodds v. Cigna Sec., Inc.,* 12 F.3d 346 (2d Cir. 1993) ......... 13

*Exch. Nat. Bank of Chicago v. Touche Ross & Co.,* 544 F.2d 1126 (2d Cir. 1976). .............................................................. 4

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.,* 385 F.3d 159 (2d Cir. 2004). ................................................................. 9

*Harper v. Poway Unified School Dist.,* 345 F. Supp. 2d 1096 (S.D. Cal. 2004) ....................................................................... 6

*Haskell v. Am. Fam. Publishers,* 857 F. Supp. 1392 (E.D. Cal. 1994) ............................................................................ 4, 6

*Hokama v. E.F. Hutton & Co.,* 566 F. Supp. 636 (C.D. Cal. 1983) ......................................................................................... 7

In re Daou Sys., Inc. Sec. Litig., 397 F.3d 704 (9th Cir. 2005). ..................................................................................... 10

*In re Silicon Graphics Inc. Sec. Litig.,* 83 F.3d 970 (9th Cir. 1999) ................................................................................... 2, 11

*Kades v. Organic Inc.,* No. 00 Civ. 3671, 2003 WL 470331 (S.D.N.Y. Feb. 24, 2003) ........................................................ 7

*Kahn v. Salomon Bros. Inc.,* 813 F. Supp. 191 (E.D.N.Y. 1993) ......................................................................................... 3

*King v. Deutsche Bank AG,* No. CV 04-1029-HU, 2005 WL 611954 (D. Or. Mar. 8, 2005) ................................................. 7

*McFarland v. Memorex Corp.,* 493 F. Supp.631 (N.D. Cal. 1980) ................................................................................... 9, 11

*McNabb v. S.E.C.,* 298 F.3d 1126 (9th Cir. 2002). .............. 4

*Moniz v. Gen'l Motors Corp.,* No. C98-4913, 2000 WL 1375285 (N.D. Cal. Sept. 18, 2000). ...................................... 6

*Moore v. Kayport Package Express, Inc.,* 885 F.2d 531 (9th Cir. 1989) ........................................................................... 7, 8, 9

*Parrino v. FHP, Inc.,* 146 F.3d 699 (9th Cir. 1998). ............. 6

*Pillsbury, Madison & Sutro v. Lerner,* 31 F.3d 924 (9th Cir. 1994) ......................................................................................... 5

*Poulos v. Caesars World, Inc.,* 379 F.3d 654 (9th Cir. 2004). ....................................................................................... 5

R A Invs. I, LLC, et al. v. Deutsche Bank AG, et al., Civ. No. 3:04-CV-1565-G (N.D. Tex. June 6, 2005). ......................... 1

*Reves v. Ernst & Young,* 494 U.S. 56, 110 S. Ct. 945, 108 L.E.2d 47 (1990) ................................................................... 1, 4

*S.E.C. v. Wallenbrock,* 313 F.3d 532 (9th Cir. 2002). ......... 4

*Simon v. Value Behavioral Health, Inc.,* ................................. 208 F.3d 1073 (9th Cir. 2000).
8                                                                                    Sup't of Ins. of State of N.Y. v. Bankers Life & Cas. Co.,
                                                                                     404 U.S. 6, 92 S. Ct. 165, 30 L.Ed.2d 128 (1971).

Reese M. JONES, Plaintiff, v. DEUTSCHE BANK AG, a..., 2005 WL 6128639...

Case 1:15-cv-00534-LTS Document 42-3 Filed 01/18/16 Page 117 of 205

1, 2, 3 ... Swartz v. KPMG LLP, No. C03-1252P, 2004 U.S. Dist. LEXIS 22757 (W.D. Wash. Feb. 13, 2004) ..................   1, 6

*Townsend v. Columbia Operations,* 667 F.2d 844 (9th Cir. 1982). .....................................................................................   6

*United States ex rel. Lee v. SmithKline Beecham, Inc.,* 245 F.3d 1048 (9th Cir. 2001). ..............................................   9

*United States v. Turkette,* 452 U.S. 576, 101 S. Ct. 2524, 69 L.Ed.2d 246 (1981). ...................................................   8

*Volk v. D.A. Davidson & Co.,* 816 F.2d 1406 (9th Cir. 1987) .................................................................................   13

*Wagh v. Metris Direct, Inc.,* 348 F.3d 1102 (9th Cir. 2003) ..   7, 8

Statutes

15U.S.C. § 78 i(e) ....................................................   12

15 U.S.C. § 78u-4(b)(1). ............................................   11

28 U.S.C. § 1658(b) ..................................................   12

Fed. R. Civ. P. 8(a). ................................................   7

Fed. R. Civ. P. 9(b) ..................................................   passim.

Defendants Deutsche Bank AG and Deutsche Bank Securities, Inc. (collectively "Deutsche Bank") [1] hereby submit this reply memorandum of law in further support of their Motion to Dismiss the First Amended Complaint.

[1]    Capitalized terms have the same meaning as in the Deutsche Bank Defendants' Memorandum of Law in Support of their Motion to Dismiss Plaintiffs First Amended Complaint ("Opening Brief" or "Opening Br."). Plaintiff's opposition memorandum is cited as "Opp'n."

## ARGUMENT

## I. PLAINTIFF'S RICO CLAIM MUST BE DISMISSED

### A. Count I (RICO) Is Barred by the PSLRA

Plaintiff argues that his allegations do not state an actionable securities fraud claim, yet Count II alleges a securities fraud claim and Plaintiff's own description of the alleged scheme is that he was fraudulently induced to engage in an investment strategy that involved the purchase of Treasury bonds, (Opening Br. at 4-5 n.1), and sale of promissory notes, (Compl. ¶¶ 27, 29, 34, 41). Both are securities. *See Sup't of Ins. of State of N.Y. v. Bankers Life & Cas. Co.,* 404 U.S. 6, 10 n.6, 92 S. Ct. 165, 30 L.Ed.2d 128 (1971) ( "Section 3(a)(10) of the 1934 Act defines 'security' very broadly ... and clearly embraces Treasury bonds."); *Reves v. Ernst & Young,* 494 U.S. 56, 66, 110 S. Ct. 945, 108 L.Ed.2d 47 (1990) ("A note is presumed to be a 'security,' and that presumption may be rebutted only by a showing that the note bears a strong resemblance ... to one of the enumerated categories of instrument."). Plaintiff's allegation that the CARDS strategy was a "tax shelter" does not preclude a finding that the alleged scheme involved securities. *See, e.g., Swartz v. KPMG LLP,* No. C03-1252P, 2004 U.S. Dist. LEXIS 22757 at *14 (W.D. Wash. Feb. 13, 2004) (dismissing RICO claim arising out of alleged tax shelter scheme as barred by the PSLRA); *R A Invs. I, LLC, et al. v. Deutsche Bank AG, et al.,* Civ. No. 3:04-CV-1565-G, slip op. at 27 (N.D. Tex. June 6, 2005) (dismissing RICO claim based on alleged tax shelter scheme where alleged fraudulent scheme and purchase of securities coincided).

### 1. Treasury Bonds Are Securities

The PSLRA bars Count I because the allegedly fraudulent scheme involved, and coincided with, the purchase and sale of government bonds, specifically Treasury bonds, that served as collateral for the loan proceeds from Deutsche Bank under a Securities Account Control Agreement and an Assumption Agreement. (Opening Br. at 5, n. 1.) Because Treasury bonds are securities, *see Sup't of Ins. of State of N.Y.,* 404 U.S. at 10 n.6, the PSLRA bar applies.

Reese M. JONES, Plaintiff, v. DEUTSCHE BANK AG, a..., 2003 WL 2126829...

Case 1:15-cv-00534-LTS Document 42-3 Filed 01/18/16 Page 118 of 205

Plaintiff largely ignores this argument, addressing it directly only in a footnote. (Opp'n at 8, n. 2.) That footnote first suggests that Deutsche Bank's assertion that the CARDS strategy involved Treasury bonds is "unsupported." In fact, however, the support for Deutsche Bank's assertion is set forth clearly in its opening brief. Paragraph 51 of the Complaint refers to IRS Notice 2002-21 and states this Notice "describe[s] the CARDS transaction." [2] Notice 2002-21, in turn, provides:

[2] Because the Notice is referred to in the Complaint, the Court may consider it on this motion to dismiss. *In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 986 (9th Cir. 1999) (doctrine of incorporation "permits a district court to consider documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading.'") (citation omitted). Indeed, Plaintiff has made no objection to the Court doing so.

The [CARDS] transaction involves the use of a loan assumption agreement to claim an inflated basis in assets acquired from another party. This inflated basis is claimed as a result of a transfer of assets in which a U.S. taxpayer (Taxpayer) becomes jointly and severally liable on indebtedness of the transferor of the assets (Transferor), with the indebtedness having a stated principal amount substantially in excess of the fair market value of the assets transferred.... Transferor uses the proceeds to purchase assets ... such as short-term deposits, **government bonds,** or high-grade corporate debt, which may be denominated in a foreign currency ....

McLeod Decl. In Support of Motion to Dismiss, Exh. 1 (IRS Notice 2002-21, 2002-14 I.R.B. 730) (emphasis added).

Moreover, it is clear that Plaintiff himself and other CARDS investors (whose conduct Plaintiff relies on in his effort to allege a pattern of racketeering activity, (see Compl. ¶¶ 63, 67 and Opp'n at 14)), in fact executed purchases and sales of Treasury bonds as part of their CARDS strategies. Indeed, Plaintiff's own use of Treasury bonds (which he never denies) is demonstrated by the Assumption Agreement which provides:

> Until the date of satisfaction and discharge of this Agreement ... and so long as no Default or Event of Default under and as defined in the Credit Agreement shall have occurred ... the Agent will from time to time, at the request of the Pledgor, invest funds on deposit in each Deposit Account and Securities Account in (w) certificates of deposit of Deutsche Bank AG, New York Branch..., (x) commercial paper... (y) U.S. Government Obligations..., or (z) such other investments as may be requested by the Pledgor and acceptable to the Agent in its sole discretion.... Except as otherwise provided ... all investment made ... shall be held in a Deposit Account or Securities Account as part of the Pledged Collateral.

December 20, 2000 Assumption Agreement between Ongar Financial Trading LLC and Reese M. Jones, Section 5, subparagraph(b) of Exhibit A thereto (Assuming Party Master Pledge and Security Agreement between Reese M. Jones and Deutsche Bank AG) (attached as Exhibits A and B to the Declaration of Michael Mandel). [3]

[3] Once again, Plaintiff has not objected to Deutsche Bank's reliance on this document and it is properly considered on this motion to dismiss. *See* fn. 2, *supra.*

In his footnote, Plaintiff also argues that Treasury bonds and certificates of deposit are not securities. However, the cases that Plaintiff cites in support of this argument are all cases involving certificates of deposits. Deutsche Bank has not argued that certificates of deposit are securities. Rather, Deutsche Bank has argued that Treasury bonds are securities. (Opening Br. at 4) (citing *Sup't of Ins., of State of N.Y.,* 404 U.S. at 10 n.6; Kahn v. Salomon Bros. Inc., 813 F. Supp. 191, 196 (E.D.N.Y. 1993).) Plaintiff does not address the authority that Deutsche Bank cites for this proposition. Instead, Plaintiff takes the novel tack of offering excerpts from deposition transcripts in another case to which Deutsche Bank is not a party. In the transcript excerpts, deponents who were allegedly involved in the design of the CARDS strategy offer their opinions that the strategy does not involve securities. These transcripts are both procedurally improper and substantively irrelevant.

Reese M. JONES, Plaintiff, v. DEUTSCHE BANK AG, a..., 2005 WL 4128629...

Case 1:15-cv-00534-LTS   Document 42-3   Filed 01/18/16   Page 119 of 205

As a procedural matter, Plaintiffs cannot submit documents that are neither part of, nor referred to within, the Complaint in opposition to a motion to dismiss. *Haskell v. Am. Fam. Publishers,* 857 F. Supp. 1392, 1396 (E.D. Cal. 1994). More importantly, even if the transcript excerpts were quoted in the Complaint, they would be irrelevant to the issue before the Court. The question of whether Treasury bonds are securities is a legal issue and the opinions of the designers of the CARDS strategy are of no moment. *McNabb v. S.E.C.,* 298 F.3d 1126, 1130 (9th Cir. 2002) (whether an instrument is a security is a matter of law).

### 2. Promissory Notes Are Securities

Plaintiff does not dispute that the Complaint alleges that his CARDS investment strategy involved the sale of promissory notes, but nonetheless argues that these notes were not securities. A promissory note -- such as the ones that Plaintiff alleges he sold in 2000, 2001, and 2002 -- is presumptively a security, and it is Plaintiff's burden to rebut that presumption. *Reves,* 494 U.S. at 65; *McNabb,* 298 F.3d at 1131; *S.E.C. v. Wallenbrock,* 313 F.3d 532, 536 (9th Cir. 2002).

Here, Plaintiff attempts to do so by analogizing the promissory notes in his CARDS transactions to certain notes -- "a note delivered in consumer financing" and "a note secured by a home mortgage" (Opp'n at 7) -- that the Supreme Court has determined are not securities. *Reves,* 494 U.S. at 65 (citing *Exch. Nat. Bank of Chicago v. Touche Ross & Co.,* 544 F.2d 1126, 1138 (2d Cir. 1976) (listing types of notes that are not securities)). In particular, Plaintiff argues:

> The CARDS Facility was supposed to provide Mr. Jones with a line of credit to make other investments.
> FAC ¶¶ 29, 31. Such consumer loans are not considered securities.

(Opp'n at 8) The flaw in this argument is that the analogy is absurd, for the CARDS Facility described in the Complaint bears no resemblance whatsoever to a consumer loan. To the contrary, the Complaint alleges that Jones executed the CARDS Facility with the understanding that it was "a business facility that would provide him with a line of credit against which he could borrow to make other investments." (Compl. ¶ 29) In light of this business investment purpose, the CARDS notes are properly considered securities, and the PSLRA bar applies for this reason, as well.

### B. Plaintiff Fails to Allege the Requisite Causation for RICO Standing

In the Ninth Circuit, as elsewhere, "[c]ausation lies at the heart of a civil RICO claim" and "[i]t well settled that, to maintain a civil RICO claim predicated on mail fraud, a plaintiff must show that the defendants' alleged misconduct proximately caused the injury." *Poulos v. Caesars World, Inc.,* 379 F.3d 654, 664-65 (9th Cir. 2004). In particular, plaintiffs must "establish that they relied on misrepresentations ...[by defendants] and that these misrepresentations caused them a concrete financial loss." *Id.* (quoting *Blackie v. Barrack,* 524 F.2d 891, 906, n. 22 (9th Cir. 1975)). *See also Chaset v. Fleer/Skybox Int'l, LP,* 300 F.3d 1083 (9th Cir. 2001) ("[A] civil RICO plaintiff must show that his injury was proximately caused by the [prohibited] conduct.").

The Complaint does not allege reliance on statements by either Deutsche Bank AG or Deutsche Bank Securities, Inc. Rather, it alleges that Plaintiff was induced to participate in his CARDS investment strategy by statements attributed to myCFO, (Compl. ¶¶ 28, 29), and advice from two law firms. (Compl. ¶¶ 29, 33, 35-38) These statements formed the basis of Plaintiff's decision to invest in CARDS, and only after that decision was made does the Complaint allege that Deutsche Bank had any contact with Plaintiff. [4] Thus, based on Plaintiff's own allegations, Deutsche Bank was neither a "but for" cause nor a proximate cause of the alleged injuries. *See Pillsbury, Madison & Sutro v. Lerner,* 31 F.3d 924, 928 (9th Cir. 1994) ("plaintiff must show not only that the defendant's violation was a 'but for' cause of his injury, but that it was the proximate cause as well").

---

[4]     Plaintiff alleges that Deutsche Bank might have participated in meetings in 1999 with other defendants, (Compl. ¶ 32), but these allegations have nothing to do with Plaintiff specifically. Thus, the allegations are not sufficient to show causation with regard to the damages Plaintiff seeks for himself.

Reese M. JONES, Plaintiff, v. DEUTSCHE BANK AG, a..., 2005 WL 6128629...

Case 1:15-cv-00534-LTS   Document 42-3   Filed 01/18/16   Page 120 of 205

The explicit disclaimers contained in the Confirmation that Plaintiff executed provide a second, independent basis for concluding that Deutsche Bank could not have caused Plaintiff's injuries. *See, e.g., Townsend v. Columbia Operations,* 667 F.2d 844, 850 (9th Cir. 1982); *Moniz v. Gen'l Motors Corp.,* No. C98-4913, 2000 WL 1375285, at *4 (N.D. Cal. Sept. 18, 2000)* (unambiguous disclaimers in written agreement "decisively refute any allegations of reasonable reliance"). Although Plaintiff asks the Court to disregard the Confirmation, he does not -- and cannot -- dispute the fact that the Confirmation was part of the CARDS Strategy out of which the Complaint arises. [5] Thus, this Court may consider the Confirmation because the representations made therein are part of Plaintiff's multi-phased CARDS investment which is at the center of Plaintiff's claims. *See Parrino v. FHP, Inc.,* 146 F.3d 699, 705-06 (9th Cir. 1998)* (district court may consider documents upon which complaint necessarily relies in order to "[p]revent ... plaintiffs from surviving a 12(b)(6) motion by deliberately omitting references to documents upon which their claims are based"); *Haskell v. Am. Fam. Publishers,* 857 F. Supp. at 1397-98 (considering documents central to the plaintiff's claim). [6]

<hr/>

[5]     The Confirmation incorporates by reference the Master Pledge and Security Agreement dated December 20, 2000 between Reese Jones and Deutsche Bank AG. (Confirmation at p. 5, ¶ (b)(vi), attached as Exh. 2 to McLeod Decl. in Support of Motion to Dismiss). The Master Pledge and Security Agreement and the other documents that form the basis of Jones' allegedly "customized" CARDS investment strategy, are an integral part of the allegations of the Complaint because CARDS is allegedly based on a loan assumed from an LLC by Jones, (Compl. ¶ 31), which the Pledge and Security Agreement evidences, and the assumed proceeds of which were to be used for designated investments, including those set forth in the Confirmation.

[6]     Plaintiff relies on *Harper v. Poway Unified School Dist.,* 345 F. Supp. 2d 1096, 1119 (S.D. Cal. 2004),* which does not address whether a court may consider documents outside the complaint. In fact, *Harper* cites *Parrino,* in which the Ninth Circuit affirmed the district court's consideration of a document the court found to be central to the plaintiffs complaint.

Plaintiff's argument that the Confirmation does not specifically address concealment is unavailing. The Confirmation states that Jones was "relying upon [his] own judgment and [his] own advisors with respect to the Transaction and ... [had] not sought and [was] not relying on any views of [Deutsche Bank] with respect to the Transaction." (Exh. 2 to McLeod Decl. in Support of Motion to Dismiss.) This disclaimer of reliance on Deutsche Bank certainly should cover any alleged misrepresentation about a strategy involving the same Confirmation. *See Swartz,* 2004 U.S. Dist. LEXIS 22757, at *4 (alleged oral misrepresentations regarding outcome of tax-oriented strategy "cannot establish reasonable reliance as a matter of law where there are written documents which contradict any oral statements").

## C. Plaintiff Fails to Allege a Pattern of Racketeering Activity

Plaintiff points to two groups of allegations that he contends constitute patterns of racketeering activity. (Opp'n at 14.) First, Plaintiff points to "at least ten other related tax shelter schemes that have been alleged by Plaintiff, more than sufficient to form a 'pattern of racketeering.'" (Opp'n at 14.) Second, Plaintiff notes that "[t]he Complaint also alleges that defendants sold multiple fraudulent CARDS Facility transactions, each of which constitutes a separate predicate act." However, none of these purported additional predicate acts are described with any specificity, let alone with the particularity required by *Fed. R. Civ. P. 9(b). See Wagh v. Metris Direct, Inc.,* 348 F.3d 1102, 1109 (9th Cir. 2003)* ("[c]omplaints alleging fraud must comply with both *Fed. R. Civ. P. 8(a)* and *9(b)*"); *Moore v. Kayport Package Express, Inc.,* 885 F.2d 531, 541 (9th Cir. 1989)* (applying *Rule 9(b)* to mail fraud RICO predicate).

Indeed, Plaintiff's Opposition Brief does not -- because it cannot -- point to even one paragraph of the Complaint that sets forth the who, what, when, where, and how of an act or acts attributable to either Deutsche Bank AG or Deutsche Bank Securities, Inc. that would amount to mail or wire fraud. *See King v. Deutsche Bank AG,* No. CV 04-1029-HU, 2005 WL 611954, at *24-25 (D. Or. Mar. 8, 2005)* (Continuity allegations must be satisfied "*as to each defendant.*") (emphasis added); *Kades v. Organic Inc.,* No. 00 Civ. 3671, 2003 WL 470331, at *12 (S.D.N.Y. Feb. 24, 2003).* Moreover, to the extent that Plaintiff's fraud-based claims are premised on alleged omissions, Plaintiff fails to specify, as required by *Rule 9(b),* the person associated with each Deutsche Bank Defendant responsible for the purported failure to speak, the precise context of the omission, and the manner in

Reese M. JONES, Plaintiff, v. DEUTSCHE BANK AG, a..., 2005 WL 6128625...

Case 1:15-cv-00534-LJES  Document 42-3  Filed 01/18/16  Page 121 of 205

which it misled Plaintiff. *See Hokama v. E.F. Hutton & Co., 566 F. Supp. 636, 646 (C.D. Cal. 1983)* (complaint must specify alleged source of omissions claimed).

Plaintiff asserts that this fatal defect in the Complaint was cured by his initial disclosures, which, according to Plaintiff, "assuredly put defendants on notice of the specific predicate acts" by providing "the names and known contact information for 45 other tax shelter victims." (Opp'n at 14, n. 6) However, initial disclosures under Rule 26 are not a substitute for an amended complaint and, not surprisingly, Plaintiff cites no authority for the proposition that he may rely on information contained within them in opposing a motion to dismiss. More importantly, even if this information were contained in the Complaint, it would still be insufficient, as the mere name and address of a purported victim is not a proper allegation of mail or wire fraud. Rather, to qualify as a proper mail or wire fraud predicate act, an allegation must identify the time, place, and content of the specific misrepresentation, as well as the mailing or wiring at issue. *See Wagh v. Metris Direct, Inc., 348 F.3d at 1109; Moore, 885 F.2d at 541.*

### D. Plaintiff Does Not Allege A Cognizable RICO Enterprise

In its Opening Brief, Deutsche Bank demonstrated that the Complaint does not adequately allege a racketeering enterprise "separate and apart from the pattern of activity in which it engages," *United States v. Turkette, 452 U.S. 576, 583, 101 S. Ct. 2425, 69 L.Ed.2d 246 (1981),* and thus fails to allege a cognizable enterprise. Plaintiffs only response to this argument is a citation to conclusory allegations of the Complaint that parrot the RICO statute but are not supported by specific factual allegations.

For example, Plaintiff cites Paragraph 20 of the Complaint, which lumps defendants into one and alleges in conclusory fashion that "Defendants functioned as a continuing unit, and ... had a decision-making structure by which they formulated and determined how to promote their tax schemes, including the CARDS Facility" (Opp'n at 16.) There are no allegations of how Deutsche Bank AG or Deutsche Bank Securities, Inc. participated in the affairs of the alleged enterprise separate and apart from their purported participation in the vaguely alleged racketeering acts themselves. *See Chang v. Chen, 80 F.3d 1293, 1298-99 (9th Cir. 1996)* ("predicate acts of racketeering activity, by themselves, do not satisfy the RICO enterprise element"); *Simon v. Value Behavioral Health, Inc., 208 F.3d 1073, 1083 (9th Cir. 2000)* ("a group does not constitute an enterprise unless it exists independently from the racketeering activity in which it engages"). Because the Complaint "fails to detail any course of fraudulent or illegal conduct [by either Deutsche Bank defendant that is] separate and distinct from the alleged predicate racketeering acts themselves," *First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 174 (2d Cir. 2004)* (emphasis in original), Plaintiff's RICO claim must be dismissed. *McFarland v. Memorex Corp., 493 F. Supp. 631, 639 (N.D. Cal. 1980)* (granting motion to dismiss where fraud not alleged with particularity; "[d]iscovery allows parties to develop the facts underlying their claims and defenses; it is not a vehicle for uncovering the claims themselves."). [7]

[7] Plaintiff argues that the correct remedy is "to allow discovery to proceed so that further facts may be discovered." (Opp'n at 16-17, n.7.) The two cases Plaintiff cites confirm that dismissal is the appropriate remedy for failure to satisfy Rule 9(b). *See Moore, 885 F.2d at 540* (affirming dismissal where the complaint failed to plead fraud with sufficient particularity); *United States ex rel. Lee v. SmithKline Beecham, Inc., 245 F.3d 1048, 1052 (9th Cir. 2001)* (dismissing complaint without prejudice for failure to plead fraud with particularity).

### E. Deutsche Bank's Alleged Participation Does Not Rise To The Requisite Level Of Operation Or Management

Providing banking services to certain taxpayers who engaged in CARDS investment strategies does not rise to the level of participation in the operation and management of the alleged enterprise, even if Deutsche Bank were alleged to have had knowledge of the enterprise's illicit nature. *Baumer v. Pachl, 8 F.3d 1341, 1344 (9th Cir. 1993).* Plaintiff contends that the Complaint alleges that Deutsche Bank did more than provide banking services, citing fifteen paragraphs of the Complaint to convince the Court that the acts attributed to Deutsche Bank in the Complaint are sufficient to establish that it actively

Reese M. JONES, Plaintiff, v. DEUTSCHE BANK AG, a..., 2005 WL 6128629...

Case 1:15-cv-00534-LTS  Document 42-3  Filed 01/18/16  Page 122 of 205

participated in the operation and management of the alleged RICO enterprise. (Opp'n at 17.) Yet only three of these paragraphs -- Paragraphs 24, 32 and 57-- even mention Deutsche Bank specifically, and only two of these three -- Paragraphs 32 and 57 -- attribute any conduct to Deutsche Bank specifically. The allegations that specifically mention Deutsche Bank in Paragraphs 32 [8] and 57 [9] amount, at best, to nothing more than allegations of control over allegedly fraudulent activities that were ancillary to the allegedly activity of the RICO enterprise. *Dep't of Econ. Dev. v. Arthur Andersen & Co.,* 924 F. Supp. 449, 467 (S.D.N.Y. 1996) ("[I]t is not enough to control even fraudulent activity that is ancillary to the fraud carried out by the RICO enterprise."). Accordingly, the Complaint should be dismissed.

[8]    Paragraph 32 alleges, vaguely, that Deutsche Bank employees met on "numerous occasions" with Chenery to "formulat[e] the manner in which a taxable event would be created and a method by which Deutsche Bank promissory notes would be utilized for the purpose of creating capital assets that could be purportedly sold at a loss so that a large tax benefit could be claimed on behalf of the taxpayers who participated in the program." (Compl. ¶ 32) These alleged discussions do not rise to the level of operation or management of the alleged enterprise. (Opening Br. at 13.)

## II. COUNT II SHOULD BE DISMISSED AS A MATTER OF LAW

### A. Count II (Securities Fraud) Does Not Satisfy The Heightened Pleading Requirements Of The PSLRA

### 1. The Complaint Fails to Properly Allege Scienter

Plaintiff argues that his conclusory allegations of the defendants' participation in the fraudulent scheme constitute "overwhelming circumstantial evidence" of Deutsche Bank's scienter. (Opp'n at 20.) But his boilerplate allegations are insufficient. To satisfy the PSRLA's scienter requirement, a "complaint must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *In re Daou Sys., Inc. Sec. Litig.,* 397 F.3d 704, 711(9th Cir. 2005). The Complaint only alleges that Deutsche Bank "provid[ed] a facade of financial substance and purported third party sales *so that the taxpayers could purport to generate huge losses,* none of which would be the product of legitimate sales or taxable events." (Compl. ¶ 57) (emphasis added). At most, this is an allegation that the taxpayers and Deutsche Bank participated jointly in a fraud against the government. There are no allegations that support the inference that Deutsche Bank itself knowingly made false or misleading statements to Plaintiff about the CARDS strategy. To the contrary, although the Complaint contains a number of allegations about Deutsche Bank's purported role in structuring and executing the financial transactions underlying the CARDS strategy, there are no allegations that Deutsche Bank played any role in communicating with Plaintiff; rather it was myCFO who allegedly marketed the transaction, (Compl. ¶ 29), and the law firm defendants who allegedly provided opinions to Plaintiff about the tax benefits. (*Id.,* ¶¶ 33-37.)

[9]    Paragraph 57 simply alleges that Deutsche Bank provided banking services with knowledge that CARDS was not a legitimate tax avoidance scheme and that the loans provided were "a sham." These allegations do not relate to control over the affairs of the alleged enterprise.

### 2. The Complaint's "Information and Belief" Allegations Do Not Comply With the PSLRA

Under the PSLRA, where a plaintiff alleges that a defendant either misrepresented a material fact or omitted a fact that was necessary to make a statement true,

> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).

Reese M. JONES, Plaintiff, v. DEUTSCHE BANK AG, a..., 2005 WL 6128020...

Case 1:15-cv-00534-LTS   Document 42-3   Filed 01/18/16   Page 123 of 205

Plaintiff argues that the Complaint meets this standard by citing authority for the unremarkable proposition that a plaintiff may base his allegations on information and belief where defendants are alleged to have concealed information. In doing so, Plaintiff misses the point, for Deutsche Bank does not contend that pleading upon information and belief is *per se improper*. However, when a plaintiff does plead securities fraud allegations upon information and belief, the PSLRA states that he

> must provide, in great detail, all the relevant facts forming the basis of [his] belief. It is not sufficient for a plaintiff's pleadings to set forth a belief that certain unspecified sources will reveal, after appropriate discovery, facts that will validate [his] claim.

*In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 985 (9th Cir. 1999) (applying 15 U.S.C. § 78u-4(b)(1)). As another court has explained it, "[m]erely pleading on 'information and belief does not relieve [a plaintiff] of the burdens imposed by Rule 9(b)." *McFarland,* 493 F. Supp. at 639 (dismissing complaint). Where, as here, the Plaintiff's allegations made upon information and belief are vague, indefinite, and do not state with any clarity the misrepresentations upon which his claim is based, they fail to meet the PSLRA's heightened pleading requirements.

### 3. Count II Fails to Allege Fraud With Particularity

The Complaint also falls short of the PSLRA requirement that it attribute specific statements to each Deutsche Bank Defendant and specify the way that any such statement is false. The Complaint lumps all defendants together and alleges, conclusorily, that they acted together. See, e.g., Compl. ¶ 32 (creating defined term "CARDS promoters" to refer to all defendants, which is then invoked throughout the Complaint). Plaintiff argues that the allegations that Deutsche Bank "acted as the third party purchaser in order to create the appearance of a taxable transaction" and that it documented the transaction as a legitimate sale when in fact it was "an elaborate sham" are sufficient to satisfy the PSLRA's heightened pleading requirements. (Opp'n at 20.) This argument misconstrues the PSLRA's requirement that a plaintiff asserting a securities fraud claim allege sufficient facts to support such a finding. *See Carol Gamble Trust 86 v. E-Rex, Inc.,* No. 03-15032, 2004 WL 43216 (9th Cir. Jan. 5, 2004). Moreover, the few allegations that Plaintiff cites that even mention Deutsche Bank fail to specify a single statement by a Deutsche Bank Defendant or its agent that was allegedly fraudulent (Opp'n at 20), and thus fail to satisfy Rule 9(b), as well.

### B. Count II Is Barred By The Applicable Statute Of Limitations

The parties agree that a securities fraud claim under Rule 10b-5 must be filed within the earlier of five years after the violation or within two years after the discovery of the facts constituting the violation (15 U.S.C. § 78 i(e); 28 U.S.C. § 1658(b)). Plaintiff argues, however, that his cause of action did not accrue until spring of 2004, when he paid approximately $2.5 million in back taxes and interest to the State of California's Franchise Tax Board, and that he did not discover the facts forming the basis of the fraud until late 2002 or early 2003. (Opp'n at 22.) This argument fails. (Opening Br. at 20-22)

According to the Complaint, Plaintiff must be charged with notice that the IRS viewed CARDS as an abusive tax shelter as of March 18, 2002, (Orig. Compl. ¶ 50) (Compl. ¶ 51) (alleging that on or about March 18, 2002, the IRS issued a public disclosure in the form of Notice 2002-21, entitled "Tax Avoidance Using Inflated Basis," describing "the CARDS transaction and listing it as a tax shelter, or transaction that is 'not allowable for federal income tax purposes'") and that based on this knowledge Plaintiff filed with the IRS a disclosure for amnesty regarding his CARDS investment strategy on April 16, 2002, pursuant to letters from Chenery and myCFO urging him to do so. (Orig. Compl. ¶ 52) (Compl. ¶ 53). Plaintiff's disclosure to the IRS indicated that Plaintiff had engaged in a "listed transaction," i.e., a transaction covered by Notice 2002-21, in 2000 and 2001. *Id.* Plaintiff has thus alleged that no later than April 16, 2002, Plaintiff knew that the IRS declared that CARDS was a tax shelter.

Thus, on April 16, 2002 Plaintiff had notice of the facts in the Complaint that give rise to his securities fraud claim. There is no requirement that Plaintiff know the "full extent" of the alleged fraud, as long as he has constructive notice of the facts

Reese M. JONES, Plaintiff, v. DEUTSCHE BANK AG, d..., 2005 WL 6128629...

Case 1:15-cv-00534-LTS   Document 42-3   Filed 01/18/16   Page 124 of 205

giving rise to his claim. *Dodds v. Cigna Sec., Inc.,* 12 F.3d 346, 350 (2d Cir. 1993) (statute of limitations analysis employs objective standard not requiring factual inquiry about knowledge of any one investor; securities plaintiff is "deemed to have discovered fraud for purposes of triggering the statute of limitations when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud.").

Plaintiff's contention that he suffered no damages until 2004 is also meritless: it is not necessary for all damages to have been incurred in order for the statute of limitations on a securities fraud claim to run, as long as the party alleging fraud has suffered some damages. *Volk v. D.A. Davidson & Co.,* 816 F.2d 1406, 1413-14 (9th Cir. 1987) (limitations period commences when alleged fraud should have been discovered; that IRS had not yet disallowed the investors' tax deductions did not toll the statute of limitations, as "[w]hatever action the IRS ultimately takes does not affect defrauded investors' rights to damages"). The Complaint alleges that Plaintiff paid fees in connection with the CARDS Strategy prior to publication of Notice 2002-21 and also had completed two of the three CARDS strategies that he used to claim losses in 2000, 2001 and 2002 respectively.

In sum, accepting the allegations of the Complaint as true, Plaintiff was on notice of the alleged fraudulent tax shelter scheme as early as March 18, 2002 when the IRS issued Notice 2002-21, and no later than April 16, 2002, the date of his disclosure to the IRS. The two-year statute of limitations ran at least as of April 16, 2004, i.e., over two years after IRS Notice 2002-21 and exactly two years after Plaintiff's disclosure to the IRS seeking amnesty. Because Plaintiff's original complaint was filed on December 17, 2004, Plaintiff's securities fraud claim is barred by the statute of limitations.

## CONCLUSION

For the foregoing reasons and those set forth in the Opening Brief, all claims against the Deutsche Bank Defendants should be dismissed with prejudice.

Dated: June 14, 2005

---

End of Document                                      © 2016 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 16

| | |
|---|---|
| **From:** | Anthony V Crocco |
| **Sent:** | Tuesday, December 26, 2000 11:40 AM |
| **To:** | Cari LaRose@Bankers_Trust |
| **Cc:** | Nancy Desmond@Bankers_Trust; Ann V Aziz@Bankers_Trust; Chris Boerum@Bankers_Trust; Adil Abubakar@Bankers_Trust; Jose Pagan@Bankers_Trust; Marc A Krusko@Bankers_Trust; John R Marson@Bankers_Trust; Shirley J White@Bankers_Trust; Danuta Panek@Bankers_Trust; John C Livia; Fabian O Brown; Mark R Westhoff@Bankers_Trust; Denia M Mornan; Carlton C Breedy@Bankers_Trust; Maria Agrusa@Bankers_Trust; Janet Sible |
| **Subject:** | Re: SHE Items in Custody Accounts |
| **Attach:** | pic04439.jpg; pic12181.jpg; CD & Note.DOC |

Cari,

A lot has to be done this week.  We will work on the asset transfers as soon as we can.  Thanks for your patience.

Regards,

Anthony Crocco
Phone # 212-250-4040
Fax     # 212-250-4923

Cari LaRose
12/26/2000 11:34 AM

To:   Nancy Desmond@Bankers_Trust
cc:   Ann V Aziz@Bankers_Trust, Chris Boerum@Bankers_Trust, Adil Abubakar@Bankers_Trust, Jose Pagan@Bankers_Trust, Marc A Krusko@Bankers_Trust, John R Marson@Bankers_Trust, Shirley J White@Bankers_Trust, Danuta Panek@Bankers_Trust, John C Livia/NewYork/DBNA/DeuBa@DBNA, Fabian O Brown/NewYork/DBNA/DeuBa@DBNA, Anthony V Crocco@Bankers_Trust, Mark R Westhoff@Bankers_Trust, Denia M Mornan/NewYork/DBNA/DeuBa@DBNA, Carlton C Breedy@Bankers_Trust, Maria Agrusa@Bankers_Trust, Janet Sible/NewYork/DBNA/DeuBa@DBNA
Subject:   Re: SHE Items in Custody Accounts  (Document link: Anthony V

Confidential

Crocco)

Now that Nancy has set up these CUSIP numbers - can we get these items booked on Global +?  Once we book these in the original accounts, we are going to need to move them around into different accounts.  This HAS TO happen this week.

Thanks and regards.




Nancy Desmond
12/20/2000 11:37 AM

To:   Ann V Aziz@Bankers_Trust
cc:   Chris Boerum@Bankers_Trust, Adil Abubakar@Bankers_Trust, Jose
       Pagan@Bankers_Trust, Marc A Krusko@Bankers_Trust, John R
       Marson@Bankers_Trust, Shirley J White@Bankers_Trust, Danuta
       Panek@Bankers_Trust, John C Livia/NewYork/DBNA/DeuBa@DBNA, Fabian O
       Brown/NewYork/DBNA/DeuBa@DBNA, Anthony V Crocco@Bankers_Trust, Mark
       R Westhoff@Bankers_Trust, Cari LaRose@Bankers_Trust, Denia M
       Mornan/NewYork/DBNA/DeuBa@DBNA, Carlton C Breedy@Bankers_Trust,
       Maria Agrusa@Bankers_Trust
Subject:   Re: SHE Items in Custody Accounts  (Document link: Cari LaRose)

The cusips have been set up in Vista & Global Plus.
The cusips are:
C/D - #996051UC0
Prom Note-  #996051UD8

Thanks,
Nancy




Ann V Aziz
12/20/2000 11:39 AM

To:   Nancy Desmond@Bankers_Trust
cc:   Chris Boerum@Bankers_Trust, Adil Abubakar@Bankers_Trust, Jose
       Pagan@Bankers_Trust, Marc A Krusko@Bankers_Trust, John R
       Marson@Bankers_Trust, Shirley J White@Bankers_Trust, Danuta
       Panek@Bankers_Trust, John C Livia/NewYork/DBNA/DeuBa@DBNA, Fabian O
       Brown/NewYork/DBNA/DeuBa@DBNA, Anthony V Crocco@Bankers_Trust, Mark
       R Westhoff@Bankers_Trust, Cari LaRose@Bankers_Trust, Denia M
       Mornan/NewYork/DBNA/DeuBa@DBNA, Carlton C Breedy@Bankers_Trust,

DBIRSAPPLEGATE 00000009
DB0024502

Maria Agrusa@Bankers_Trust
Subject:   Re: SHE Items in Custody Accounts

Nancy, the below securities can be set-up as follows under US Misc Assets.
I spoke with Chris, Adil and Jose and believe we should encounter no
problems under this category.  Chris, please correct me if I am wrong.

     Deutsche Bank AG CD due 11/21/01
     -the price can remain constant at 100.00
     -interest rate is zero

     Deutsche Bank Promissory Note due 10/21/01 - Yield = 1 month EURIBOR
     -the price can remain constant at 100.00
     -interest rate is zero

I know the complete description for the promissory note will not appear on
Global Plus.  Will appear on the clients' statements?

Maria, I do not think you will be able to receive monthly statements on
these securities to verify positions.  Is there another alternative?

Regards to all, Ann

--------------------- Forwarded by Ann V Aziz on 12/20/2000 11:21 AM
---------------------------


Ann V Aziz
12/20/2000 09:11 AM

To:   Nancy Desmond@Bankers_Trust
cc:   Marc A Krusko@Bankers_Trust, John R Marson@Bankers_Trust, Shirley J
    White@Bankers_Trust, Danuta Panek@Bankers_Trust, John C
    Livia/NewYork/DBNA/DeuBa@DBNA, Fabian O
    Brown/NewYork/DBNA/DeuBa@DBNA, Anthony V Crocco@Bankers_Trust, Mark
    R Westhoff@Bankers_Trust, Cari LaRose@Bankers_Trust, Denia M
    Mornan/NewYork/DBNA/DeuBa@DBNA, Carlton C Breedy@Bankers_Trust,
    Maria Agrusa@Bankers_Trust
Subject:   Re: SHE Items in Custody Accounts  (Document link: Ann V Aziz)

Nancy, unless Mark or Janet disagree, I would set-up both securities under
"US Misc Assets".  I did not see a maturity date for the promissory note.
Janet, is there one?



Nancy Desmond
12/20/2000 08:59 AM

Confidential

DBIRSAPPLEGATE 00000010
DB0024503

To:   John R Marson@Bankers_Trust
cc:   Ann V Aziz@Bankers_Trust, Shirley J White@Bankers_Trust, Danuta
      Panek@Bankers_Trust, John C Livia/NewYork/DBNA/DeuBa@DBNA, Fabian O
      Brown/NewYork/DBNA/DeuBa@DBNA, Anthony V Crocco@Bankers_Trust, Mark
      R Westhoff@Bankers_Trust, Cari LaRose@Bankers_Trust, Denia M
      Mornan/NewYork/DBNA/DeuBa@DBNA, Carlton C Breedy@Bankers_Trust,
      Maria Agrusa@Bankers_Trust
Subject:   Re: SHE Items in Custody Accounts  (Document link: Ann V Aziz)

Ann,
There are some issues in setting up the below Securities.
There is a Security type for floating rate C/D's which require specific pay
dates and frequency to set it up and specific rates.
My suggestion is Discounted C/D with does not require a rate.
We do not have a Security type for Promissory Notes and I do not believe I
ever saw one on G+.
We have a Security type called US Misc Assets.  This security does not
require any dated date, maturity date or rate.  I am not sure how this
would look on
the clients statement.
My suggestion is Disc Commercial paper which  requires a dated date and
maturity date and no rate.  I do not see a maturity date for the Promissory
note.
We can make up a maturity date.
Please let me know so I can set these Securities up.

Thanks,
Nancy




John R Marson
12/19/2000 04:43 PM

To:   Ann V Aziz@Bankers_Trust
cc:   Shirley J White@Bankers_Trust, Danuta Panek@Bankers_Trust, John C
      Livia/NewYork/DBNA/DeuBa@DBNA, Fabian O
      Brown/NewYork/DBNA/DeuBa@DBNA, Anthony V Crocco@Bankers_Trust, Mark
      R Westhoff@Bankers_Trust, Cari LaRose@Bankers_Trust, Denia M
      Mornan/NewYork/DBNA/DeuBa@DBNA, Nancy Desmond@Bankers_Trust, Carlton
      C Breedy@Bankers_Trust, Maria Agrusa@Bankers_Trust
Subject:   Re: SHE Items in Custody Accounts  (Document link: Nancy
      Desmond)

Ann,

My apologies for the incorrect numbers in my email dated yesterday. Please
use the attached, revised numbers for the Deposit and Promissory Note

Confidential

amounts related to the CARDs tranche 1.

(Embedded image moved to file: pic04439.jpg)

Regards,
John R Marson
Private Client Financing
Bankers Trust/Deutsche Bank
280 Park Ave. 6th Floor
New York, NY 10017
(212) 454-3425
(212) 454-4740 (fax)
(917) 514-3530 (cell)

Ann V Aziz
12/19/2000 01:03 PM

To:   Shirley J White@Bankers_Trust, Danuta Panek@Bankers_Trust, John C
      Livia/NewYork/DBNA/DeuBa@DBNA, Fabian O
      Brown/NewYork/DBNA/DeuBa@DBNA, Anthony V Crocco@Bankers_Trust
cc:   John R Marson@Bankers_Trust, Mark R Westhoff@Bankers_Trust, Cari
      LaRose@Bankers_Trust, Denia M Mornan/NewYork/DBNA/DeuBa@DBNA, Nancy
      Desmond@Bankers_Trust, Carlton C Breedy@Bankers_Trust, Maria
      Agrusa@Bankers_Trust
Subject:   SHE Items in Custody Accounts

The par amounts have been changed.  I will be sending corrected ones in a
separate e-mail.

Regards, Ann

--------------------- Forwarded by Ann V Aziz on 12/19/2000 01:02 PM
--------------------------

Ann V Aziz
12/19/2000 11:50 AM

To:   Shirley J White@Bankers_Trust, Danuta Panek@Bankers_Trust, John C
      Livia/NewYork/DBNA/DeuBa@DBNA, Fabian O
      Brown/NewYork/DBNA/DeuBa@DBNA, Anthony V Crocco@Bankers_Trust
cc:   John R Marson@Bankers_Trust, Mark R Westhoff@Bankers_Trust, Cari
      LaRose@Bankers_Trust, Janet Sible/NewYork/DBNA/DeuBa@DBNA, Denia M
      Mornan/NewYork/DBNA/DeuBa@DBNA, Nancy Desmond@Bankers_Trust, Carlton
      C Breedy@Bankers_Trust, Maria Agrusa@Bankers_Trust

Confidential

Subject:   SHE Items in Custody Accounts

Anthony/Shirley, please "free receive" with a value date of November 20th
the below deposit and note into the respective accounts using the par
amounts noted by John.  Please insure the statements are re-rendered and
mailed after the securities are booked into the accounts.  I have tried to
give you as much info as possible to facilitate the set-up of each security
on Global Plus.  Please let me know if additional info is needed.  Both
securities should be booked under location 1905 (IIA Service Team).  Please
use the respective par amounts for the book price.

> Deutsche Bank AG CD due 11/21/01
>  - interest rate varies
>  - inerest payment dates vary
>
> Deutsche Bank Promissory Note
>  - interest rate varies
>  - interest payable monthly

Listed below are the respective account numbers.



Knightsbridge Finl Trading #191039

Janet, should the price for both securities remain constant at 100.00?  If
not, Carlton Breedy will need a contact name and number so that he can
obtain a month-end price for the statements.

Maria, will you need to verify these positions monthly?  If so, perhaps
Janet can give you a contact name and number.

Regards to all, Ann


---------------------- Forwarded by Ann V Aziz on 12/19/2000 11:03 AM
--------------------------


John R Marson
12/18/2000 11:38 PM

To:   Ann V Aziz@Bankers_Trust, Mark R Westhoff@Bankers_Trust, Cari
      LaRose@Bankers_Trust, Denia M Mornan/NewYork/DBNA/DeuBa@DBNA, Janet
      Sible/NewYork/DBNA/DeuBa@DBNA

DBIRSAPPLEGATE 00000013
DB0024506

cc:    Anthony V Crocco@Bankers_Trust, Shirley J White@Bankers_Trust
Subject:    SHE Items in Custody Accounts

Ann/Denia,

The following securities and amounts need to be set up in the custody
accounts and back dated for value date November 20 as soon as possible.
Each of the following accounts will hold a DB Deposit and a DB Promissory
Note,  in the amounts below.

(Embedded image moved to file: pic12181.jpg)

Attached is the documentation related to these instruments including full
documentation.

(See attached file: CD & Note.DOC)

Regards,
John R Marson
Private Client Financing
Bankers Trust/Deutsche Bank
280 Park Ave. 6th Floor
New York, NY 10017
(212) 454-3425
(212) 454-4740 (fax)

Confidential

# EXHIBIT 17

**From:**    Cari LaRose
**Sent:**    Friday, December 1, 2000 5:40 PM
**To:**    Ann V Aziz@Bankers_Trust
**Cc:**    Fabian O Brown; John R Marson@Bankers_Trust
**Subject:**    Re: SHE Assets in G+ Accts
**Attach:**    pic16862.jpg

---

Ann - We've been working with Shirley and Fabian to get these SHE items
booked on the system.  John Marson is out of the office until Monday but
said he would work to get some supporting documentation for these bookings.
The lending group does this often on AIMS accounts, I didn't know if you
had any expertise in this area.  (It kind of reminds me of what we do for
Morino?)

Thanks and regards.
--------------------- Forwarded by Cari LaRose on 12/01/2000 04:39 PM
--------------------------


John R Marson
11/29/2000 09:59 AM

To:   Shirley J White@Bankers_Trust
cc:   Denia M Mornan/NewYork/DBNA/DeuBa@DBNA, Anthony V
     Crocco@Bankers_Trust, Ann V Aziz@Bankers_Trust, Mark R
     Westhoff@Bankers_Trust, William S Wyman@Bankers_Trust, Michael S
     Jacoby@Bankers_Trust, Cari LaRose@Bankers_Trust
Subject:   Re: SHE Assets in G+ Accts  (Document link: Cari LaRose)

Shirley,

These are securities.  Please amend the deposit to a one year deposit,  not
a 7 year deposit.  Thanks.

Regards,
John R Marson
Private Client Financing
Bankers Trust/Deutsche Bank
280 Park Ave. 6th Floor
New York, NY 10017
(212) 454-3425
(212) 454-4740 (fax)

Confidential

Shirley J White
11/28/2000 08:08 PM

To:   Denia M Mornan/NewYork/DBNA/DeuBa@DBNA
cc:   Anthony V Crocco@Bankers_Trust, Denia M
      Mornan/NewYork/DBNA/DeuBa@DBNA, Ann V Aziz@Bankers_Trust, John R
      Marson@Bankers_Trust, Mark R Westhoff@Bankers_Trust, William S
      Wyman@Bankers_Trust, Michael S Jacoby@Bankers_Trust, Cari
      LaRose@Bankers_Trust
Subject:   Re: SHE Assets in G+ Accts  (Document link: John R Marson)

Denia,

I need to know what type of fund is this, is it CASH or SECURITIES.  Once I
get your reply I will speak with Nancy Desmond as to how we will reflect
this on Global Plus.

Rgds
Shirley

Cari LaRose
11/28/2000 01:23 PM

To:   Shirley J White@Bankers_Trust, Anthony V Crocco@Bankers_Trust
cc:   Denia M Mornan/NewYork/DBNA/DeuBa@DBNA, Ann V Aziz@Bankers_Trust,
      John R Marson@Bankers_Trust, Mark R Westhoff@Bankers_Trust, William
      S Wyman@Bankers_Trust, Michael S Jacoby@Bankers_Trust
Subject:   SHE Assets in G+ Accts

We need to get the following SHE items posted in the accounts listed below.
These holdings are integral in relationship to a very large outstanding
loan.  Please advise asap if you need additional information and/or are
having any problems entering these items.

Thanks and regards.

--------------------- Forwarded by Cari LaRose on 11/28/2000 12:21 PM
--------------------------

John R Marson

Confidential

11/22/2000 04:40 PM

To:   Cari LaRose@Bankers_Trust, Janet Sible/NewYork/DBNA/DeuBa@DBNA
cc:   Denia M Mornan/NewYork/DBNA/DeuBa@DBNA
Subject:   SHE Assets in G+ Accts

Carrie/Janet,

The following items need to be set up in each of the following clients'
Global Custody accounts at BTCO as securities held elsewhere (SHE assets).
The deposits and promissory notes are held at DB and BTCO respectively.

DB Deposit defined as a 1 year time deposit held by Deutsche Bank AG New
York branch denominated in Euro (EUR), DTD 11/21/00. Initial interest
period of 1 month and yield for that period of 1 month Euribor, second
interest period for 11 months and yield for that period 11 month Euribor,
annual interest periods thereafter yielding 12 month Euribor. Each Borrower
has a DB Deposit in the amount below.

Promissory Note is a bearer note denominated in Euro. The Note yields
monthly Euribor, resets and pays interest monthly Euribor.   Each Borrower
has a Promissory Note in the amount below.

(Embedded image moved to file: pic16862.jpg)

Please call if you would care to discuss.

Regards,
John R Marson
Private Client Financing
Bankers Trust/Deutsche Bank
280 Park Ave. 6th Floor
New York, NY 10017
(212) 454-3425
(212) 454-4740 (fax)

Confidential

# EXHIBIT 18

**From:**   Cari_LaRose%BANKERS__TRUST%DEUBAINT@Zantaz-DB.com
**Sent:**   Tuesday, December 26, 2000 11:35 AM
**To:**   Nancy_Desmond%Bankers__Trust@Zantaz-DB.com
**Cc:**   Ann_V_Aziz%Bankers__Trust@Zantaz-DB.com;
Chris_Boerum%Bankers__Trust@Zantaz-DB.com;
Adil_Abubakar%Bankers__Trust@Zantaz-DB.com;
Jose_Pagan%Bankers__Trust@Zantaz-DB.com;
Marc_A_Krusko%Bankers__Trust@Zantaz-DB.com;
John_R_Marson%Bankers__Trust@Zantaz-DB.com;
Shirley_J_White%Bankers__Trust@Zantaz-DB.com;
Danuta_Panek%Bankers__Trust@Zantaz-DB.com;
John_C_Livia/NewYork/DBNA/DeuBa%DBNA@Zantaz-DB.com;
Fabian_O_Brown/NewYork/DBNA/DeuBa%DBNA@Zantaz-DB.com;
Anthony_V_Crocco%Bankers__Trust@Zantaz-DB.com;
Mark_R_Westhoff%Bankers__Trust@Zantaz-DB.com;
Denia_M_Mornan/NewYork/DBNA/DeuBa%DBNA@Zantaz-DB.com;
Carlton_C_Breedy%Bankers__Trust@Zantaz-DB.com;
Maria_Agrusa%Bankers__Trust@Zantaz-DB.com;
Janet_Sible/NewYork/DBNA/DeuBa%DBNA@Zantaz-DB.com
**Subject:**   Re: SHE Items in Custody Accounts
**Attach:**   pic00015.jpg; pic16796.jpg; CD & Note.DOC

Now that Nancy has set up these CUSIP numbers - can we get these items
booked on Global +?  Once we book these in the original accounts, we are
going to need to move them around into different accounts.  This HAS TO
happen this week.

Thanks and regards.

Nancy Desmond
12/20/2000 11:37 AM

To:   Ann V Aziz@Bankers_Trust
cc:   Chris Boerum@Bankers_Trust, Adil Abubakar@Bankers_Trust, Jose
Pagan@Bankers_Trust, Marc A Krusko@Bankers_Trust, John R
Marson@Bankers_Trust, Shirley J White@Bankers_Trust, Danuta
Panek@Bankers_Trust, John C Livia/NewYork/DBNA/DeuBa@DBNA, Fabian O
Brown/NewYork/DBNA/DeuBa@DBNA, Anthony V Crocco@Bankers_Trust, Mark
R Westhoff@Bankers_Trust, Cari LaRose@Bankers_Trust, Denia M
Mornan/NewYork/DBNA/DeuBa@DBNA, Carlton C Breedy@Bankers_Trust,

Confidential

Maria Agrusa@Bankers_Trust
Subject:   Re: SHE Items in Custody Accounts  (Document link: Cari LaRose)

The cusips have been set up in Vista & Global Plus.
The cusips are:
C/D - #996051UC0
Prom Note-  #996051UD8

Thanks,
Nancy

Ann V Aziz
12/20/2000 11:39 AM

To:   Nancy Desmond@Bankers_Trust
cc:   Chris Boerum@Bankers_Trust, Adil Abubakar@Bankers_Trust, Jose
      Pagan@Bankers_Trust, Marc A Krusko@Bankers_Trust, John R
      Marson@Bankers_Trust, Shirley J White@Bankers_Trust, Danuta
      Panek@Bankers_Trust, John C Livia/NewYork/DBNA/DeuBa@DBNA, Fabian O
      Brown/NewYork/DBNA/DeuBa@DBNA, Anthony V Crocco@Bankers_Trust, Mark
      R Westhoff@Bankers_Trust, Cari LaRose@Bankers_Trust, Denia M
      Mornan/NewYork/DBNA/DeuBa@DBNA, Carlton C Breedy@Bankers_Trust,
      Maria Agrusa@Bankers_Trust
Subject:   Re: SHE Items in Custody Accounts

Nancy, the below securities can be set-up as follows under US Misc Assets.
I spoke with Chris, Adil and Jose and believe we should encounter no
problems under this category.  Chris, please correct me if I am wrong.

   Deutsche Bank AG CD due 11/21/01
    -the price can remain constant at 100.00
    -interest rate is zero

   Deutsche Bank Promissory Note due 10/21/01 - Yield = 1 month EURIBOR
    -the price can remain constant at 100.00
    -interest rate is zero

I know the complete description for the promissory note will not appear on
Global Plus.  Will appear on the clients' statements?

Maria, I do not think you will be able to receive monthly statements on
these securities to verify positions.  Is there another alternative?

Regards to all, Ann

--------------------- Forwarded by Ann V Aziz on 12/20/2000 11:21 AM
--------------------------

Confidential

Ann V Aziz
12/20/2000 09:11 AM

To:   Nancy Desmond@Bankers_Trust
cc:   Marc A Krusko@Bankers_Trust, John R Marson@Bankers_Trust, Shirley J
      White@Bankers_Trust, Danuta Panek@Bankers_Trust, John C
      Livia/NewYork/DBNA/DeuBa@DBNA, Fabian O
      Brown/NewYork/DBNA/DeuBa@DBNA, Anthony V Crocco@Bankers_Trust, Mark
      R Westhoff@Bankers_Trust, Cari LaRose@Bankers_Trust, Denia M
      Mornan/NewYork/DBNA/DeuBa@DBNA, Carlton C Breedy@Bankers_Trust,
      Maria Agrusa@Bankers_Trust
Subject:   Re: SHE Items in Custody Accounts  (Document link: Ann V Aziz)

Nancy, unless Mark or Janet disagree, I would set-up both securities under
"US Misc Assets".  I did not see a maturity date for the promissory note.
Janet, is there one?

Nancy Desmond
12/20/2000 08:59 AM

To:   John R Marson@Bankers_Trust
cc:   Ann V Aziz@Bankers_Trust, Shirley J White@Bankers_Trust, Danuta
      Panek@Bankers_Trust, John C Livia/NewYork/DBNA/DeuBa@DBNA, Fabian O
      Brown/NewYork/DBNA/DeuBa@DBNA, Anthony V Crocco@Bankers_Trust, Mark
      R Westhoff@Bankers_Trust, Cari LaRose@Bankers_Trust, Denia M
      Mornan/NewYork/DBNA/DeuBa@DBNA, Carlton C Breedy@Bankers_Trust,
      Maria Agrusa@Bankers_Trust
Subject:   Re: SHE Items in Custody Accounts  (Document link: Ann V Aziz)

Ann,
There are some issues in setting up the below Securities.
There is a Security type for floating rate C/D's which require specific pay
dates and frequency to set it up and specific rates.
My suggestion is Discounted C/D with does not require a rate.
We do not have a Security type for Promissory Notes and I do not believe I
ever saw one on G+.
We have a Security type called US Misc Assets.  This security does not
require any dated date, maturity date or rate.  I am not sure how this
would look on
the clients statement.
My suggestion is Disc Commercial paper which  requires a dated date and
maturity date and no rate.  I do not see a maturity date for the Promissory
note.
We can make up a maturity date.
Please let me know so I can set these Securities up.

Thanks,
Nancy

John R Marson
12/19/2000 04:43 PM

Confidential

DBIRSAPPLEGATE 00022806
DB0047299

To:   Ann V Aziz@Bankers_Trust
cc:   Shirley J White@Bankers_Trust, Danuta Panek@Bankers_Trust, John C
      Livia/NewYork/DBNA/DeuBa@DBNA, Fabian O
      Brown/NewYork/DBNA/DeuBa@DBNA, Anthony V Crocco@Bankers_Trust, Mark
      R Westhoff@Bankers_Trust, Cari LaRose@Bankers_Trust, Denia M
      Mornan/NewYork/DBNA/DeuBa@DBNA, Nancy Desmond@Bankers_Trust, Carlton
      C Breedy@Bankers_Trust, Maria Agrusa@Bankers_Trust
Subject:   Re: SHE Items in Custody Accounts  (Document link: Nancy
      Desmond)


Ann,


My apologies for the incorrect numbers in my email dated yesterday. Please
use the attached, revised numbers for the Deposit and Promissory Note
amounts related to the CARDs tranche 1.


(Embedded image moved to file: pic00015.jpg)


Regards,
John R Marson
Private Client Financing
Bankers Trust/Deutsche Bank
280 Park Ave. 6th Floor
New York, NY 10017
(212) 454-3425
(212) 454-4740 (fax)
(917) 514-3530 (cell)




Ann V Aziz
12/19/2000 01:03 PM


To:   Shirley J White@Bankers_Trust, Danuta Panek@Bankers_Trust, John C
      Livia/NewYork/DBNA/DeuBa@DBNA, Fabian O
      Brown/NewYork/DBNA/DeuBa@DBNA, Anthony V Crocco@Bankers_Trust
cc:   John R Marson@Bankers_Trust, Mark R Westhoff@Bankers_Trust, Cari
      LaRose@Bankers_Trust, Denia M Mornan/NewYork/DBNA/DeuBa@DBNA, Nancy
      Desmond@Bankers_Trust, Carlton C Breedy@Bankers_Trust, Maria
      Agrusa@Bankers_Trust
Subject:   SHE Items in Custody Accounts


The par amounts have been changed.  I will be sending corrected ones in a
separate e-mail.


Regards, Ann


--------------------- Forwarded by Ann V Aziz on 12/19/2000 01:02 PM
---------------------------




Ann V Aziz
12/19/2000 11:50 AM

DBIRSAPPLEGATE 00022807
DB0047300

To:   Shirley J White@Bankers_Trust, Danuta Panek@Bankers_Trust, John C
      Livia/NewYork/DBNA/DeuBa@DBNA, Fabian O
      Brown/NewYork/DBNA/DeuBa@DBNA, Anthony V Crocco@Bankers_Trust
cc:   John R Marson@Bankers_Trust, Mark R Westhoff@Bankers_Trust, Cari
      LaRose@Bankers_Trust, Janet Sible/NewYork/DBNA/DeuBa@DBNA, Denia M
      Mornan/NewYork/DBNA/DeuBa@DBNA, Nancy Desmond@Bankers_Trust, Carlton
      C Breedy@Bankers_Trust, Maria Agrusa@Bankers_Trust
Subject:   SHE Items in Custody Accounts

Anthony/Shirley, please "free receive" with a value date of November 20th
the below deposit and note into the respective accounts using the par
amounts noted by John.  Please insure the statements are re-rendered and
mailed after the securities are booked into the accounts.  I have tried to
give you as much info as possible to facilitate the set-up of each security
on Global Plus.  Please let me know if additional info is needed.  Both
securities should be booked under location 1905 (IIA Service Team).  Please
use the respective par amounts for the book price.

        Deutsche Bank AG CD due 11/21/01
        - interest rate varies
        - inerest payment dates vary

        Deutsche Bank Promissory Note
        - interest rate varies
        - interest payable monthly

Listed below are the respective account numbers.

        Metropolitan Finl Trading #191172
        Edgeware Finl Trading #191173
        Ongar Finl Trading #191171
        Mordern Finl Trading #191168
        Knightsbridge Finl Trading #191039
        Marylebone Finl Trading #191169
        Stanmore Finl Trading #191170

Janet, should the price for both securities remain constant at 100.00?  If
not, Carlton Breedy will need a contact name and number so that he can
obtain a month-end price for the statements.

Maria, will you need to verify these positions monthly?  If so, perhaps
Janet can give you a contact name and number.

Regards to all, Ann

--------------------- Forwarded by Ann V Aziz on 12/19/2000 11:03 AM
---------------------------

John R Marson
12/18/2000 11:38 PM

Confidential

To:   Ann V Aziz@Bankers_Trust, Mark R Westhoff@Bankers_Trust, Cari
      LaRose@Bankers_Trust, Denia M Mornan/NewYork/DBNA/DeuBa@DBNA, Janet
      Sible/NewYork/DBNA/DeuBa@DBNA
cc:   Anthony V Crocco@Bankers_Trust, Shirley J White@Bankers_Trust
Subject:   SHE Items in Custody Accounts

Ann/Denia,

The following securities and amounts need to be set up in the custody
accounts and back dated for value date November 20 as soon as possible.
Each of the following accounts will hold a DB Deposit and a DB Promissory
Note,  in the amounts below.

(Embedded image moved to file: pic16796.jpg)

Attached is the documentation related to these instruments including full
documentation.

(See attached file: CD & Note.DOC)

Regards,
John R Marson
Private Client Financing
Bankers Trust/Deutsche Bank
280 Park Ave. 6th Floor
New York, NY 10017
(212) 454-3425
(212) 454-4740 (fax)

Confidential

# EXHIBIT 19

| **From:** | Doug Anderson <danderson@mycfo.com> |
| **Sent:** | Thursday, August 29, 2002 5:18 PM |
| **To:** | Janet Sible/NewYork/DBNA/DeuBa@DBNA |
| **Cc:** | Jennifer Bonvechio <jen@mycfo.com>; Cari LaRose/NewYork/DBNA/DeuBa@DBNA; Sven Schwuchow/NewYork/DBNA/DeuBa@DBNA; Steve Kennedy <skennedy@mycfo.com> |
| **Subject:** | RE: TJ's cash balance |

Janet,

We spoke with Bernstein today. Your contact there is Maryanne Pantilione, mailto:PantilioneMZ@bernstein.com. (212) 756-4223

The letter itself should be addressed to:

Richard Abramson
Bernstein
767 Fifth Avenue
NY, NY  10153

Please copy me on the letter when you send it.

Thank you,

-Doug Anderson

-----Original Message-----
From: Janet Sible [mailto:janet.sible@db.com]
Sent: Thursday, August 22, 2002 2:00 AM
To: Doug Anderson
Cc: Jennifer Bonvechio; Cari LaRose; Sven Schwuchow
Subject: RE: TJ's cash balance

--So sorry guys, I had this saved as a draft and never sent it!

Doug,

First, we will need a copy of the Bernstein- Thomas Jermoluk Investment
Management Agreement.  We will expect the muni bonds purchased to be
Investment Grade (BBB- or better).  We would prefer to see a diversified
portfolio, more than four bond positions--I can't see where that will
present any problems.  The initial advance rate on muni bonds is 80%.

Second, we will need an original letter from Mr. Jermoluk requesting that
Bernstein be added to the account as the manager.
--What you might want to do instead of the letter is have him sign updated
Worldwide Custody docs  giving myCFO "Consultant Rights" as well as naming
Bernstein as his Investment Manager.   After myCFO has Consultant Rights,
we would be able to take direction from myCFO authorized signers regarding
statements, trade instructions, authorization for online access, wire
instructions etc.  It's something you need to talk over with the client but
it would definitely make life easier for myCFO.  I'm attaching the current
version of that document at the end of this email.

Third, in the past we have received a letter of instruction from the client
to liquidate part of his remaining Promissory Note, convert Euros to USD
and to hedge the FX position.   Since Mr. Jermoluk's Promissory Note
expired,  that same letter doesn't apply here, but it would be helpful to
have a letter of authorization from the client that asks us to convert EUR
to USD and hedge the position.   I'm not sure who has drafted this type of
LOA for your clients  in the past but I believe that it is Jonathan Waller
that has done so,   Mr. Jermoluk  would buy US dollars for spot settlement
and purchase Euros forward to settle on  12/17/2002--one day prior to the
next roll date of the facility.    I can coordinate the execution and
settlement of that trade.  We will need to have Kevin McAuliffe (as power
of attorney for Mr. Jermoluk) or the client on the phone for the execution.
If we get new a new custody agreement giving myCFO consultant rights, then
we can have a little more
freedom as far as which myCFO rep is on the call.
Mr. Jermoluk will receive a written request to confirm the foreign exchange
trade a couple of days after the trade has been executed.  It is the same
long form confirm that he has signed in the past.

Finally, the Lending Department has a one page agreement that Bernstein
needs to sign that basically says that in the event of foreclosure,
Bernstein acknowledges that Deutsche Bank has the right to liquidate the
portfolio.  We will  work with the broker to avoid or manage that process
should it be necessary, but by signing Berstein acknowledges our lien on
the collateral.  When we have the name and address of the Bernstein
advisor, then we'll fill in that information and send that document
directly to Sanford Bernstein...i.e. it doesn't need to be sent to Mr.
Jermoluk.  Bernstein has signed this document before so I don't foresee any
problems.

(See attached file: worldwide custody 5 13 02.pdf)

Confidential
DB0002256

If you have any questions, please feel free to call.

Regards,

Janet Sible

> "Doug Anderson"
> <danderson@mycfo.     To:     Janet
> Sible/NewYork/DBNA/DeuBa@DBNA
> com>              cc:    "Jennifer
> Bonvechio" <jen@mycfo.com>
>                 Subject:  RE: TJ's cash
> balance
> 08/14/2002 05:07
> PM

Janet,

Are you able to provide any information on how I can get this going? Are
there detail restrictions on the account that I need to provide Bernstein?

Thank you,

-Doug

-----Original Message-----
From: Doug Anderson
Sent: Thursday, August 08, 2002 8:25 AM
To: Janet Sible (E-mail)
Cc: Jonathan Waller; Teresa Holland
Subject: FW: TJ's cash balance

Janet-

We would like, instead to move forward with a managed municipal portfolio
with Bernstein for the full account (hedging the euro exposure). I know

we've done this with another client with a similar account. Please let me
know what you would need from your side in order to get this going.

thank you,

-Doug

-----Original Message-----
From: Janet Sible [mailto:janet.sible@db.com]
Sent: Friday, August 02, 2002 8:16 AM
To: Jonathan Waller
Cc: Mark R Westhoff; Sven Schwuchow
Subject: TJ's cash balance


Hi Jonathan,

Just a followup to our conversation a couple of days ago...

Thomas Jermoluk's account 140362 has the following balances:
Cash USD  $6,638,064.28
Cash EUR 3,470,103.48

We can purchase a treasury for him if we get a letter of authorization or
what you might want to do is get a letter similar to the [Redacted] letter
that just instructs us to keep rolling him into the current 3 month
treasury bill as his existing position matures.

As far as the EUR cash is concerned, we can convert to USD & hedge the
position forward if TJ wants to put the funds to work in USD form.
Otherwise, both the USD & EUR positions are earning an idle cash interest
rate.  The USD earns a rate of target Fed Funds rate less 50 bps.  The EUR
cash earns a money market  rate taken directly from what we earn on the
bank's Euro position.

Please let me know if you want me to send you a copy of the [Redacted] letter to
use as a draft for a letter for TJ.


Regards,

Janet


--

This e-mail may contain confidential and/or privileged information. If you
are not the intended recipient (or have received this e-mail in error)
please notify the sender immediately and destroy this e-mail. Any

unauthorized copying, disclosure or distribution of the material in this
e-mail is strictly forbidden.

--

This e-mail may contain confidential and/or privileged information. If you
are not the intended recipient (or have received this e-mail in error)
please notify the sender immediately and destroy this e-mail. Any
unauthorized copying, disclosure or distribution of the material in this
e-mail is strictly forbidden.

Confidential

# EXHIBIT 20

| **From:** | Janet_Sible/NewYork/DBNA/DeuBa%PS@Zantaz-DB.com |
|---|---|
| **Sent:** | Thursday, December 5, 2002 7:21 PM |
| **To:** | easlanian@earthlink.net; rbickham@myCFO.com; mprimiani@mosaicwealth.com |
| **Cc:** | Mark_R_Westhoff/NewYork/DBNA/DeuBa%DBNA@Zantaz-DB.com; Michael_S_Jacoby/NewYork/DBNA/DeuBa%DBNA@Zantaz-DB.com |
| **Subject:** | Edouard Aslanian - Upney Financial Trading Payoff Worksheet |
| **Attach:** | Aslanian-Upney reset worksheet 12 02.xls |

Hello everyone,

Please disregard the previous worksheet and replace it with the Excel spreadsheet attached to this email.

(See attached file: Aslanian-Upney reset worksheet 12 02.xls)

I've drafted the steps to close out the Edouard Aslanian-Upney Financial Trading LLC facility.  They are as follows:

1.  Spot Euro trade will be executed to purchase EUR 279,086.21  for settlement 12/13/02.  This spot trade can be executed  with Mr. Aslanian on the phone with Janet and the DB Foreign Exchange traders or else Mr. Aslanian can sign a letter of authorization for DB to execute the trade at prevailing EUR/ USD exchange rate.  USD needed to pay for the spot purchase of Euros can be wired directly from Merrill Lynch to DB London.

2.  Merrill is instructed to wire ($3,276,488.22+ USD amount from spot Euro purchase) directly to DB London for value 12/13/02.  (Janet will provide instructions, Mr. Aslanian will direct Merrill Lynch).  This will save time versus wiring US Dollars from Merrill  to DB Custody account and then having DB Custody wire the funds.

 3.  Promissory note Euro interest and custody account Euro interest will be transferred from Aslanian accounts to LLC account.  (Janet will draft letter of authorization).

4.  Custody & legal fees for Aslanian account will be charged from USD balance in Aslanian custody account.   The account will be short a small amount but we will take care of that amount here.

5.  LLC Custody fee will be charged to LLC Custody account.

If you have any questions, please feel free to call me.

Regards,

Janet Sible
Vice President

Confidential

Deutsche Bank Private Banking
Family Office Group
312.993.8021  phone
312.993.8086  fax

Confidential

DB0005243

# EXHIBIT 21

December 11, 2002

Mr. Mark Westhoff
Deutsche Bank Private Banking
200 S. Wacker Drive, Suite 8400
Chicago, IL 60606

Dear Mr. Westhoff,

The loan facility for Bigglesworth Financial Trading LLC for which I am a co-obligor matures on December 18, 2002.

Euro proceeds of EUR 8,037,729.43 from the two Thomas Jermoluk #0570022 FX forward contracts that settle on 12/17/02 should be transferred to Bigglesworth Financial Trading LLC's DB Internet Account 104 119 260 008  to satisfy loan obligations due.

Please execute the following spot trade as soon as possible:

Client:              Thomas Jermoluk # 0570022
Trade Date:          To be determined
Settlement Date:     12/17/02
Thomas Jermoluk      BUYS EUR 197,309.37
Thomas Jermoluk      SELLS USD *201,452.87*
Spot Rate:           *1.021*

The Euros resulting from the above spot trade should be delivered to Bigglesworth Financial Trading LLC's DB Internet account 104 119 260 008.

Please wire US Dollars from custody account 140362  to pay for the settlement of the FX forward contract that matures on 12/17/02 as well as for the spot trade listed above.  USD 7,445,253.20 plus settlement amount from spot Euro purchase listed above should be wired for value 12/17/02 to:

**Deutsche Bank Trust Company Americas**
**ABA 021 001 033**
**Deutsche Bank AG, London**
**Acct No. 04-411-739**
**Ref. DBI No. #0570022  Thomas Jermoluk**

In addition, please transfer the EUR 1,412.61 balance in account 140362 to Bigglesworth Financial Trading LLC's DB Internet account 104 119 260 008.

When the loan facility has been closed, please close out account 140362 at Deutsche Bank.
I will provide further instructions regarding the delivery of remaining cash and securities in my Deutsche Bank account.

Regards,

Thomas Jermoluk

# EXHIBIT 22

December 9, 2002


Mr. Mark Westhoff
Deutsche Bank Private Banking
200 S. Wacker Drive, Suite 8400
Chicago, IL 60606

Dear Mr. Westhoff,

The loan facility for Upney Financial Trading LLC for which I am a co-obligor matures on December 16, 2002.

All proceeds from my FX forward contract that settles on 12/13/02 should be transferred to Upney Financial Trading LLC's DB Internet Account 105 505 900 008 to satisfy the obligations due.

Please execute the following trade as soon as possible:
Client:               Edouard Aslanian # 0570086
Trade Date:           To be determined
Settlement Date:      12/13/02
Edouard Aslanian BUYS  EUR 279,103.57
Edouard Aslanian SELLS USD  _282,787.74_
Spot Rate:    _1.0132_

The Euros resulting from the above spot trade should be delivered to Upney Financial Trading LLC's DB Internet account 105 505 900 008.

I will wire US Dollars from an external source to pay for the settlement of the FX forward contract as well as the spot trade listed above.

All Euro cash held in my DB Custody account 140409 should be transferred to Upney Financial Trading LLC's DB Internet account 105 505 900 008.

Any Euro cash held in my DB Internet account 105 507 230 016 should also be transferred to Upney Financial Trading LLC's DB Internet account 105 505 900 008.

The remaining US Dollars in my DB custody account should be applied to my 2002 Custody Fee for the account as well as to pay for the legal bill presented by Akin Gump in the amount of $1,546.50.

When all fees have been paid and the loan facility has been closed, please close out my accounts at Deutsche Bank.

Regards,

Edouard Aslanian

Confidential

# EXHIBIT
# 23

**From:**      Michael Raphael
**Sent:**      Thursday, December 12, 2002 3:55 PM
**To:**        Janet Sible; Mark R Westhoff
**Subject:**   Deal Confos

---

I await LOAs.

Regards,
Michael Raphael
Deutsche Bank Private Wealth Management
Product Management and Investment Solutions
280 Park Avenue, New York, N.Y. 10017 Fl. 22 East
Mail Stop NYC03-2204
P - 212-454-9947
F - 212-454-0542

----- Forwarded by Michael Raphael/NewYork/DBNA/DeuBa on 12/12/2002 03:55 PM -----

> Guido Graff
> 12/12/2002 03:14 PM
>
>          To: Janet Sible/NewYork/DBNA/DeuBa@DBNA, Mark R
> Westhoff/NewYork/DBNA/DeuBa@DBNA
>          cc: Nancy Fahmy, Michael Raphael
>          Subject: Deal Confos

Hello All-

below please note the final details marked in RED for Jermoluk, Redacted

Redacted

any questions, please give me a call

Thanks for the biz

Guido

NEW SPOT TRADE REQUESTED BY THOMAS JERMOLUK:

Client:   Thomas Jermoluk # 0570022
Trade Date:  Hopefully 12/12/02 - waiting for client letter of authorization
Settlement Date: 12/17/02
Thomas Jermoluk BUYS  EUR 197,309.37
Thomas Jermoluk  SELLS USD __201,452.87___
Spot Rate:  __1.0210___

Settlement:
EUR 8,037,729.43 (from the two  forward contracts) plus EUR 197,309.37 (from
the new Spot trade) should be transferred to Bigglesworth Financial Trading

                                                        DB0003741

LLC☐,s DB Internet Account 104 119 260 008 for value 12/17/02.

The Euros resulting from the above spot trade should also be delivered to
Bigglesworth Financial Trading LLC☐,s DB Internet account 104 119 260 008.

*****************************************



Please execute a new forward trade as follows:



Confidential

DB0003743

# EXHIBIT
# 24

**From:** Janet Sible
**Sent:** Monday, December 16, 2002 4:07 PM
**To:** Donna A Dickens
**Cc:** Christine Cronin; Linda Dedalto; Rudolph B Beckford; Sven Schwuchow; Willie J Griszell
**Subject:** Re: 1 MONTH EURIBOR RATE-CARDS -DEC

---

Donna,

That Promissory Note is maturing today along with the entire facility so we don't need a new rate.  Is there someone that Sven should be contacting regarding the early maturity of the Prom Note?

The principle from the Promissory Note plus all interest in account 105 507 230 016 is supposed to be transferred to Upney Financial Trading's DB Internet account 105 505 900 008.  We have a signed letter of authorization from Edouard Aslanian for the transfer.  The problem right now is that I don't have DB Direct and I've been told it will take weeks to get it set up.  Michael Laufer has assured me that Dennis Green will be able to do the transfer in the old way while we I am waiting for access.

Regards,

Janet Sible

Donna A Dickens
12/16/2002 02:56 PM

    To: Janet Sible/NewYork/DBNA/DeuBa@DBNA
    cc: Sven Schwuchow/NewYork/DBNA/DeuBa@DBNA, Willie J Griszell/NewYork/DBNA/DeuBa@DBNA, Rudolph B Beckford/NewYork/DBNA/DeuBa@DBNA, Linda Dedalto/NewYork/DBNA/DeuBa@DBNA, Christine Cronin/NewYork/DBNA/DeuBa@DBNA
    Subject: Re: 1 MONTH EURIBOR RATE-CARDS -DEC

Janet,

  Please  note that we will be updating the 1 month EURIBOR rate for the CARDS deal.
   The rate to be posted for Dec  16, will be 2.947.

Donna Dickens
(212) 454-3351

DB0003102

# EXHIBIT 25

**From:**       Mark R Westhoff
**Sent:**       Friday, January 4, 2002 6:54 PM
**To:**         Roy_hahn@chenneryassociates.com
**Cc:**         John R Marson@Bankers_Trust; Janet Sible; Francesco Piovanetti; Brian J
                McGuire@Bankers_Trust
**Subject:**    Settling Dust..

___

Roy,

Happy New Year.  Understand you are still in Asia.  I'm sure you can't wait to
get back.  The last few weeks of 2001 were a bit tense but everything seemed to
work out in the end. From what I can tell, all the clients are very satisfied
with ther results of there trades.  Cristi and Bill were a big help.

I have a few items that I need to confer with you about and thought we could
get started by email.

The accountants are asking me to firm up year-end fee accruals and I wanted to
get some idea of what to expect from the last few structured loan transactions
that we closed for Aslanian, ▮▮▮Redacted▮▮▮
▮Redacted▮ .  If you give me the formula I can pull some of the numbers together.
The fee formula for last trade we did ▮Redac▮ was 1% of the tax benefit (the
LLC CD amount in USD).  We also are expecting to be billed somewhere between
$75,000 to $100,000 in legal fees from Akin Gump for the 3 small trades which
is in excess of the fee income from these deals.  I wasn't sure what the exact
arrangement was for these trades so I wanted to get your reaction to this
issue.  Finally, the ▮Redac▮ loan matter seems to have gone quiet and I was
wondering if there is any follow up we should be pursuing there.

Let me know.

Mark

Confidential                                                           DB0001487

# EXHIBIT 26

**From:**      Janet Sible
**Sent:**      Wednesday, September 4, 2002 5:00 PM
**To:**        danderson@mycfo.com
**Cc:**        Cari LaRose
**Subject:**   Thomas Jermoluk

---

Doug,

The Lending officer is waiting to receive a copy of the Investment
Management agreement from Bernstein.  He needs to review that agreement
before he can send out a letter that acknowledges that Bernstein is
managing the account.  Both Donna (who works with Maryann Pantelione) and
Andrew Matteotti (who will be setting up the Thomas Jermoluk account) are
aware that we need the agreement and are trying to get a copy for me.  I
just found out a couple of minutes ago that we can't send out the Lien
acknowledgement letter until Lending has given its stamp of approval

Do you have a copy of the agreement between Bernstein & TJ that you can fax
over?  Do you have a blank one (if TJ hasn't signed one yet) so that we can
get moving on the Bernstein approval?  I don't anticipate any problems as
we already have Bernstein as a manager for another co-obligor account.
However, we do need a photocopy of the agreement for Lending to review.

Finally, I noticed that the paperwork coming over from Bernstein today
referenced the Thomas Jermoluk Trust.  As you probably know, the account
that we have here is in the name of "Thomas Jermoluk".  If our account is a
trust it fouls up the tax benefits to the individual.  I just want you to
be aware of that fact.

Oh, and I almost forgot...do you want to be on the foreign exchange call?
And what are your expectations on the timing?  We can execute tomorrow
morning for standard settlement on Monday....  I'm going to be out tomorrow
afternoon and Friday as well.  I would prefer to coordinate the execution
and payment of the FX trade.

Regards,

Janet

Confidential                                                                    DB0002309

# EXHIBIT 27

**From:**      Janet Sible
**Sent:**      Wednesday, September 10, 2003 2:34 PM
**To:**        Mark R Westhoff; Michael S Jacoby
**Subject:**   Business Awarded Reconciliation

---

Mike & Mark,

Mona distributed a Gross Business Awarded reconciliation this afternoon.  If you are using the numbers on it while you're in NY, please note that 2 out of the 3 CARDS deals for which we collected an additional 20bps in December 2002 (Val Vaden & Thomas Jermoluk) are not included in your total revenue numbers.  Only ████Redacted████ additional fees have made it to this report.

Each of your revenue numbers should be $113,842 higher (for a total of $227,685).  Mona will continue to work with Ellen Shin to get those revenues recognized.

--Janet

Confidential                                                                                                DB0004623

# EXHIBIT
# 28



**BrokerCheck Report**

# DB ALEX. BROWN LLC

CRD# 17790

Report #79857-75694, data current as of Sunday, January 17, 2016.

| Section Title | Page(s) |
| --- | --- |
| Report Summary | 1 |
| Registration and Withdrawal | 2 |
| Firm Profile | 3 - 12 |
| Firm History | 13 |
| Firm Operations | 14 - 55 |
| Disclosure Events | 56 |

**About BrokerCheck®**

BrokerCheck offers information on all current, and many former, registered securities brokers, and all current and former registered securities firms. FINRA strongly encourages investors to use BrokerCheck to check the background of securities brokers and brokerage firms before deciding to conduct, or continue to conduct, business with them.

- **What is included in a BrokerCheck report?**
  BrokerCheck reports for individual brokers include information such as employment history, professional qualifications, disciplinary actions, criminal convictions, civil judgments and arbitration awards. BrokerCheck reports for brokerage firms include information on a firm's profile, history, and operations, as well as many of the same disclosure events mentioned above.
  Please note that the information contained in a BrokerCheck report may include pending actions or allegations that may be contested, unresolved or unproven. In the end, these actions or allegations may be resolved in favor of the broker or brokerage firm, or concluded through a negotiated settlement with no admission or finding of wrongdoing.
- **Where did this information come from?**
  The information contained in BrokerCheck comes from FINRA's Central Registration Depository, or CRD® and is a combination of:
  - information FINRA and/or the Securities and Exchange Commission (SEC) require brokers and brokerage firms to submit as part of the registration and licensing process, and
  - information that regulators report regarding disciplinary actions or allegations against firms or brokers.
- **How current is this information?**
  Generally, active brokerage firms and brokers are required to update their professional and disciplinary information in CRD within 30 days. Under most circumstances, information reported by brokerage firms, brokers and regulators is available in BrokerCheck the next business day.
- **What if I want to check the background of an investment adviser firm or investment adviser representative?**
  To check the background of an investment adviser firm or representative, you can search for the firm or individual in BrokerCheck. If your search is successful, click on the link provided to view the available licensing and registration information in the SEC's Investment Adviser Public Disclosure (IAPD) website at http://www.adviserinfo.sec.gov. In the alternative, you may search the IAPD website directly or contact your state securities regulator at http://www.finra.org/Investors/ToolsCalculators/BrokerCheck/P455414.
- **Are there other resources I can use to check the background of investment professionals?**
  FINRA recommends that you learn as much as possible about an investment professional before deciding to work with them. Your state securities regulator can help you research brokers and investment adviser representatives doing business in your state.

**Thank you for using FINRA BrokerCheck.**



Using this site/information means that you accept the FINRA BrokerCheck Terms and Conditions. A complete list of Terms and Conditions can be found at

brokercheck.finra.org



For additional information about the contents of this report, please refer to the User Guidance or www.finra.org/brokercheck.  It provides a glossary of terms and a list of frequently asked questions, as well as additional resources. For more information about FINRA, visit www.finra.org.



# DB ALEX. BROWN LLC

**CRD# 17790**

**SEC# 8-35766**

## Main Office Location

ONE SOUTH STREET
BALTIMORE, MD  21202

## Mailing Address

ONE SOUTH STREET
BALTIMORE, MD  21202

## Business Telephone Number

410-727-1700

# Report Summary for this Firm

This report summary provides an overview of the brokerage firm. Additional information for this firm can be found in the detailed report.

## Firm Profile

This firm is classified as a limited liability company.

This firm was formed in Delaware on 12/03/1999.

Its fiscal year ends in December.

## Firm History

Information relating to the brokerage firm's history such as other business names and successions (e.g., mergers, acquisitions) can be found in the detailed report.

## Firm Operations

This brokerage firm is no longer registered with FINRA or a national securities exchange.

## Disclosure Events

Brokerage firms are required to disclose certain criminal matters, regulatory actions, civil judicial proceedings and financial matters in which the firm or one of its control affiliates has been involved.

| Are there events disclosed about this firm? | **Yes** |
|---|---|

**The following types of disclosures have been reported:**

| Type | Count |
|---|---|
| Regulatory Event | 27 |
| Civil Event | 1 |
| Arbitration | 6 |

©2016 FINRA. All rights reserved.   Report# 79857-75694 about DB ALEX. BROWN LLC. Data current as of Sunday, January 17, 2016.

www.finra.org/brokercheck



# Registration Withdrawal Information

This section provides information relating to the date the brokerage firm ceased doing business and the firm's financial obligations to customers or other brokerage firms.

**This firm terminated or withdrew registration on:**   01/12/2001

**Does this brokerage firm owe any money or securities to any customer or brokerage firm?**   No

# Firm Profile

This firm is classified as a limited liability company.

This firm was formed in Delaware on 12/03/1999.

Its fiscal year ends in December.

# Firm Names and Locations

This section provides the brokerage firm's full legal name, "Doing Business As" name, business and mailing addresses, telephone number, and any alternate name by which the firm conducts business and where such name is used.

**DB ALEX. BROWN LLC**

**Doing business as DB ALEX. BROWN LLC**

**CRD#**   17790

**SEC#**   8-35766

**Main Office Location**

ONE SOUTH STREET
BALTIMORE, MD  21202

**Mailing Address**

ONE SOUTH STREET
BALTIMORE, MD  21202

**Business Telephone Number**

410-727-1700



# Firm Profile

This section provides information relating to all direct owners and executive officers of the brokerage firm.

## Direct Owners and Executive Officers

| | |
|---|---|
| **Legal Name & CRD# (if any):** | DEUTSCHE BANK SECURITIES INC. |
| | 2525 |
| **Is this a domestic or foreign entity or an individual?** | Domestic Entity |
| **Position** | MEMBER |
| **Position Start Date** | 06/1999 |
| **Percentage of Ownership** | 75% or more |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | Yes |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | BURGESS, ROBERT WILLIAM JR |
| | 1665805 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | MANAGER |
| **Position Start Date** | 07/1999 |
| **Percentage of Ownership** | Less than 5% |
| **Does this owner direct the management or policies of the firm?** | No |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | CONNELLY, JOSEPH MICHAEL JR |
| | 2010897 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | MANAGER, CHIEF OPERATIONS OFFICER |

# Firm Profile



## Direct Owners and Executive Officers (continued)

| | |
|---|---|
| **Position Start Date** | 09/1997 |
| **Percentage of Ownership** | Less than 5% |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | DEBALMANN, YVES CHRISTIAN |
| | 1675429 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | MANAGER, CO-CHIEF EXECUTIVE OFFICER |
| **Position Start Date** | 09/1997 |
| **Percentage of Ownership** | Less than 5% |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | GRISWOLD, BENJAMIN HOWELL IV |
| | 230465 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | MANAGER, SENIOR CHAIRMAN |
| **Position Start Date** | 09/1997 |
| **Percentage of Ownership** | Less than 5% |
| **Does this owner direct the management or policies of the firm?** | No |
| **Is this a public reporting company?** | No |

# Firm Profile

## Direct Owners and Executive Officers (continued)

| | |
|---|---|
| **Legal Name & CRD# (if any):** | JUSTINI, PETER THOMAS |
| | 2097898 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | CHIEF FINANCIAL OFFICER/ FINOP |
| **Position Start Date** | 06/2000 |
| **Percentage of Ownership** | Less than 5% |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | KILEY, CHARLES F |
| | 1918304 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | MANAGER |
| **Position Start Date** | 07/1999 |
| **Percentage of Ownership** | Less than 5% |
| **Does this owner direct the management or policies of the firm?** | No |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | LAIA, CHRISTOPHER PHILIP |
| | 2837101 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | CHIEF COMPLIANCE OFFICER |
| **Position Start Date** | 08/1999 |
| **Percentage of Ownership** | Less than 5% |

**Firm Profile**



## Direct Owners and Executive Officers (continued)

| | |
|---|---|
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | MASON, ALEXANDER TAYLOR |
| | 1960682 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | MANAGER |
| **Position Start Date** | 07/1999 |
| **Percentage of Ownership** | Less than 5% |
| **Does this owner direct the management or policies of the firm?** | No |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | ROSS, JOHN ALAN |
| | 1761238 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | MANAGER |
| **Position Start Date** | 07/1999 |
| **Percentage of Ownership** | Less than 5% |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | SCHWEIZER, THOMAS S JR |
| | 416657 |

**Firm Profile**



## Direct Owners and Executive Officers (continued)

| | |
|---|---|
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | MANAGER |
| **Position Start Date** | 09/1997 |
| **Percentage of Ownership** | Less than 5% |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | SHATTUCK, MAYO A III |
| | 1464321 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | MANAGER, CO-CHIEF EXECUTIVE OFFICER |
| **Position Start Date** | 09/1997 |
| **Percentage of Ownership** | Less than 5% |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | VIRTUE, JAMES EDWARD |
| | 1236163 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | MANAGER, PRESIDENT |
| **Position Start Date** | 07/1999 |
| **Percentage of Ownership** | Less than 5% |

**Firm Profile**



## Direct Owners and Executive Officers (continued)

**Does this owner direct the management or policies of the firm?**      Yes

**Is this a public reporting company?**      No



# Firm Profile

This section provides information relating to any indirect owners of the brokerage firm.

## Indirect Owners

| | |
|---|---|
| **Legal Name & CRD# (if any):** | DEUTSCHE BANK AG |
| **Is this a domestic or foreign entity or an individual?** | Foreign Entity |
| **Company through which indirect ownership is established** | TAUNUS CORPORATION |
| **Relationship to Direct Owner** | SHAREHOLDER |
| **Relationship Established** | 05/1999 |
| **Percentage of Ownership** | 75% or more |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | DEUTSCHE BANK US FINANCIAL MARKETS HOLDING CORP. |
| **Is this a domestic or foreign entity or an individual?** | Domestic Entity |
| **Company through which indirect ownership is established** | DEUTSCHE BANK SECURITIES INC. |
| **Relationship to Direct Owner** | SHAREHOLDER |
| **Relationship Established** | 12/1986 |
| **Percentage of Ownership** | 75% or more |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | TAUNUS CORPORATION |
| **Is this a domestic or foreign entity or an individual?** | Domestic Entity |

**Firm Profile**



## Indirect Owners (continued)

| | |
|---|---|
| **Company through which indirect ownership is established** | DEUTSCHE BANK AMERICAS HOLDINGS CORPORATION |
| **Relationship to Direct Owner** | SHAREHOLDER |
| **Relationship Established** | 10/1999 |
| **Percentage of Ownership** | 75% or more |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | TAUNUS CORPORATION |
| **Is this a domestic or foreign entity or an individual?** | Domestic Entity |
| **Company through which indirect ownership is established** | DEUTSCHE BANK US FINANCIAL MARKETS HOLDING CORPORATION |
| **Relationship to Direct Owner** | SHAREHOLDER |
| **Relationship Established** | 10/1999 |
| **Percentage of Ownership** | 50% but less than 75% |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | DEUTSCHE BANK AMERICAS HOLDING CORP. |
| **Is this a domestic or foreign entity or an individual?** | Domestic Entity |
| **Company through which indirect ownership is established** | DEUTSCHE BANK US FINANCIAL MARKETS HOLDING CORPORATION |
| **Relationship to Direct Owner** | SHAREHOLDER |
| **Relationship Established** | 09/1992 |

**Firm Profile**



## Indirect Owners (continued)

**Percentage of Ownership**        25% but less than 50%

**Does this owner direct the
management or policies of
the firm?**        Yes

**Is this a public reporting
company?**        No

www.finra.org/brokercheck

User Guidance



## Firm History

This section provides information relating to any successions (e.g., mergers, acquisitions) involving the firm.

**This firm was previously:**   BT ALEX. BROWN INCORPORATED

**Date of Succession:**   12/03/1999

**Predecessor CRD#:**   17790

**Predecessor SEC#:**   8-35766

**Description**   EFFECTIVE THE CLOSE OF BUSINESS 12/03/99, BT ALEX. BROWN
INCORPORATED ("BTAB"), CONVERTED FROM A DELAWARE CORPORATION
TO A DELAWARE LIMITED LIABILITY COMPANY WHICH NOW OPERATES
UNDER THE NAME OF DB ALEX. BROWN LLC ("DBAB").  AS A RESULT OF
THE CONVERSION, DBAB SUCCEEDED TO THE ENTIRE BUSINESS ASSETS
AND LIABILITIES OF BTAB.  THERE WAS NO CHANGE IN THE NATURE OF
THE BUSINESS, THE SUPERVISORY PERSONNEL, OR THE ULTIMATE
OWNERSHIP AND CONTROL OF THE BUSINESS CONDUCTED BY BTAB.

www.finra.org/brokercheck

# Firm Operations

## Registrations

This section provides information about the regulators (Securities and Exchange Commission (SEC), self-regulatory organizations (SROs), and U.S. states and territories) with which the brokerage firm is currently registered and licensed, the date the license became effective, and certain information about the firm's SEC registration.

**This firm is no longer registered.**

**The firm's registration was from 05/01/1987 to 01/20/2005.**



# Firm Operations

## Types of Business

This section provides the types of business, including non-securities business, the brokerage firm is engaged in or expects to be engaged in.

**This firm currently conducts 18 types of businesses.**

**Types of Business**

Exchange member engaged in exchange commission business other than floor activities

Exchange member engaged in floor activities

Broker or dealer making inter-dealer markets in corporation securities over-the-counter

Broker or dealer retailing corporate equity securities over-the-counter

Broker or dealer selling corporate debt securities

Underwriter or selling group participant (corporate securities other than mutual funds)

Mutual fund underwriter or sponsor

Mutual fund retailer

U S. government securities dealer

U S. government securities broker

Municipal securities dealer

Municipal securities broker

Put and call broker or dealer or option writer

Investment advisory services

Trading securities for own account

Private placements of securities

Broker or dealer involved in a networking, kiosk or similar arrangment with a: bank, savings bank or association, or credit union

Other - PROVIDE CORRESPONDENT CLEARING AND SETTLEMENT SERVICES.

**Other Types of Business**

This firm does not effect transactions in commodities, commodity futures, or commodity options.
This firm does not engage in other non-securities business.

Non-Securities Business Description:

**Firm Operations**



## Clearing Arrangements

**This firm does hold or maintain funds or securities or provide clearing services for other broker-dealer(s).**

## Introducing Arrangements

**This firm does not refer or introduce customers to other brokers and dealers.**

©2016 FINRA. All rights reserved.   Report# 79857-75694 about DB ALEX. BROWN LLC. Data current as of Sunday, January 17, 2016.

**Firm Operations**

**Industry Arrangements**



**This firm does not have books or records maintained by a third party.**

**This firm does not have accounts, funds, or securities maintained by a third party.**

**This firm does not have customer accounts, funds, or securities maintained by a third party.**

**Control Persons/Financing**

**This firm does not have individuals who control its management or policies through agreement.**

**This firm does not have individuals who wholly or partly finance the firm's business.**

# EXHIBIT 29



**BrokerCheck Report**

# DEUTSCHE BANK SECURITIES INC.

CRD# 2525

Report #91889-92217, data current as of Sunday, January 17, 2016.

| Section Title | Page(s) |
| --- | --- |
| Report Summary | 1 |
| Firm Profile | 2 - 9 |
| Firm History | 10 |
| Firm Operations | 11 - 41 |
| Disclosure Events | 42 |

**FINRA**

**About BrokerCheck®**

BrokerCheck offers information on all current, and many former, registered securities brokers, and all current and former registered securities firms. FINRA strongly encourages investors to use BrokerCheck to check the background of securities brokers and brokerage firms before deciding to conduct, or continue to conduct, business with them.

- **What is included in a BrokerCheck report?**
  BrokerCheck reports for individual brokers include information such as employment history, professional qualifications, disciplinary actions, criminal convictions, civil judgments and arbitration awards. BrokerCheck reports for brokerage firms include information on a firm's profile, history, and operations, as well as many of the same disclosure events mentioned above.
  Please note that the information contained in a BrokerCheck report may include pending actions or allegations that may be contested, unresolved or unproven. In the end, these actions or allegations may be resolved in favor of the broker or brokerage firm, or concluded through a negotiated settlement with no admission or finding of wrongdoing.

- **Where did this information come from?**
  The information contained in BrokerCheck comes from FINRA's Central Registration Depository, or CRD® and is a combination of:
  - information FINRA and/or the Securities and Exchange Commission (SEC) require brokers and brokerage firms to submit as part of the registration and licensing process, and
  - information that regulators report regarding disciplinary actions or allegations against firms or brokers.

- **How current is this information?**
  Generally, active brokerage firms and brokers are required to update their professional and disciplinary information in CRD within 30 days. Under most circumstances, information reported by brokerage firms, brokers and regulators is available in BrokerCheck the next business day.

- **What if I want to check the background of an investment adviser firm or investment adviser representative?**
  To check the background of an investment adviser firm or representative, you can search for the firm or individual in BrokerCheck. If your search is successful, click on the link provided to view the available licensing and registration information in the SEC's Investment Adviser Public Disclosure (IAPD) website at http://www.adviserinfo.sec.gov. In the alternative, you may search the IAPD website directly or contact your state securities regulator at http://www.finra.org/Investors/ToolsCalculators/BrokerCheck/P455414.

- **Are there other resources I can use to check the background of investment professionals?**
  FINRA recommends that you learn as much as possible about an investment professional before deciding to work with them. Your state securities regulator can help you research brokers and investment adviser representatives doing business in your state.

**Thank you for using FINRA BrokerCheck.**



Using this site/information means that you accept the FINRA BrokerCheck Terms and Conditions. A complete list of Terms and Conditions can be found at

brokercheck.finra.org



For additional information about the contents of this report, please refer to the User Guidance or www.finra.org/brokercheck.  It provides a glossary of terms and a list of frequently asked questions, as well as additional resources. For more information about FINRA, visit www.finra.org.

www.finra.org/brokercheck



# DEUTSCHE BANK SECURITIES INC.

CRD# 2525

SEC# 8-17822

## Main Office Location

60 WALL STREET
NEW YORK, NY  10005
Regulated by FINRA New York Office

## Mailing Address

60 WALL STREET
NYC60-3712
NEW YORK, NY  10005

## Business Telephone Number

212-250-2500

This firm is a brokerage firm and an investment adviser firm.  For more information about investment adviser firms, visit the SEC's Investment Adviser Public Disclosure website at:

http://www.adviserinfo.sec.gov

# Report Summary for this Firm

This report summary provides an overview of the brokerage firm. Additional information for this firm can be found in the detailed report.

## Firm Profile

This firm is classified as a corporation.

This firm was formed in Delaware on 12/29/1971.

Its fiscal year ends in December.

## Firm History

Information relating to the brokerage firm's history such as other business names and successions (e.g., mergers, acquisitions) can be found in the detailed report.

## Firm Operations

**This firm is registered with:**

- the SEC
- 19 Self-Regulatory Organizations
- 53 U.S. states and territories

Is this brokerage firm currently suspended with any regulator?  **No**

This firm conducts 16 types of businesses.

This firm is affiliated with financial or investment institutions.

This firm does not have referral or financial arrangements with other brokers or dealers.

## Disclosure Events

Brokerage firms are required to disclose certain criminal matters, regulatory actions, civil judicial proceedings and financial matters in which the firm or one of its control affiliates has been involved.

Are there events disclosed about this firm?     **Yes**

**The following types of disclosures have been reported:**

| Type | Count |
|------|-------|
| Regulatory Event | 221 |
| Civil Event | 2 |
| Arbitration | 12 |

©2016 FINRA. All rights reserved.   Report# 91889-92217 about DEUTSCHE BANK SECURITIES INC. Data current as of Sunday, January 17, 2016.

# Firm Profile

This firm is classified as a corporation.

This firm was formed in Delaware on 12/29/1971.

Its fiscal year ends in December.

## Firm Names and Locations

This section provides the brokerage firm's full legal name, "Doing Business As" name, business and mailing addresses, telephone number, and any alternate name by which the firm conducts business and where such name is used.

**DEUTSCHE BANK SECURITIES INC.**

**Doing business as DEUTSCHE BANK SECURITIES INC.**

**CRD#**   2525

**SEC#**   8-17822

**Main Office Location**

60 WALL STREET
NEW YORK, NY  10005

**Regulated by FINRA New York Office**

**Mailing Address**

60 WALL STREET
NYC60-3712
NEW YORK, NY  10005

**Business Telephone Number**

212-250-2500

©2016 FINRA. All rights reserved.   Report# 91889-92217 about DEUTSCHE BANK SECURITIES INC. Data current as of Sunday, January 17, 2016.



# Firm Profile

This section provides information relating to all direct owners and executive officers of the brokerage firm.

## Direct Owners and Executive Officers

| | |
|---|---|
| **Legal Name & CRD# (if any):** | DB U.S. FINANCIAL MARKETS HOLDING CORPORATION |
| **Is this a domestic or foreign entity or an individual?** | Domestic Entity |
| **Position** | STOCKHOLDER |
| **Position Start Date** | 12/1987 |
| **Percentage of Ownership** | 75% or more |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | ARIYAN, GERALD HAIG |
| | 2326282 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | DIRECTOR |
| **Position Start Date** | 02/2013 |
| **Percentage of Ownership** | Less than 5% |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | BAUSANO, MICHAEL BARRY |
| | 1442955 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | DIRECTOR/PRESIDENT |
| **Position Start Date** | 12/2010 |

**Firm Profile**



## Direct Owners and Executive Officers (continued)

| | |
|---|---|
| **Percentage of Ownership** | Less than 5% |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |

---

| | |
|---|---|
| **Legal Name & CRD# (if any):** | BAUSANO, MICHAEL BARRY |
| | 1442955 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | CHIEF EXECUTIVE OFFICER |
| **Position Start Date** | 01/2016 |
| **Percentage of Ownership** | Less than 5% |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |

---

| | |
|---|---|
| **Legal Name & CRD# (if any):** | CLARKE, STUART |
| | 2002754 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | DIRECTOR |
| **Position Start Date** | 03/2006 |
| **Percentage of Ownership** | Less than 5% |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |

---

| | |
|---|---|
| **Legal Name & CRD# (if any):** | HANTHO, MARK ALBERT |

# Firm Profile



## Direct Owners and Executive Officers (continued)

| | |
|---|---|
| | 2975486 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | CHAIRMAN |
| **Position Start Date** | 04/2013 |
| **Percentage of Ownership** | Less than 5% |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | JUUL, JOHN MARTIN |
| | 2937484 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | CO-CHIEF COMPLIANCE OFFICER- CORP. BANKING & SECURITIES |
| **Position Start Date** | 07/2014 |
| **Percentage of Ownership** | Less than 5% |
| **Does this owner direct the management or policies of the firm?** | No |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | KLOBY, ROBERT ANTHONY JR |
| | 1299725 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | CO CHIEF COMPLIANCE OFFICER - ASSET & WEALTH MGT. |
| **Position Start Date** | 01/2013 |
| **Percentage of Ownership** | Less than 5% |



# Firm Profile

## Direct Owners and Executive Officers (continued)

| | |
|---|---|
| **Does this owner direct the management or policies of the firm?** | No |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | KLOBY, ROBERT ANTHONY JR |
| | 1299725 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | CHIEF COMPLIANCE OFFICER FOR INVESTMENT ADVISER |
| **Position Start Date** | 10/2011 |
| **Percentage of Ownership** | Less than 5% |
| **Does this owner direct the management or policies of the firm?** | No |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | MASSARO, TIBERIO |
| | 1847137 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | DIRECTOR/CHIEF FINANCIAL OFFICER/FINOP |
| **Position Start Date** | 02/2015 |
| **Percentage of Ownership** | Less than 5% |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | PATRICK, THOMAS HAROLD JR |
| | 2372257 |

**Firm Profile**



## Direct Owners and Executive Officers (continued)

| | |
|---|---|
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | DIRECTOR |
| **Position Start Date** | 04/2013 |
| **Percentage of Ownership** | Less than 5% |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | REICH, STEVEN FREDERICK |
| | 6483435 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | GENERAL COUNSEL |
| **Position Start Date** | 04/2015 |
| **Percentage of Ownership** | Less than 5% |
| **Does this owner direct the management or policies of the firm?** | No |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | SIMON, SCOTT ALAN |
| | 1358198 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | DIRECTOR |
| **Position Start Date** | 12/2010 |
| **Percentage of Ownership** | Less than 5% |

# Firm Profile



## Direct Owners and Executive Officers (continued)

| | |
|---|---|
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | STUCCHIO, ANTHONY |
| | 2198592 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | CHIEF OPERATIONS OFFICER |
| **Position Start Date** | 04/2009 |
| **Percentage of Ownership** | Less than 5% |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |



# Firm Profile

This section provides information relating to any indirect owners of the brokerage firm.

## Indirect Owners

| | |
|---|---|
| **Legal Name & CRD# (if any):** | DB USA CORPORATION |
| **Is this a domestic or foreign entity or an individual?** | Domestic Entity |
| **Company through which indirect ownership is established** | DB U.S. FINANCIAL MARKETS HOLDING CORPORATION |
| **Relationship to Direct Owner** | SHAREHOLDER |
| **Relationship Established** | 09/2000 |
| **Percentage of Ownership** | 75% or more |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | DEUTSCHE BANK AG |
| **Is this a domestic or foreign entity or an individual?** | Foreign Entity |
| **Company through which indirect ownership is established** | DB USA CORPORATION |
| **Relationship to Direct Owner** | SHAREHOLDER |
| **Relationship Established** | 05/1999 |
| **Percentage of Ownership** | 75% or more |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | Yes |

www.finra.org/brokercheck

# Firm History



This section provides information relating to any successions (e.g., mergers, acquisitions) involving the firm.

No information reported.

# Firm Operations

**FINRA**

## Registrations

This section provides information about the regulators (Securities and Exchange Commission (SEC), self-regulatory organizations (SROs), and U.S. states and territories) with which the brokerage firm is currently registered and licensed, the date the license became effective, and certain information about the firm's SEC registration.

**This firm is currently registered with the SEC, 19 SROs and 53 U.S. states and territories.**

| Federal Regulator | Status | Date Effective |
|---|---|---|
| SEC | Approved | 11/26/1973 |

## SEC Registration Questions

This firm is registered with the SEC as:

A broker-dealer:     Yes

A broker-dealer and government securities broker or dealer:    Yes

A government securities broker or dealer only:     No

This firm has ceased activity as a government securities broker or dealer:    No

| Self-Regulatory Organization | Status | Date Effective |
|---|---|---|
| FINRA | Approved | 03/16/1940 |
| BATS Y-Exchange, Inc. | Approved | 10/11/2010 |
| BATS Z-Exchange, Inc. | Approved | 10/15/2008 |
| BOX Options Exchange LLC | Approved | 05/07/2012 |
| C2 Options Exchange, Incorporated | Approved | 08/15/2011 |
| Chicago Board Options Exchange | Approved | 04/25/1996 |
| Chicago Stock Exchange | Approved | 11/02/1993 |
| EDGA Exchange, Inc. | Approved | 05/21/2010 |
| EDGX Exchange, Inc. | Approved | 05/21/2010 |
| ISE Gemini, LLC | Approved | 08/01/2013 |
| International Securities Exchange | Approved | 05/01/2000 |
| Miami International Stock Exchange (MIAX), LLC | Approved | 01/25/2013 |
| NASDAQ OMX BX, Inc. | Approved | 03/18/2009 |
| NASDAQ OMX PHLX, Inc. | Approved | 11/26/1973 |
| NASDAQ Stock Market | Approved | 07/12/2006 |

www.finra.org/brokercheck

| | | |
|---|---|---|
| NYSE Arca, Inc. | Approved | 10/01/1973 |
| NYSE MKT LLC | Approved | 02/26/1988 |
| National Stock Exchange | Approved | 11/20/2015 |
| New York Stock Exchange | Approved | 11/17/1982 |

©2016 FINRA. All rights reserved.   Report# 91889-92217 about DEUTSCHE BANK SECURITIES INC. Data current as of Sunday, January 17, 2016.

**Firm Operations**



## Registrations (continued)

| U.S. States & Territories | Status | Date Effective | U.S. States & Territories | Status | Date Effective |
|---|---|---|---|---|---|
| Alabama | Approved | 03/26/1990 | North Carolina | Approved | 07/15/1982 |
| Alaska | Approved | 02/13/1990 | North Dakota | Approved | 03/09/1990 |
| Arizona | Approved | 02/09/1988 | Ohio | Approved | 07/16/1982 |
| Arkansas | Approved | 01/05/1984 | Oklahoma | Approved | 09/14/1987 |
| California | Approved | 09/28/1973 | Oregon | Approved | 11/25/1985 |
| Colorado | Approved | 02/01/1983 | Pennsylvania | Approved | 04/05/1960 |
| Connecticut | Approved | 10/01/1973 | Puerto Rico | Approved | 12/07/2000 |
| Delaware | Approved | 10/06/1981 | Rhode Island | Approved | 11/25/1983 |
| District of Columbia | Approved | 11/02/1983 | South Carolina | Approved | 11/14/1985 |
| Florida | Approved | 04/27/1983 | South Dakota | Approved | 03/14/1990 |
| Georgia | Approved | 02/16/1984 | Tennessee | Approved | 03/08/1990 |
| Hawaii | Approved | 09/08/1986 | Texas | Approved | 07/25/1983 |
| Idaho | Approved | 03/02/1990 | Utah | Approved | 04/09/1990 |
| Illinois | Approved | 09/28/1973 | Vermont | Approved | 02/13/1984 |
| Indiana | Approved | 08/17/1987 | Virgin Islands | Approved | 12/21/2005 |
| Iowa | Approved | 04/02/1990 | Virginia | Approved | 09/22/1983 |
| Kansas | Approved | 10/19/1983 | Washington | Approved | 11/08/1983 |
| Kentucky | Approved | 10/07/1987 | West Virginia | Approved | 03/20/1990 |
| Louisiana | Approved | 04/20/1983 | Wisconsin | Approved | 10/02/1972 |
| Maine | Approved | 02/09/1984 | Wyoming | Approved | 03/06/1990 |
| Maryland | Approved | 10/03/1981 | | | |
| Massachusetts | Approved | 07/31/1981 | | | |
| Michigan | Approved | 02/02/1983 | | | |
| Minnesota | Approved | 07/15/1982 | | | |
| Mississippi | Approved | 03/02/1990 | | | |
| Missouri | Approved | 07/18/1983 | | | |
| Montana | Approved | 02/26/1990 | | | |
| Nebraska | Approved | 04/02/1990 | | | |
| Nevada | Approved | 02/22/1990 | | | |
| New Hampshire | Approved | 10/04/1983 | | | |
| New Jersey | Approved | 07/13/1983 | | | |
| New Mexico | Approved | 02/14/1984 | | | |
| New York | Approved | 01/02/1985 | | | |

©2016 FINRA. All rights reserved.   Report# 91889-92217 about DEUTSCHE BANK SECURITIES INC. Data current as of Sunday, January 17, 2016.

www.finra.org/brokercheck 



# Firm Operations

## Types of Business

This section provides the types of business, including non-securities business, the brokerage firm is engaged in or expects to be engaged in.

**This firm currently conducts 16 types of businesses.**

**Types of Business**

| |
|---|
| Exchange member engaged in exchange commission business other than floor activities |
| Exchange member engaged in floor activities |
| Broker or dealer making inter-dealer markets in corporation securities over-the-counter |
| Broker or dealer retailing corporate equity securities over-the-counter |
| Broker or dealer selling corporate debt securities |
| Underwriter or selling group participant (corporate securities other than mutual funds) |
| Mutual fund retailer |
| U S. government securities dealer |
| U S. government securities broker |
| Municipal securities dealer |
| Municipal securities broker |
| Put and call broker or dealer or option writer |
| Investment advisory services |
| Trading securities for own account |
| Private placements of securities |
| Broker or dealer selling interests in mortgages or other receivables |

**Other Types of Business**

This firm does effect transactions in commodities, commodity futures, or commodity options.
This firm does not engage in other non-securities business.

Non-Securities Business Description:

©2016 FINRA. All rights reserved.   Report# 91889-92217 about DEUTSCHE BANK SECURITIES INC. Data current as of Sunday, January 17, 2016.